80 ( A )  <u>Specificity as to the terms of the Contract that was breached</u>

(1) The Contract is the Deed of Trust Between Plaintiff and Wells Fargo Defendant. Ex# (DT) for Deed of Trust. (2) The expressed terms of the contract at paragraph five prohibits  Wells Fargo Defendant from obtaining LPI with knowledge of existing voluntary coverage. Such prohibition is a duty of care Wells Fargo owes to Plaintiff. The contract contains a reasonable clause, which imposes on the parties to exercise their duties under the contract reasonably, which is also a duty, one of mutuality; the same is a duty of care Wells Fargo owes to Plaintiff. The contract contains neither expressed or implied provisions that requires Plaintiff to report to Defendant her coverage status unless Defendant make the request of her as to the status.

81.(B). The duty not to place LPI on Plaintiff's property when she maintained coverage was breached when Defendant placed the LPI on Plaintiff's property as expressed and evidenced herein.

82. (C )  The reasonable clause in the contract was breached by Defendant when Defendant obtained the coverage at an exorbitant rate, as revealed in Plaintiff's original complaint  and attached exhibits  and as to the new Defendants'  Exhibits A,B,C, and D, specifically Exhibit

A, which provide LPI coverage at a premium of $7,844.30 for 90-Days, with the coverage extending for one year(05/05/10 to 05/05/11), which amounts to $31,376 for the entire year, as expressed in the facts herein. Further all known and unknown LPI and associated costs as to Defendants on Plaintiff's property shall constitute a separate breach under this Breach of Contract allegation. The $31,376 hidden cost of the years coverage is a material misrepresentation of Fact designed to specifically deceive Plaintiff and to acquire money from Plaintiff as a result of the deception. Plaintiff was in fact deceived and suffered monetary damages as a result of the deception.

83.(D) No contributory Negligence by Plaintiff exist because she had no prior knowledge of the LPI  before it was placed on her property and had remained there for quite some time. See Plaintiff's Affidavit.

84.(E) <u>The damages</u> sustained as a result of the Breach of Contract is the money Defendant admits that it charged Plaintiff in  MELS #1 $60.43, and $371.29, charged on  10/03/2011 and the charges displayed  in MELS #2, $7,412.58 and $8,011.20; dated 01/12/11 and 05/05/2011, and other damages yet unknown but known by Wells Fargo Defendant.  59 (F ) <u>Request for Award of Damages</u>:  Plaintiff prays for

any and all relief permissible by law and equity and to be Placed in a

position as good as the one she would have enjoyed had the contract not

been breached.

**COUNT TWO**
**Malicious breach of contract**
UNDER THE LEGAL THEORY OF COMMON LAW FRAUD
**AGAINST DEFENDANT WELLS  FARGO**

**PLAINTIFFF MAKES A CLAIM FOR WILFUL AND
MALICIOUS BREACH OF CONTRACT AGAINST DEFENDANT
WELLS FARGO BASED ON ALL OF THE FOREGOING FACTS IN
THE COMPLAINTAND ESPECIALLY COUNT ONE BREACH OF
CONTRACT CLAIM**

85.. Willful Malicious Breach of Contract: All of the above aforementioned acts and

Omissions by Defendant that constituted breach of contract were perpetrated with

malice, ill will with specific intent to defraud Plaintiff and the Class and false

representation of a material fact.

A. Malice, ill well are demonstrated by Defendant because Defendant had actual

knowledge of Plaintiff existing coverage; Defendant maliciously and intentionally

with the specific intent to deceive Plaintiff  did not and refused to provide Plaintiff

with prior notice of the LPI; further with malice with the specific intent to deceive

Plaintiff, Defendant obtained the LPI with full knowledge that the obtainment was

expressly prohibited due to the existing coverage.

B. The Deception was profit motivated for the purpose of obtaining money from

Plaintiff for shared kickbacks between Wells Fargo Defendant and QBE Defendant.

0115

C.  Plaintiff justifiably and reasonably relied on Defendant to adhere to the terms of the Contract.

D.  By obtaining LPI at an exorbitant rate as shown in Defendant's Ex. A, Doc#9-2, Page 7,and Plaintiff's Exhibits MELA #1 and MELS#2, with full knowledge that the breach was being made for profit and for illegal purposes, maliciously breached the terms of the Contract.

E.  <u>Special Relationship</u>: Defendant Wells Fargo Defendant created a special relationship with Plaintiff when it acted in contravention and outside of the contract by obtaining the LPI, Servicing the LPI, Receiving Payments for the LPI even though the Policy was issued by QBE Insurance Corporation. All such performances were malicious with the specific intent to Deceive Plaintiff and were also extra contractual performances.

F.  Wells Fargo Defendant willfully, intentionally with malice and the specific intent to deceive Plaintiff, manipulated Paragraph five of the agreement to (1) shield its self from Liability, (2) Justify the exorbitant rates, (3) and to victimize Plaintiff by falsely stating that she caused the placement of the LPI because she did not respond to request for proof of coverage when Defendant know that such inquiry was never sent to Plaintiff.

G.  <u>Plaintiff was deceived by Defendant's</u> Intentional Malice act which were performed for deception purposes.

H.  As a direct result of the Deception, Plaintiff suffered monetary loses as known and displayed in EX MELS#2, MELS#1, Defendant's EX B , Doc# 9-2, Page 7 and

0116

other and further damages known and unknown because the information of their
existence is within the exclusive dominion and control of Defendant.

I.   Damages: Plaintiff prays for punitive damages against Defendant in the
amount of $5,000,000 because Defendant's acts are shocking to the conscious of a Sane
Civilized Society.

### COUNT THREE
### FRAUD AGAINST QBE DEFENDANT
### FIRST CLAIM

86. Plaintiff incorporates the preceding portion of the complaint as if the same were
Expressed herein Count Three for all practical purposes, including but not limited to
anticipated Rule 12 (b) and Rule 56 Motions.

87. (A)  FACTS UPON WHICH FRAUD IS BASED IN ADDITION TO THE
PRECEEDING FACTS:

#### First fraudulent act –separate cause of action

88. Based on new information provided by Wells Fargo Defendant, but not known to
Plaintiff on February 7, 2012, QBE Defendant issued the following: (a) Doc# 9-2 (90 Day
Binder) Dated 05/20/10–Amount of Insurance $834,500-Premium $7, 844.30-Total Charge
$7,844.30. Policy Terms From: 05/05/10 to 05/05/11. Doc# 9-2 correspond to QBE
Notification Letter dated 01/10/12 which expressly states: : If applicable, your account will
be credited:$7,844.30". The statement indicates that QBE was paid and did receive from
Plaintiff's account with Defendant Wells Fargo the quoted amount. However, there were
two simultaneous policies on the property issued by QBE for identical coverage's and

0117

premiums. For this allegation, Plaintiff is left to believe, without further evidence, that the coverage's and premiums represent one policy but circumstances indicate differently.

89 ( A)   False  Representation of Material Fact:  QBE Defendant falsely represented that (1) Plaintiff was without coverage when it had actual knowledge that Plaintiff maintained coverage. The proof of coverage was discovered by Defendant when it searched Defendant's Wells Fargo Data base. Therefore the false representation is one of material fact with the intent to deceive. (2) The 90 Day Binder and the quoted amount therein was a false misrepresentation of material fact with Defendant's specific Intent to Deceive Plaintiff to accept what was presented as  low rate coverage, but in fact was excessive courage in the amount of $31,536. At all times Defendant knew that the quoted amount was false and that if Plaintiff was successfully deceived, and abandon her voluntary coverage, she would be bound by her ignorance as to the yearly cost. (3) Plaintiff relied on the false representation of material fact because she, to her financial detriment, as admitted by QBE Defendant, paid $7,844.30 to said Defendant.(4) The  known damages Plaintiff suffered as a direct result of Defendant's intentional  misrepresentation of material fact with the specific intent to deceive and in fact did deceive Plaintiff  is $7,844.30.

Prayer for Damages : Plaintiff seek compensatory damages to the in the amount of which she was deceived and in addition an amount of $100,000 and Punitive Damages in the amount of One Million $1,000,000 , cost and reasonable attorney fees.

### COUNT FOUT:    SECOND FRAUD COUNT AGAINST QBE DEFENDANT

90. Plaintiff incorporate all the preceding facts and allegation as against a 12 (b) (6) and

41

0118

Summary Judgment motion as if the same were expressly written in Count Four.

91. (1)  the Cause of Action is based on the following facts in conjunction with the aforementioned fact. (1) Defendant's Exhibit D Doc#9-5 Page 6. The document is from Defendant QBE and it represents (Additional Named Insurance Certificate. Amount of insurance $834,500./ Premium $8,011.20; Total Charge $8,011.20. The Document is dated 05/17/11. Plaintiff was charged with the amount as revealed on her Mortgage EquityLoan Statement dated 04/14/2012, Ex MELS#2 (Transaction Amount 05/05/2011 Hazard Insurance premium reversal $8,011.20.) (2) The False Representation of a material fact is that Defendant was fully aware of Plaintiff's existing coverage for more than one year prior to this second application of coverage, but place additional coverage on the property for huge profits, as it did previously, through excessive premium cost to be shared with QBE and Wells Fargo Defendant. (2) The False representation of material fact was presented to Plaintiff  through MELS#2, but without Plaintiff having the opportunity to reject the same because she was presented only with the cost of the coverage. (3) Defendant made the false material misrepresentation with malice, knowing the falsity of the same, with specific intent to deceive and defraud Plaintiff for money. (4) DETRIMENTAL RELIANCE  Plaintiff relied on the false, malicious representation of false material facts because she trusted Defendant Wells Fargo and Defendant used that trust to cause Plaintiff to Pay money to QBE in the amount of $8,011.20 Plaintiff received absolutely no consideration for the payment of $8,011.20.  Damaged:  As a direct result of Defendant  consciously known falsification of  material facts specifically designed to deceive Plaintiff, Plaintiff was in

fact deceived and suffered known damages in the amount $8,011.20 and damages yet to

realize and damages unknown .

<u>Prayer for relief:</u>  Plaintiff prays for Punitive Damages in the amount of One Million

$1,000,000 Dollars and compensatory damages in the amount of $3,000,000 and

reasonable attorney fees and cost.

### COUNT FOUR-THIRD COUNT OF FRAUD AGAINST QBE
### FRAUD

92.  Plaintiff incorporates all preceding facts and allegations herein  as if the same were

expressly stated  here in Count Five for all intended purposes including but not limited

12 (b) (6) and Rule 56 Motions.


93. QBE Defendant made a false representation of material fact as to  Wells Fargo

Defendant Exhibit  B, Doc# 9-4 Page 5, dated 08/03/10 Titled Additional Named

Insurance Certificate with coverage on Plaintiff's property in the amount of $834,500 at

a premium Cost of $7,844.30; Policy Term From 05/05/11.  <u>Bases of the allegations</u> are

(1) The 90 Day Binder of 05/20/10, Doc#9-2 Page 7, with identical coverage and

premium cost had already been issued by QBE Defendant. The notification date are

different: 90-Day Binder notification date is 05/20/10-as opposed to the Certificate:

08/03/10. The policy numbers are different: LRE780124594 represents the <u>certificate</u> as

oppose to <u>Binder</u> Number BFI0019915969 represented by the 90 Day Binder. Plaintiff

Ex#3 represents QBE potential credit to Plaintiff for  Policy Number LRE78012594

Doc# 9-4 Page 5, but there is no indications for credit to Plaintiff for then 90-Day

Binder. (2) Defendant's had actual knowledge that Plaintiff maintained coverage on the

property for the period of time Defendant Place the (90-Day Binder-, Doc#9-2, yet

0120

Defendant with full knowledge that the property was insured no with two policies,

Defendant issued yet a second policy of its own in the form of **ADDITIONAL NAMED**

**INSURANCE CERTIFICATE** . (3) The double placement of LPI in addition to the

voluntary courage, was done by Defendant with malice, recklessness, and with an evil

intend to deceive Plaintiff for monetary profits to be shared by QBE Defendant and

Wells Fargo Defendants. (4) Plaintiff justifiably relied on Defendants' false, malicious

representation with the intent to deceive her of monetary value because she trusted

Defendant Wells Fargo, (5) and Plaintiff was in fact deceived by the false

representation specifically designed to defraud her and as a direct consequence, the

amount of the coverage, $7,844.30 was added to principal of Plaintiff's Home Equity

Loan with Defendant Wells Fargo and Plaintiff made monthly payment of the same

for over a year. See Plaintiff Ex MELA#1 and #2.

Prayer for damages: Plaintiff prays for punitive damages in amount equal to the

satisfaction of a reasonable jury and restitution for the money taken fro her by

Defendant, reasonable attorney fees and cost.

## COUNT FIVE
### (VIOLATION OF MARYLAND UNFAIR OR DECEPTIVE TRADE)
### (PRACTICE ACT)

94. Plaintiff restate and incorporate all allegation and facts in ALL paragraph(S) one through

ALL PRECEDING PARAGRAPHS as if the same were actually expressen here in count

0121

seven.

**95.** Defendant (s) is subject to the Maryland Unfair or Deceptive Trade Protection Act ( the

" Act") as defendant extended  consumer credit to Plaintiff pursuant to a consumer Contract "

" Deed of Trust" real property under Maryland Code Title 13-301 (2) (i) and (iv)  and engaged in

collecting CPI  premiums for Plaintiff for the obtainment  of unnecessary and unilateral purchase

of CPI ( collection of Consumer Debt by way of premiums and mortgage payments) under

section 13-101.1,13-303 (3) (4) and 13 -303 (4).

## DUTY OF CARE

**96.** Defendant (s)  owed Plaintiff a duty of reasonable care

97. To not make false and misleading oral or written statement and other representation

which had the capacity, tendency, or effect of deceiving or misleading the laintiff

( Maryland Code sec . 13-301 (1)).  **Defendants QBE and Defendant Wells Fargo, as decribed by the
Documents, cited herein, and as expressed in the fraud allegaions against the Defendants, willfully,
knowlingly and with malicice and  spectfic intent to defraud Plaintiff made false representations of
material fact for the specific purpose of  accumulating  to be shared between Defendants at
Plaintiff's expense as cited herein. The false reresentations were made to Plaintiff in Defendants
Exhibits. A,B,C and D where Defendants charged Plaintiff thousands of dollars for the unilateral
LPI on her property as demotrated in Plaintiff's Exhibits MELA#1 and#2. Plaintiff, a Consumer
was in fact deceived by said acts and she relied reasonably on said false representation and as a
result of her reliance  on the fase representation she suffered damages in the form of monetary
paymens to Defendant. Further Defendants violated the provisions of the Truth in Lending Act in
that they intentionally, maliciously and with the intent to specifically deceive Plaintiff refused and**

0122

failed to disclose the true cost of the LPI and further refused to provide Plaintiff with the Binders,

Policies and other Documentation representing the Placement of the LPI until well after the the

Placement of the LPI. Said disclosure was first made to the Court as Defendant, Wells Fargo

Exhibit A,B,C and D. Again, Plaintiff suffered Thousands of Dollars in damages as disclosed by

Plaintiff's Exhibits and Defendant's Exhibits.


98. Information for a more extensive allegation is not yet available to Plaintiff because upon

information and belief, Defendant is hiding or otherwise concealing important financial documents

of further cost to Plaintiff which she has paid Defendant in response to said hidden cost.

Prayer for relief:   Plaintiff prays for any and all statutory monetary and equitable relief, including

punitive damages available and permissible by law and equity.


### COUNT SIX
### FRAUD
### FRAUDULENT CONSEALMENT

### AGAINST WELLS FARGO DEFENDANT AND QBE DEFENDANT
### JOINTLY AND SEVERALLY FOR FRAUDULENT CONSEALMENT

99. Plaintiff restates all allegations and proceeding facts as if the same were cited

herein for all practical purposes including the cited anticipated motions as if the

same were cited herein.

(1) Duty of Care: Defendants owe Plaintiff a duty of care to disclose all debts,

liabilities, and financial obligations Defendant may have charged to Plaintiff and

legally bound or otherwise obligated Plaintiff to pay money either to Wells Fargo,

QBE or any other third party. Both Defendants breach the duty when they

maliciously, intentionally, and deceitfully with the specific intent to defraud

Plaintiff, refuse to (a) inform Plaintiff of their obtainment of the LPI on her

0123

property (b) inform Plaintiff of the excessive premium charge; (c) inform Plaintiff of the debt obligation to her for the premium for the LPI; (d) inform Plaintiff that she was paying for duplicative insurance and most importantly, (e) inform Plaintiff that her Mortgage Loan Payoff balance would be substantially altered by the additional cost attached to the principal of the Mortgage Loan. (f) Plaintiff relied to her detriment on Defendants' specific intent to deceive her and she was in fact deceived and as a consequence of the Deception, Plaintiff, for more than one year paid Defendants monthly payments toward the premium cost of the LPI.  (g) Plaintiff suffered financially in the amount of $7,412.58 and $8,011.20 as expressed on EX# MELS#2 and# 1.

100.  Wherefore, on the Joint Claim for Fraud, Plaintiff seeks punitive damages against the Defendants jointly and severally in the amount of Five Million ($5,000,000) Dollars.

101.  Wherefore, as to the count of Fraudulent concealment, Plaintiff seeks to toll the statute of limitation on all claims in law or equity she may have against for illegal acts not yet disclosed but may be disclosed beyond the one year or the  three statutory period.


### COUNT SEVEN
### COMMON LAW FRAUD AGAINST: QBE DEFENDANT AND WELLS FARGO  DEFENDANT, JOINTLY AND SEVERALLY

102.  Plaintiff incorporate the entire preceding factual allegations and theories of law into this count as if the same were expressed herein for all aforementioned

0124

practical purposes.

## AGENCY BETWEEN THE PARTIES:

103. An Agency Relationship exist between Defendant Wells Fargo and QBE

Defendant, based on the following facts:

(1) <u>Selection</u>: Wells Fargo selected QBE as it agent for the purpose of placing LPI

on Wells Fargo Customers throughout the United States and specifically the State

of Maryland.  The selection and procurement process by Wells Fargo as to LPI is

demonstrated by evidence in the instant case. See Defendants Wellss Fargo

Exhibits A, B.C.and D. There,  Wells Fargo Selects QBE as the captive provider of

LPI.

(2). <u>Control</u>: Wells Fargo Defendant controls the activity of QBE through

Advertisement. Wells Fargo solicit customers for QBE through advertisement  that

offer Homeowners low premium rates to lieu them to purchase coverage, where in

reality the rates are exhorbitant .  See Exhibits A, B, C, and D.  By advertisement,

Wells Fargo explains that QBE will place the LPI on the property.

(3).<u>Payment for the LPI. Defendant</u>: Wells Fargo controls the payment for the LPI

by attaching the cost of the LPI to the Principal of the Customer  Home Equity

Loan held and serviced by Wells Fargo, See Plaintiff's  Exhibits MELS #1 and#2 as

evidence of the collection of Payment. Wells Fargo has the power to cancel the

payment, alter the payment amount and reverse the payment for the PLI.

(4)(<u>Power to Discharge</u>: Wells Fargo has the power to discharge QBE as a captive

Ageny for Wells Fargo in several ways (i) Disallow QBE access to it data base for

the search for its mortgage customers  because without access to the Data Base,

0125

QBE would not be able to identify those upon whom to place the LPI .(ii) Deny payment to QBE and (iii) are just simply discharge QBE.

(5) **POWER TO CONTROL**: Wells Fargo exercise its power to control QBE and all of QBE activities for Wells Fargo  through the selection and procurement process of  Wells Fargo Customer upon whom LPI is obtained; dictate to QBE the amount of the premium to be charged to the customer because the Defendant's jointly agree to secure coverage at a very high premium cost for profit to be shared between them at the expense of the customer.

(6) **THE WORK AS TO THE LPI  IS PART OF THE REGULAR BUSINESS OF THE EMPLOYER, Wells Fargo Defendant.**

Wells Fargo Insurance Inc., as stated herein, is a business that deals with homeowners and commercial insurance and the same for QBE. All of QBE activities, as evident, is associated with and is a part of Wells Fargo's Insurance business and activities.Wherefore, the agency relationship processed the LPI and placement of the same on Plaintiff's property and the property of the class members.


104.    **RESPONDEA SUPERIOR**: The acts of QBE are the Acts of Wells Fargo and Wells Fargo is vicariously liable for the acts of QBE and vice versa.


**JOINT ACTIVIIES  SPECIFICALLLY  DESIGNED  TO  DECEIVE  AND DEFRAUD  PLAINTIFF  OF  HER  MONEY( was successful)**

**ALLEGATIONS OF FRAUD**

105.    By way of agreement, Defendants' acted jointly with the specific intent to defraud Plaintiff on the class of their money for the purpose of profit sharing in the form of kickbacks.

0126

## FALSE REPRESENTATION OF MATERIAL FACTS:

106.    The false representation of material facts are contained in Defendant'sExhibits A,B,C and D, where Defendant, on the dates specified on each document, Charged Plaintiff for the LPI by representing falsely that the LPI was placed on the property because Plaintiff was without coverage or proof of coverage. Where as Defendant maintained Plaintiff's proof of coverage by way of communication with Old Dominion, Plaintiff insurance Agency and the information of Wells Fargo's Data Base.

107. The False representation made to Plaintiff by way of the aforementioned Exhibits and through Plaintiff's Ex MELS#1 and 2, where Defendant charge Plaintiff $60.43; $371.29; $7,412.58;$8,011.20. And where QBE, as to Defendant's Exhibits A,B.C and D charged Plaintiff $$7,844.30;  $8,011.20 and other payment charges known and unknown.


## DEFENDANT'S KNOWLEDGE OF THE FALSITY OF THE MATERIAL ACTS:

107.  Defendant s had documentation that informed them of Plaintiff's coverage and had full knowledge that their representation that Plaintiff had no proof of coverage or that she had not provided proof of coverage was false and that the LPI was procured for profit sharing between the parties charged to Plaintiff with no consideration to Plaintiff.

## THE FALSE MATERIAL FACTS WERE PRESENTED TO PLAINTIF WITH MALICE, WITH THE SPECIFIC INTENT TO  DECEIVE AND DEFRAUD PLAINTIFF.

108. Defendant, with malice and with the specific Intent to Defraud Plaintiff, made the false representations to Plaintiff for profit sharing to Plaintiff's and the Class

0127

financial detriment. Defendants falsely contend that Exhibits A,D,C and D were provided Plaintiff prior to the Placement of theLPI when in fact they wer not and Defendants are fully aware that they are false representing theses facts as an affirmative defendae for their fraudulent activities.

## PLAINTIFF WAS IN FACT DECEIVED BY THE FALSE REPRESENTATIO N

109. Plaintiff was in fact deceived by Defendants false representation because she was charged and paid to Defendants, upon actual facts, and information and belief, thousands of dollars as demonstrated and revealed in Plaintiff's Ex.MELS#1 and #2. For proof of QBE's Placement of the LPI , See Defendant's Exbibits A. 05/20/10 Page 7, Doc#9-2 where Plaintiff was charged $7,844.30; ExB where QBE charged Plaintiff for LPI in the amount of $7,844.30,dated 08/03/10 Doc#9-4, Page 5, and where QBE charge Plaintiff for the PLI in the amount of $8,011.20 for Additional Named Insurance dated 05/17/11 and where some of the charges and dates match those contained on Plaintiff ExMELS #1 and #2.

## PLAINTIFF JUSTIFIABLY RELIED ON FLASE REPRESENTATIONS TO HER DETRIMENT:

110. Plaintiff justifiably and reasonable relied on Defendants' false representation of matrial fact to her detriment by making payments on the premiums charged to her monthly equity payments to Defendants. Defendants retained the money paid by Plaintiff and shared the same in kickbacks disguised a commissions.

0128

52

## PLAINTIFF WAS DAMAGED BYTHE DEFENDANS' DECEPTION.

**111.  Plaintiff was damaged monetarily (i)through payments she made to Defendants as explained in Plaintiff's ExMELS #1 and #2 and as demonstrated by Defendant's Exhibits A,B,C and D. (ii) Some of the premium cost was attached to the principal of Plaintiff mortgage with Defendant, Wells Fargo which accumulated Interest and altered the terms of Plaintiff contract with Defendant.**

## PLAINTIFF PRAYS FOR DAMAGES AGAINST DEFENDANTS JOINTLY AND SEVERALLYAS FOLLWS:

**112. Plaintif prays for punitive damages against Defendants jointly and severally in the amount of Ten Million Dollars and Compensatory damages in the amount of $300,000, restitution of all finaccial considerations taken from her by Defendants and cost and reasonable attoney fees.**

### COUNT SEVEN

### BREACH OF FIDUCIARY DUTY

112. Plaintiff repeats and incorporates  the allegations contained herein.

113.  Pursuant to the customer and banking relationship between Plaintiff and Defendant, the mortgagee mortgager relationship between Plaintiff and Defendant and the Creditor Debtor relationship between Plaintiff and Defendant and the Creditor relationship between Plaintiff and Defendant, Defendant owed Plaintiff a fiduciary duty, which include duty to (1) Disclose to Plaintiff the management of her Deed of Trust and security payments for collateral Insurance Protection (2) and to not purchase CIP unnecessarily;   to not charge Plaintiff's account for the CPI without her expressed knowledge and consent; (4) and to not  discredit Plaintiff's account with Defendant with the  sum of the premium for the purchase of the unnecessary CPI.

0129

53

## BREACH OF FIDUCIARY DUTY

114. Defendant failed and otherwise intentionally refused to obtain affirmative consent from Plaintiff

to authorize Defendant to obtain CPI and to charge her with the premium for the CPI. Thus Defendant

breached the enumerated duties, one , two, three and four as expressed in paragraph  48.

115. Defendant's breached was conscious, intentional, deliberate, wanton and malicious and contrary to

normal banking  practiced and with reckless disregard for Plaintiff as a human being.  **(A) Defendant

Wells Fargo's acts of (1) obtaining the LPI on Plaintiff's property through a third party QBE, (2)

with the decision to service the LPI for QBE, (3) with the decision to accept payment on behalf of

QBE by attaching the debt owed to QBE to the principal of Plaintiff's loan with Defendant Wells

Fargo, (4) under circumstances in which the LPI was (i) not authorized by the Contract between

Wells Fargo and Plaintiff; (ii) the LPI was duplicative because Plaintiff maintained coverage and

the (iii) entire transaction, excessive premium and the placement of the LPI was specifically

contrived under fraudulent and deceptive acts with the specific intent to deceive Plaintiff for money

so that the Defendants could share the profits in the form of kickbacks, the Defendant's acts

transformed the creditor debtor business relationship between the parties to one of a fiduciary

relationship.**

**116. (A). As a fiduciary, Defendant owed Plaintiff a duty of care to protect her financial interest

over which Defendant had complete control and to not act adversely to Plaintiff's financial interest.**

**117. (B) Defendant maliciously , intentionally , with specific intent to deceive Plaintiff, and did in

fact deceive Plaintiff by obtaining PLI from QBE when Defendant had knowledge of existing

coverage but obtained  the PLI  purely for profit to be shared between QBE and Wells Farog at the

expense and cost to Plaintiff.**

0130

54

118. ( C ) Plaintiff relied on Defendant deceptive specific acts to her detriment and as a consequence, Plaintiff was damaged monetarily by Defendants placement of $7,844.30 and other monetary cost to the principal of her equity loan on which she made monthly payments for more than one or two years before the charges were allegedly reversed.

119. PRAYER FOR DAMAGES: Plaintiff prays for punitive damages in the amount of $1,000,000 and compensatory damages in the amount of $1,000,000 and restitution cost and reasonable attorney fees.

### CAUSATION AND PRAYER FOR DAMAGES

110. Wherefore, as a direct result and proximate cause of Defendant's willful, wanton, callous andreckless disregard for the rights of the Plaintiff, Plaintiff prays for an award of damages, actual and compensatory damages , in the amount of $5,000,000.

### COUNT EIGHT

### UNJUST ENRICHMENT

### AGAINST DEFENDANT WELLS FARGO AND DEFENDANT QBE JOINTLY AND SEVERALLY

128 Plaintiff repeats and incorporates the allegations contained herein.

129.Defendant's ENRICHED ITSELF AS A Banking Institution by unilaterally and unnecessarily obtaining CPI without Plaintiff's knowledge, expressed or implied consent and thereafter and at all times operating with full knowledge that Plaintiff has coverage sufficient to protect Defendant's Collateral, charged Plaintiff with the premium for the purchase of the coverage and pain a kick back to an affiliate in the form of a commission for the unauthorized, illegal transaction.

130.A party cannot induce, encourage or manipulate another to provide or render something of value to such a party and simultaneously seek to providing and compensation for the value received.

54

55

131.Defendant (S) , QBE and Wells Fargo **are,** (is) discrediting Plaintiff with more than $15,000 in premiums payment or the CPI, under (he) **the** circumstances, as explained herein, constituted and unauthorized use of Plaintiff's funds without financial benefit to Plaintiff but with substantial benefit to Defendant. **(A) Plaintiff conferred the foll0wing financial benefits upon both defendants: (1) $7,844.30, Ex# 3 , (2)$8,011.20, Ex#4 and $7,412.58 as revealed by MELS#2 and other financial benefits yet unknown. (2) Defendants knowingly receipt of the financial benefits, as shown in the exhibits, and exercised complete dominion and control over the financial benefits by using the same for their financial gain and kickbacks and profit. (3) defendants have retained all of said benefits and have refused to return the same to Plaintiff heretofore, although promises by Defendants have been made for the return of said benefits . It would be unethical for Defendants to retain the benefits under the circumstances. The benefits were unjustly retained and charged to Plaintiff for the specific profit motive intent of the Defendants for self-enrichment as the expense of Plaintiff. Plaintiff had no way of avoiding payment for the LPI because she only became aware of the LPI well after the LPI was Placed on her property. The entire transaction took place outside of the terms of the Deed of Trust between Plaintiff and Defendant Wells Fargo. The expres terms of the contract prohibit duplicative LPI Coverage; illegal kickbacks a of LPI premiums are outside of the terms of the contract.**

132. Through financial investments and financial transaction as Banking and lending Institution, Defendant received revenue from Plaintiff's fund and was unjustly enriched at Plaintiff's Expense and to the detriment of Plaintiff. Defendant's unjust enrichment is traceable to, and resulting directly and proximately from,. Defendant's aforementioned conduct. It is illegal and unethical to allow Defendant to retain all of the profits generated from the illicit use of Plaintiff's fund. Defendant should be compelled to disgorge these funds and the amount totaling the wrongful or inequitable proceeds received by Defendant..

0132

CONSTRUCTIVE TRUST

DANMAGES

133. Plaintiff further request that the court impose a constructive trust upon all wrongful or inequitable sums received by Defendant that are traceable to the Plaintiff. Plaintiff prays for Compensatory damagesin the amount of $5000,000 and reasonable attorney fees and cost and to be placed in a position as good as the one she would gave occupied had Defendant not committed its illegal acts.

COUNT NINE

CONVERSION

134.Plaintiff repeats and incorporates the allegations contained herein count one, two, three, four and five.134.

135. Defendant illegally obtained Plaintiff's funds and used the same to unjustly enrich itself through the use of the funds for investment purposes.

136.The used of the funds constitutes conversion of the same. Plaintiff has a legal right to receive portions of the interest generated by Defendant's use of Plaintiff's funds. **The money that was converted by Defendants is: (1) $7,44.30, See Ex#3; $7,412.58, and $8,011.20, see Ex. MELS #2; $371.29 and $60.43,  see ExMELS#1. Defendants have and continue to exercise complete dominion and control over said money to the exclusion of Plaintiff and her rights to retrieve the same.**

0133

57

## DUTY OF CARE

137. Defendant owes Plaintiff a duty of reasonable care to pay Plaintiff interest for the use

of her funds and to refund the principal of the funds in their total amount.

138.  Defendant has breached the duty of care in that it has failed and otherwise refused to credit

Plaintiff with the premium amount illegally charged to her for the illegal purchase of the CPI

along with interest and profit received from said funds by Defendant during the time the funds

were used.

**AGENCY RELATIONSHIP BETWEEN DEFENDANTS WELLS FARGO AND DEFENDANT.
AND QBE DEFENDANT**

COUNT TEN- COMMON LAW NEGLIGENCE

ALTERANTAIVELY; NEGLIGENT MISREPRESNTATION

Of Material Facta

**Against QBE Defendants and Wells Fargo Defendants Jointly and Severaly**

Plaintiff incorporates all facts and allegations in the complaint that preceeds those contained in

the forging count for all practical purposes.

**AS TO COMMONLAW NEGLIGENCE**

**A.  At all times herein, Defendants owed Plaintiff A duth of Care**

139. Duty of Care: Defendants owed Plaintiff a reasonable duty of care to:

1. Acertain the existence of coverage  Plaintiff had on said property before obtaining

the CPI, **Defendan did in fact ascertained that Plaintiff maintained coverage and chose to**

**ignore the same and thereafter placed three PLI on her property at an excess premium**

**cost of theousand as cited herein in Plainiff Ex MELS #1 and #1 and Defndants'**

57

0134

58

Exhibits A,B,C and D, herein after the Exhibits.

2.  Notify Plaintiff of its intent to obtain the CPI and the associated cost; **Defendants**

   **jointly claim that they provided Plaintiff with the policy statement and the premium cost prior to the Placement of the LPI, but Defendant know the statement are false and that the Documents, Exhibits A,B,C and D were created and produced as an affirmative defense and to acquire a dismissal of Plaintiff's cause of action before the court. See Plaintiff's affidavit.**

3. Acquire Plaintiff's consent to obtain the CPI;   **Defendants falsely states that the contract etween Plaintif and Defendant Wells Fargo permits the placementofthe PLI with full knowledge that thesatement is false under the circumstances where Plaintiff maintained coverage.**

3.  Inform Plaintiff of its action in charging Plaintiff with the premium for the purchase

   of the CPI.   **Plaintiff was never informed of the PLI by Defendants. She became aware of the LPI through examination of ExhibitsMELS#1 and#2.**

139 Breach of the duty of Care   Defendant (s)  breached the above four duty of care by not

First ascertaining the existing coverage Plaintiff had on said property .**And ignoring the same the ascertainment of the coverage**.

Had Defendant (s) exercised the duty of care it owed Plaintiff, Defendant, prior to obtaining the CPI,would have learned that its collateral was secured by more than sufficient coverage and that the CPI was unnecessary. **But when the coverage was ascertained by Defendants, Defendants decided to obtain the PLI notwithstanding, for the purpose of deceiving Plaintiff for profit to be share between Defendants.**

0135

59

140.  Causation and damages:   As a direct and proximate result of Defendant's negligence

and breach of the duty of care owed to Plaintiff, Plaintiff suffered financially, and emotionally

and continue to suffer the same.

141 WHEREFORE, with all things considered, Plaintiff prays for compensatory damaged

and restitution of the funds taken from her by Defendant.

PRYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendant as follows:

Damages as allowed on each Cuase of Action in an amount for which Plaintiff prays, or

alternatively, according to proof as the time of trial;

Disgorgement of improper gains derived by Defendant, Wells Fargo's misconduct;

Punitive and exemplary damages.

All together with any interest, pre-judgment, cost and disbursements; and reasonable

attorney fees; and

Such other further relief as this Court deems just and property.


## AS TO NEGLIGENT MISREPESENTAION OF MATERIAL FACTS

**142.Plaintiff incorporates all prior facts and allegations contained in the complaint and further
state that those claims and facts which are contained in Plaintiff's allgations against Defendant as to
Fraud and as to fraud aainst joint and severally be incorporated into the claim for Negligent
Misrepresentation of Material Fact  as well as the allegtons representing oCommon Law Negligence
for the purpose of Federal Rule 9 (b) Pleading requirement.**

### PRAYER FOR DAMAGES

**143.Wherefore with all things considered, Plaintiff prays for Punitive damages against Defendant's**

59

0136

jointly and severally in the amount of Five Million Dollare and compensatory damage in the

amount of Two Million Dollars, restitution, reasonable ost and attorney fees.

Demand Trial By Jury

### VERIFIED COMPLAINT

I_____Andrea Jackson Cannon, having supplied the factual
allegations of the foregoing complaint, having read and understood the content of the
complaint, affirms that the factual content of the complaint is true to the very best of my
ability and recollection and therefore I place my signature to the same in the presence of
a Notary Public on this _____day of _____2012

### PRAYER FOR RELIEF

**Demand Trial By Jury**

Signature of :  *Harry T. spikes*
Harry T. Spikes Federal Bar
#02493
P.O. Box 23828
L'Enfant Plaza S.W.
Washington, DC 20016
(202) 288-4175

### CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of April 2012, a true copy of this, Plaintiff's First
Amended Complaint, was served upon the Defendant Wells Fargo Bank, National Association
by certified mail, postage prepaid, at its P.O. Box 8129, Jacksonville, Florida 32239-0129, with a
courtesy copy to the added Defendant, QBE First, at its regional Corporate Headquarters,
210 Interstate North Parkway, Atlanta, GA 30339 by regular mail, postage prepaid.

_____
Harry T. Spikes

0137

Case 8:12-cv-00377-RWT   Document 18-2   Filed 05/16/12   Page 1 of 3

Andrea Cannon's Affidavit
Case Number 8:12 –cv-00377-RWT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
GREENBELT DIISION

Andrea Jackson Cannon,
            Plaintiff,

v.                                              Case No. 00377-RWT

Wells Fargo Bank, et al

            Defendants.

I, Andrea Jackson Cannon, am the Plaintiff is the case before the court.

   1. On April 10, 2012, my attorney, Harry T. Spikes, presented to me  four
   Documents which he said were, among other documents in support of
   Defendant's motion to dismiss the Complaint.

   2. I examined each page of each of the documents, all of which are stamped as
   filed with the court on April 4, 20012.

   3. The four documents documented exhibits are identified alphabetically;
   A,B,C,D., of which reference insurance 12400 Fort Washington, Road, Fort
   Washington, Maryland 20744, a dwelling which I own and on which I have
   always maintained insurance coverage without any lapse in coverage.

   4. Exhibit A, Doc# 9-2, page 1of 7 is dated 05/20/10 titled Fire Insurance Audit
   Cover Letter; from Wells Fargo Bank, N.A. Page (2).  Page 7 reveal a 90-Day
   Binder, it is dated; Notification date 05/20/10; Policy Terms 05/05/ to
   05/05/11. The amount of insurance is $834,500; the premium cost is
   $7,844.30. The 90 Day Binder contains the name QBE Insurance Corporation
   88 Pine Street, 16th Floor New York, NY 10005. After reviewing all seven
   page of Exhibit A, I can say with absolute certainty that April 10, 2012 was
   the first time I have ever seen Exhibit A.

1



EXHIBIT
A

0138







Andrea Cannon's Affidavit
Case Number 8:12 –cv-00377-RWT

5.  Exhibit B, Doc#9-3, page 1of 4. Page two reveals the name Wells Fargo; Fire Insurance Warning Reminder Non-Escrow; Notification Date 06/22/10. The document states also that "Please note the full year premium for this policy, if issued will be $7,844.30. Page four is advertisement letter from Wells Fargo dated 06/22/10 which states in part." Quotes from multiple insurance companies-Improved Coverage compared to your current  homeowner or policy insurance-Discount for smoke alarms, security system and recently constructed homes*   I can say with absolute certainty, the first time I saw Exhibit B was on  was on April 10, 2012.

6.  Exhibit C, Doc# 9-4 P 1 of 12. Fire Insurance Lender Placed Letter from Wells Fargo ; " QBE  Insurance  Corporation now insure your real property (dwelling) The declaration page shows the annual premium of $7,844.30...Please understand that under the terms of your loan agreement, this insurance premium will be charged to your loan account and will be reflected in applicable payoff statement." Page 4 of 21 is a letter from Wells Fargo Insurance, Inc., dated 08/03/10 "Re. Homeowners Insurance" advertisement:" Quotes from multiple insurance companies- Improved coverage compared to your current homeowners or property insurance-Discount for smoke alarms, security system and recently constructed homes*" Page 5 of 21 is from QBE Insurance Corporation, ("Additional Named Insurance Certificate")   "Amount of Insurance $834,500; premium $7,844.30." ("Total charge $7,844.30.") ("Policy Terms 05/05/10 to 05/05/11." I can say with absolute certainty that the first time I have ever seen Exhibit C  was on April 10, 2012, when it was shown to be my  attorney.

7.  Exhibit D Doc# 9-5 Page 1 of 22, from Wells Fargo-"Notice of Hazards Insurance Renewal-Notification Date 05/17/11- Insurance Effective Date 05/05/11"). Page 4 of 22, dated 05/17/11, advertisement from Wells Fargo ,"Quotes from multiple insurance companies-Improved Coverage compared to  your current or property insurance-Discount for smoke alarms, security systems and recently constructed homes.") Page 6 of 22; From QBE Insurance Corporation ("Additional Named Insurance Certificate-Policy Term from 05/05/12 to 05/05/12;-Amount of Insurance $834,500; Premium$8,011.20;- Total Charges $8,011.20." I can say with an absolute degree of certainty April 10, 2012 was the first time I have ever seen Exhibit D.

2

0139

Andrea Cannon's Affidavit
Case Number 8:12 –cv-00377-RWT

**MY CERTIFICATE OF VOLUNTARY INSURANCE COVERAGE DATED**

**11/7/2011 ( Total Property Premium Cost $1,763-Coverage amount**

**$704,000.**

8. I have always maintained voluntary coverage on the property sufficient to secure Wells Faro's interest in the property as evidenced by my exhibit. Plaintiff's Exhibit #1,1-A the Certificate of Liability Insurance, Certificate Holder First Mortgagee Wells Fargo Bank, NA ISAOA, Atima P.O. Box 8129 Jacksonville, Fl..   The Total Property premium Cost  is $1,763.

<u>USE OF 12400 FORT WASHINGTON ROAD</u>

9.  The building is used as a home day care. The building is a residential building in which my family members resides.

10. The building is used primarily for residential purposes seven days a week.

I, Andrea Jackson Cannon, under the penalties of perjury, states that the facts contained in the affidavit are based on my personal knowledge and they are rue to the very best of my knowledge and recollection.

_____
Andrea Jackson Cannon

3

0140

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND (GREENBELT)

ANDREA JACKSON CANNON                    *

    Plaintiff                              *

v.                                        *    Case No. 12-cv-00377-RWT

WELLS FARGO BANK, N.A., *et al.*          *

    Defendants                             *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>AFFIDAVIT OF MELISSA CASSITY</u>

COUNTY OF ROANOKE  )
                      )    TO WIT:
STATE OF VIRGINIA    )

I, MELISSA CASSITY, being duly sworn, do hereby depose and say as follows:

1.    I am over eighteen (18) years of age and I am competent to be a witness.

2.    I am a Vice President and the Loan Operations Manager for Wells Fargo Bank, N.A. ("Wells Fargo"), the Defendant in the above-captioned case. In that role, I have first-hand, personal knowledge of the facts and matters set forth herein.

3.    In the absence of receipt of proof of insurance from the Plaintiff regarding property located at 12400 Old Fort Washington Road, Fort Washington, MD 20744 (the "Property"), Wells Fargo obtained Lender Placed Insurance ("LPI") on the Property in order to safeguard its collateral. The LPI policy initially was effective from May 5, 2010 until May 5, 2011, and the premium for this policy of $7,844.30 was posted as an outstanding expense item to the Plaintiff's account.



0141



DEFENDANT'S EXHIBIT
A
ALL-STATE LEGAL®

4.      In May of 2011, the LPI policy was renewed for another year to May 5, 2012 at an annual premium of $8,011.20. As with the initial LPI annual premium, this amount also was posted to the Plaintiff's account as an expense item.

5.      On or about January 10, 2012, after the Plaintiff eventually tendered proof of insurance on the Property, Wells Fargo cancelled the LPI policy (for both years) and reversed the two premium expense entries that had been previously posted to the Plaintiff's mortgage loan account. At no time from the initiation of LPI coverage until its cancellation, approximately eighteen months later, was any portion of either annual premium ever actually collected from or paid by the Plaintiff.

6.      The Plaintiff's monthly mortgage payment was not affected in any way by the LPI premium expense entries that were temporarily posted to her account. Specifically, her regular monthly mortgage payment was not increased by any amount for purposes of application to either of the LPI premiums.

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING PAPER ARE TRUE.

_____
MELISSA CASSITY

Date: __6 | 1 | 12__

0142

2

STATE OF VIRGINIA, COUNTY OF ROANOKE, To Wit:

On this 1st day of June, 2012, before me, the undersigned officer, MELISSA CASSITY, personally appeared, and is known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that she executed the same for the purposes therein contained.

In witness hereof I hereunto set my hand and official seal.

_Susan H. Ford_
Notary Public

My Commission expires: 9/30/2013



Embossed Hereon Is My Commonwealth of VA
Notary Public Seal · County of Roanoke
My commission expires 09/30/2013
Susan H. Ford ID # 262471

0143

3

**ACORD** CANCELLATION REQUEST / POLICY RELEASE

DATE (MM/DD/YY) 04/06/10

| PRODUCER | PHONE (A/C, No, Ext): (703) 765-7653 |
|---|---|

Old Dominion Ins. Agency
Belle Haven Prof. Bldg.
1451 Belle Haven Rd., #230
Alexandria, Virginia
22307

CODE: OXG113    SUB CODE

AGENCY CUSTOMER ID: NEW300

COMPANY NAME AND ADDRESS

Travelers Insurance Co.
c/o Old Dominion Insurance
1451 Belle Haven Rd, #230
Alexandria, VA  22307

INSURED NAME AND ADDRESS

Andrea Cannon

12502 Haxall Court
Fort Washington, MD  20744

POLICY TYPE **DWELLING FIRE POLICY**

CANCELLED POLICY INFORMATION

POLICY NUMBER 932722471 663 1

| EFFECTIVE DATE AND HOUR OF CANCELLATION | CANCELLATION DATE 04/15/10 | TIME 12:01 | X AM PM |
|---|---|---|---|
| POLICY TERM | EFFECTIVE DATE 12/09/09 | EXPIRATION DATE 12/09/10 | |

CANCELLATION REQUEST (Policy attached)    [X] POLICY RELEASE (Complete Statement Section Below)

### POLICY RELEASE STATEMENT

The undersigned agrees that:

The above referenced policy is lost, destroyed or being retained.

No claims of any type will be made against the Insurance Company, its agents or its representatives, under this policy for losses which occur after the date of cancellation shown above.

Any premium adjustment will be made in accordance with the terms and conditions of the policy.

WITNESS _____ DATE _____

SIGNATURE NAMED INSURED *Andrea Jackson Cannon*  4/13/10

WITNESS _____ DATE _____

SIGNATURE NAMED INSURED _____ DATE _____

| LIEN HOLDER | MORTGAGEE | LOSS PAYEE |
|---|---|---|

AUTHORIZED SIGNATURE _____ TITLE _____ DATE ____

| LIEN HOLDER | MORTGAGEE | LOSS PAYEE |
|---|---|---|

AUTHORIZED SIGNATURE _____ TITLE _____ DATE ____

**FOR AGENCY/COMPANY USE**

REASON FOR CANCELLATION

NOT TAKEN    OTHER (Identify)
[X] REQUESTED BY INSURED REWRITTEN (Complete below)

COMPANY
Markel Insurance Company

POLICY NUMBER TBD    EFFECTIVE DATE 04/15/10

REMARKS

METHOD OF CANCELLATION

FLAT
SHORT RATE
[X] PRO RATA

| FULL TERM PREMIUM | $ |
|---|---|
| UNEARNED FACTOR | |

[N] PREMIUM CALCULATION SUBJECT TO AUDIT

RETURN PREMIUM  $

0144

NAME AND ADDRESS

REQUEST/RELEASE DISTRIBUTION

| INSURED | LOSS PAYEE |
|---|---|
| MORTGAGEE | LIEN HOLDER |
| COMPANY | FINANCE COMPANY |

PRODUCER'S SIGNATURE *Sharon Sanborn*    DATE 04/06/10

ID 35 (1/94)    © ACORD CORPORATION 1994

0144 #1    EX 05-08-2012

NOTICE OF CANCELLATION

PO BOX 59059
KNOXVILLE TN
37950

**TRAVELERS**

0060

| Producer's Code | Issue Date | Office |
|---|---|---|
| 0XG113 | 04/15/10 | 411 |
| Date of Cancellation | Policy Number | |
| 05/05/10 | 9327224716631 | |

MORTGAGEE

WACHOVIA NA
PO BOX 50010
ROANOKE VA 24022

NAMED INSURED

ANDREA CANNON
12502 HAXALL CT
FORT WASHINGTON MD 20744

Loan Number:

Location of Property:

12400 FORT WASHINGTON RD
FORT WASHINGTON
MD  207446262

Insurer: THE TRAVELERS INSURANCE COMPANIES

### NOTICE OF CANCELLATION

**PLEASE TAKE NOTICE THAT THE POLICY DESIGNATED ABOVE HAS BEEN
CANCELLED.  YOUR INTEREST UNDER THE POLICY IS CANCELLED AS OF
THE DATE OF CANCELLATION ABOVE.**

0145

MORTGAGEE COPY

PL-13303 2-07

DEFENDANT'S
EXHIBIT
B
ALLSTATE LEGAL

GREAT AMERICAN INSURANCE CO

**GREAT AMERICAN.**
INSURANCE GROUP

Administrative Offices
580 Walnut Street
Cincinnati, Ohio 45202
Tel: 1-513-369-5000

IL 70 01 (Ed. 10 07)

**Policy No.** PAC 213-18-58 - 00
Renewal Of

## BUSINESSPRO® POLICY COMMON DECLARATIONS

**NAMED INSURED
AND ADDRESS:**
FORT WASHINGTON CHILD
DEVELOPMENT CENTER
12505 HAXALL COURT
FORT WASHINGTON, MD 20744

IN RETURN FOR PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**AGENT'S NAME AND ADDRESS:**
OLD DOMINION INSURANCE AGENCY

1451 BELLE HAVEN RD # 230
ALEXANDRIA, VA 22307 1201

Insurance is afforded by the Company named below, a Capital Stock Corporation:
GREAT AMERICAN INSURANCE COMPANY

**POLICY PERIOD:** From 04/15/2010 To 04/15/2011
12:01 A.M. Standard Time at the address of the Named Insured

This policy consists of the following Coverage Parts for which a premium is indicated. This premium may be subject to adjustment.

|  | Premium |
|---|---|
| Commercial Property | $1,763.00 |
| Commercial General Liability | $1,006.00 |
| Commercial Crime and Fidelity |  |
| Commercial Inland Marine |  |
| Commercial Equipment Breakdown | $220.00 |
| Commercial Auto |  |
| Commercial Umbrella |  |

0146



| TOTAL | $2,989.00 |
|---|---|

FORMS AND ENDORSEMENTS applicable to all Coverage Parts and made part of this Policy at time of issue are listed on the attached Forms and Endorsement Schedule, IL 88 01 (11/85).

Countersigned _____    Date _____    By _____    Authorized Representative

143.A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  11-21233-CIV-ALTONAGA/Simonton

RAY WILLIAMS, *et al.*,

      Plaintiffs,

vs.

WELLS FARGO BANK N.A., *et al.*,

      Defendants.

_____/

**ORDER**

**THIS CAUSE** came before the Court on Defendant, Wells Fargo Bank, N.A.'s ("Wells Fargo Bank['s]") Motion to Dismiss ("Motion") [ECF No. 60], filed on September 7, 2011.  The Motion seeks dismissal of the claims asserted against Wells Fargo Bank in the Amended Complaint [ECF No. 44] filed by Plaintiffs, Ray Williams, Luis Juarez, and Migdaliah Juarez, on behalf of themselves and all others similarly situated ("Plaintiffs").  Plaintiffs filed their Response to the Motion [ECF No. 89] on September 26, 2011, and on October 6, 2011 Wells Fargo Bank filed its Reply [ECF No. 96].  The Court has considered the parties' written submissions and applicable law.

**I. BACKGROUND**[1]

This putative class-action lawsuit involves "force-placed insurance."  (Am. Compl. ¶ 2). Plaintiffs are homeowners whose property-insurance policies lapsed and who were subsequently charged for force-placed insurance.  (*See generally id.*).  Wells Fargo Bank is a national bank registered to do business in the State of Florida and is the successor in interest and/or assign of

---

[1] The allegations of Plaintiffs' Complaint are taken as true.

0147



Case No. 11-21233-CIV-ALTONAGA/Simonton

Wachovia as to all of Wachovia's home mortgages. (*See id.* ¶ 4). Defendant, Wells Fargo

Insurance, Inc. ("WFI"), is a division of Wells Fargo Bank, which Plaintiffs claim "exists only to

collect kickbacks or commissions related to the force-placed insurance policies." (*Id.* ¶ 34).[2]

Defendant, QBE Specialty Insurance Co. ("QBE Specialty"), is a surplus-line insurance provider

doing business in the State of Florida. (*See id.* ¶ 6). Defendant, QBE First Insurance Agency,

Inc. ("QBE First"), is a "managing general agent/surplus-line insurance broker" that Plaintiffs

claim "exists only to provide kickbacks and/or collect excessive commission related to the force-

placed insurance policies." (*Id.* ¶ 7).[3]

### A.    General Allegations

Each mortgage at issue is owned and/or serviced by Wells Fargo and requires borrowers

to maintain insurance on their real property. (*See id.* ¶ 17). If a borrower fails to maintain the

requisite insurance, the mortgage servicer may forcibly place insurance on the property. (*See

id.*). In other words, once an insurance policy lapses, the mortgage servicer can purchase

insurance for the home, "force-place" it, and then charge the borrower the full cost of the

premium. (*Id.* ¶ 18).

According to Plaintiffs, the premiums charged on the force-placed loans at issue in this

case "are not the actual amount that Wells Fargo pays, because a substantial portion of the

premiums are refunded to Wells Fargo through various kickbacks and/or unwarranted

commissions." (*Id.*). To accomplish the forced placement, Wells Fargo enters into an exclusive

---

[2] WFI and Wells Fargo Bank are referred to collectively as "Wells Fargo" by Plaintiffs, and thus
the Court uses this term as well.

[3] QBE Specialty and QBE First are referred to collectively as "QBE" by Plaintiffs, and thus the
Court uses this term as well.

    0148    

Case No. 11-21233-CIV-ALTONAGA/Simonton

arrangement with QBE to be the sole insurance provider for all force-placed policies. (*See id.* ¶ 19). Under this arrangement, QBE has access to and searches Wells Fargo's database to find lapsed insurance policies. (*See id.* ¶ 26). Then, QBE writes to the homeowners to notify them of the force-placed coverage and charges exorbitant rates to Plaintiffs, who have no way of refusing the force-placed charges. (*See id.*). The premiums are well in excess of those which can be obtained in the open market, generally costing at least five to six times — and up to ten times — more than what the borrower was either originally paying or what the borrower could obtain in the open market. (*See id.* ¶¶ 19, 20). Force-placed insurance is also applied retroactively for periods of time in the past where coverage has lapsed. (*See id.* ¶ 31).

Wells Fargo receives commissions or kickbacks from the force-placed insurance companies or insurance brokers once one of the force-placed insurance policies is purchased. (*See id.* ¶ 23). The commission or kickback is paid by QBE to Wells Fargo in order to maintain the preexisting uncompetitive and exclusive relationship, to induce Wells Fargo to purchase excessively-priced force-placed insurance policies, and to cause Wells Fargo not to seek competitive bids in the market. (*See id.* ¶ 25). As a result of this arrangement, Wells Fargo and QBE have reaped significant profits. (*See id.* ¶ 22). Plaintiffs allege these practices constitute bad faith and are unconscionable. (*See id.* ¶ 32).

**B.    Plaintiff Ray Williams**

Plaintiff Ray Williams ("Mr. Williams") "obtained a mortgage from Wachovia Bank, which has a mortgage balance of approximately $85,000" and is serviced by Wells Fargo. (*Id.* ¶ 38). From the inception of the mortgage until October 17, 2010, Mr. Williams maintained the



Case No. 11-21233-CIV-ALTONAGA/Simonton

insurance required by the mortgage contract. (*See id.* ¶ 39). On October 17, 2010, however, the insurance policy lapsed. (*See id.*).

Mr. Williams's insurance had lapsed for less than 30 days when, on November 15, 2010, Mr. Williams secured new insurance for the property. (*See id.* ¶ 40). Thereafter, Wells Fargo, "without seeking competitive bids on the open market or attempting to re-establish Mr. Williams's prior insurance," used QBE to obtain "surplus-lines force-placed insurance" for Mr. Williams's property. (*Id.* ¶ 41). On December 27, 2010, Wells Fargo notified Mr. Williams "that it was retroactively force-placing an insurance policy on the property for the approximate 30-day lapsed period and adding the cost of the premium to his mortgage loan." (*Id.* ¶ 42). The cost of the premium totaled approximately $1,743.00 for the 30-day lapsed period, amounting to nearly six times the amount of the monthly premium ordinarily paid by Mr. Williams. (*See id.* ¶ 43).

### C.    Plaintiffs Luis Juarez and Migdaliah Juarez

Plaintiffs Luis and Migdaliah Juarez obtained a mortgage from Wachovia Bank secured by a parcel of real property, which was serviced by Wells Fargo. (*See id.* ¶ 45). Mr. and Mrs. Juarez maintained an insurance policy on the property, as required by the mortgage contract; however, the policy lapsed. (*See id.* ¶ 46). Wells Fargo, "without seeking competitive bids on the open market or attempting to re-establish [the Juarezes'] prior insurance," contracted with QBE to obtain "surplus-line, force-placed[] insurance" for Mr. and Mrs. Juarez's property. (*Id.* ¶ 48). On July 16, 2010, Wells Fargo notified the Juarezes that it was force-placing an insurance policy on them for the period of March 3, 2010 to March 3, 2011. (*See id.* ¶ 49). Despite being purchased in July 2010, the insurance policy was backdated over four months to March 3, 2010,

  0150  

Case No. 11-21233-CIV-ALTONAGA/Simonton

notwithstanding the fact that there was no damage to the property or claims arising out of the property for that four-month period. (*See id.* ¶ 50). The cost of the annual premium for that force-placed insurance policy totaled approximately $25,000.00, which is nearly four times the amount now paid by the Juarezes. (*See id.* ¶ 51).

## II. ANALYSIS

Wells Fargo Bank raises several arguments in support of its Motion. The Court addresses the arguments in the order in which they have been presented by the parties.

### A.    Rule 12(b)(6)

Wells Fargo Bank contends that the claims asserted against it in the Amended Complaint fail to satisfy the standard under Federal Rule of Civil Procedure 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556).





Case No. 11-21233-CIV-ALTONAGA/Simonton

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). A court's analysis of a Rule 12(b)(6) motion "is limited primarily to the face of the complaint and the attachments thereto." *Brooks*, 116 F.3d at 1368. The court may also consider other documents to be part of the pleadings for purposes of Rule 12(b)(6) where the plaintiff refers to the documents in the complaint and those documents are central to the plaintiff's claim. *Id.* at 1369.

### 1. Breach of the Covenant of Good Faith and Fair Dealing (Count I)

In Count I, Plaintiffs assert a claim of breach of the implied covenant of good faith and fair dealing against Wells Fargo Bank and WFI. (*See* Am. Compl. ¶¶ 68–74). Wells Fargo Bank contends this claim must be dismissed as it relates to Wells Fargo Bank because Plaintiffs fail to indicate whether the claim is brought against Wells Fargo Bank in its role as the *servicer* of Plaintiffs' loans or as the *owner* of the loans. (*See* Mot. 14). Wells Fargo Bank suggests this distinction is "critical" because

> if Plaintiffs are pursuing their claims against Wells Fargo Bank solely in its capacity as the servicer of their loans, the breach of contract claims . . . would require a threshold analysis of agency principals [sic] regarding whether Wells Fargo Bank, as agent of the loan owner, is bound by the implied covenants in the Plaintiffs' mortgages.

(*Id.*).

In their Amended Complaint, Plaintiffs allege "Wells Fargo" — referring collectively to both WFI and Wells Fargo Bank — is a party to the mortgage contracts and breached the duty of good faith and fair dealing under those contracts. (Am. Compl. ¶¶ 72–75). Plaintiffs allege that Wells Fargo Bank is the successor in interest and/or assign of Wachovia as to all of Wachovia's



0152



Case No. 11-21233-CIV-ALTONAGA/Simonton

home mortgages. (*See id.* ¶ 4). Whether Wells Fargo Bank is the loan *owner*, *servicer*, or both, is irrelevant at this stage. Taking Plaintiffs' allegations as true, Wells Fargo is bound by the mortgage contracts, and any argument to the contrary fails at this motion-to-dismiss stage. Plaintiffs' allegations that Wells Fargo Bank, a party to the mortgage contracts, acted in bad faith in contravention of Plaintiffs' reasonable expectations under those contracts, sufficiently allege a claim for breach of the implied covenant.

### 2. Violation of RESPA (Count II)

In Count II, Plaintiffs claim Wells Fargo Bank violated section 2605 of the Real Estate Settlement and Procedure Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*, which provides that "[a]ll charges . . . related to force-placed insurance imposed on the borrower by or through the servicer shall be bona fide and reasonable." 12 U.S.C. § 2605(m). As the Court noted in the Order of September 19 [ECF No. 76], that section of RESPA is not yet in effect. (*See* Sept. 19 Order 7–12). Because RESPA section 2605(m) was not effective prior to the issuance of the force-placed insurance policies on Plaintiffs' property, Count II must be dismissed.[4]

### 3. Unconscionability (Count III)

In Count III, Plaintiffs assert the provision in the mortgage contracts "that allows Wells Fargo to force-place high-cost insurance and charge borrowers the cost of obtaining that insurance and misrepresents why the cost of force-placed insurance is excessive, is procedurally and substantively unconscionable." (Am. Compl. ¶ 87). Wells Fargo Bank maintains this claim must be dismissed for several reasons, one of which is that unconscionability is not a cause of action under Florida law. That same argument was raised by WFI in its Motion to Dismiss

---

[4] Plaintiffs appear to concede this claim must be dismissed as they do not respond to Wells Fargo Bank's arguments regarding Count II.

7

Case No. 11-21233-CIV-ALTONAGA/Simonton

("WFI Motion") [ECF No. 48], and addressed by the Court in the September 19 Order. The Court has already held that Count III must be dismissed because, even if unconscionability is a cause of action under Florida law, the Court cannot grant the relief sought by Plaintiffs under their unconscionability claim. (*See* Sept. 19 Order 13–14). "[E]ven where courts have recognized a cause of action for unconscionability, they have held that money damages are not recoverable as a remedy for such a claim." (*Id.* 14 (citing *Cowin Equip. Co., Inc. v. Gen. Motors Corp.*, 734 F.2d 1581, 1582 (11th Cir. 1984), and 8 WILLISTON ON CONTRACTS § 18:17 (4th ed.)). Count III seeks a judgment requiring Wells Fargo to "refund an amount equal to all hidden profits or other financial benefits previously collected from Plaintiffs." (Am. Compl. ¶ 91). Because the Court cannot grant this relief on an "unconscionability" claim, Count III must be dismissed.

### 4.    Unjust Enrichment (Count IV)

In Count IV, Plaintiffs allege QBE and Wells Fargo "received from Plaintiffs and Class Members a benefit in the form of overcharges for force-placed insurance policies which are excessive and unreasonable, and are the result of overcharging and overreaching." (Am. Compl. ¶ 93). They further claim Defendants will be unjustly enriched if allowed to retain this benefit. (*See id.* ¶ 97). Wells Fargo Bank contends this claim must be dismissed as it relates to Wells Fargo Bank for four reasons. (*See* Mot. 18–20).

#### a.    Direct Benefit

First, Wells Fargo Bank maintains the unjust enrichment claim must be dismissed because Plaintiffs fail to allege that Wells Fargo Bank received any money directly from the Plaintiffs. (*See id.* 18–19). As the Court explained in the September 19 Order,




Case No. 11-21233-CIV-ALTONAGA/Simonton

just because the benefit conferred by Plaintiffs on Defendants did not pass directly from Plaintiffs to Defendants — but instead passed through a third party — does not preclude an unjust-enrichment claim. Indeed to hold otherwise would be to undermine the equitable purpose of unjust enrichment claims. *See* 11 FLA. JUR. 2d Contracts § 288 ("[I]f someone does enrich himself unjustly to the detriment of another, that person should be required to make restitution of all the benefits received, retained, or appropriated when it appears that to require it would be just and equitable."). It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the "benefit" passed through an intermediary before being conferred on a defendant.[5]

---

[5]    To find otherwise would mean that a company could set up a shell parent company without any funds, funnel money through that shell company, and essentially launder the "benefit," thereby defeating any unjust enrichment claim.

(Sept. 19 Order 17).

Plaintiffs have sufficiently alleged that a payment arrangement existed between Wells Fargo Bank and the Defendants that did have direct contact with Plaintiffs. (*See* Am. Compl. ¶¶ 5, 7, 23, 25, 26). Plaintiffs allege Wells Fargo Bank directly benefitted from its wrongful conduct related to the force-placed insurance arrangement. In particular, Plaintiffs claim Wells Fargo Bank received kickbacks and/or commissions which were taken directly from the insurance premiums paid by Plaintiffs. (*See id.* ¶¶ 6, 7, 26–28, 96–97). Therefore, even if there was no direct contact between Wells Fargo Bank and Plaintiffs, by paying the allegedly excessive premiums, Plaintiffs directly conferred a benefit on Wells Fargo Bank. Drawing all reasonable inferences in favor of Plaintiffs, the Court finds these allegations sufficient to show Plaintiffs conferred a direct benefit on Wells Fargo Bank, and thus dismissal of the claim on this basis is unwarranted.

> **b.   Plaintiffs' Ability to Avoid Paying the Allegedly Excessive Premiums**

Second, Wells Fargo Bank contends that even if a direct benefit has been conferred on it

9



0155

Case No. 11-21233-CIV-ALTONAGA/Simonton

by Plaintiffs, the unjust enrichment claim still fails because Plaintiffs could have avoided the allegedly excessive insurance premiums. (*See* Mot. 19). Essentially, Wells Fargo Bank's argument is that the unjust-enrichment claim fails because the force-placed insurance process was provided for in the Plaintiffs' mortgage contracts, and Plaintiffs could have avoided that process by keeping their insurance current. The Court rejected this very same argument in the September 19 Order, explaining:

> Plaintiffs do not allege that the force-placed insurance process, in and of itself, supports a claim for unjust enrichment. Instead, Plaintiffs allege that Defendants' manipulation of that process, in order to maximize their profits, supports the unjust-enrichment claim. (*See* Am. Compl. ¶ 35). The fact that Plaintiffs, had they maintained insurance coverage on their properties, could have avoided being subject to this manipulation does not render the claim insufficient, nor would such an argument serve the principles of equity and justice that the unjust-enrichment claim is intended to promote.

(Sept. 19 Order 18–19).

### c.    Adequate Consideration

Third, Wells Fargo Bank asserts the unjust-enrichment claim fails because Plaintiffs admit they received a benefit for the premiums that were charged, and thus adequate consideration was given for any benefit received. (*See* Mot. 19–20). This argument necessarily fails. The entire crux of Plaintiffs' Amended Complaint is that any consideration they received for the benefit conferred on Defendants was grossly inadequate. They allege the insurance policies were "unreasonably, uncompetitively, and excessively priced" for the sole purpose of maximizing profits and kickbacks to Defendants. (Am. Compl. ¶ 32). Whether the consideration received was in fact adequate is not an appropriate question for the Court to resolve at this stage.

 

Case No. 11-21233-CIV-ALTONAGA/Simonton

### d.    Mortgage Contracts

Finally, Wells Fargo Bank maintains the unjust-enrichment claim fails because it is barred by Plaintiffs' mortgage contracts. (*See* Mot. 20). Essentially, Wells Fargo Bank argues that the lender-placed insurance and charges related to it are governed by the Plaintiffs' mortgage contracts, and therefore Plaintiffs' quasi-contractual claim of unjust enrichment fails as a matter of law. (*See id.*).

Florida courts have held that "'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *1021018 Alberta Ltd. v. Netpaying, Inc.*, 8:10-CV-568-T-27MAP, 2011 WL 1103635, at *5 (M.D. Fla. Mar. 24, 2011) (quoting *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008) (collecting cases)); *see also Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1227 (S.D. Fla. 2010). However, a party may plead in the alternative for relief under an express contract and for unjust enrichment. *See ThunderWave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1566 (S.D. Fla. 1997) (citing *Hazen v. Cobb-Vaughan Motor Co.*, 117 So. 853, 857–58 (Fla. 1928)). But unjust enrichment may only be pleaded in the alternative where one of the parties asserts that the contract governing the dispute is invalid. *See Zarrella*, 2010 WL 4663296, at *7 (quoting *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337–38 (S.D. Fla. 2002)).

Wells Fargo Bank contends it may not be a party to the mortgage contracts. (*See* Mot. 14–15). In particular, Wells Fargo Bank indicates that it may merely be the *servicer* of the mortgages and thus would be subject to the contracts only under a possible agency theory. (*See id.*). In other words, Wells Fargo Bank suggests there may not be contracts governing *its*

11

0157

Case No. 11-21233-CIV-ALTONAGA/Simonton

relationship with Plaintiffs. By doing so, Wells Fargo Bank is essentially asserting that, to the extent the mortgage contracts govern the relationship between Wells Fargo Bank and Plaintiffs, they may be invalid. Accordingly, Wells Fargo Bank's argument that the unjust enrichment claim fails because of the existence of the contracts is unavailing.

**B.    Federal Preemption in the Context of National Banks[5]**

Wells Fargo Bank contends Plaintiffs' state law claims for unconscionability, breach of the implied covenant of good faith and fair dealing, and unjust enrichment are preempted by the National Bank Act ("NBA").[6] Because the Court has already determined that the unconscionability claim must be dismissed (*see* Part A.3, *supra*), it only addresses Wells Fargo Bank's preemption argument with respect to the latter two claims.

National banks are chartered by the federal government pursuant to the NBA, and are regulated by the Office of the Comptroller of the Currency ("OCC"). *See* 12 U.S.C. §§ 1, *et seq.* The NBA grants national banks "all such incidental powers as shall be necessary to carry on the

---

[5] Although there are three categories of preemption, express preemption, field preemption, and conflict preemption, Wells Fargo's Motion only addresses conflict preemption. (*See* Mot. 5). "Conflict preemption occurs either when it is physically impossible to comply with both the federal and the state law or when the state law stands as an obstacle to the objective of the federal law." *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008). As with express and field preemption, "conflict preemption will not be found unless it is the clear intent and purpose of Congress." *Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041, 1048 (S.D. Fla. 1998) (citing *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

[6] Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), modified the regulations governing preemption under the NBA. *See id.* §§ 1041–48. However, that portion of the Dodd-Frank Act did not become effective until July 21, 2011. *See* Dodd-Frank Act § 1048 (making the preemption amendment effective on the "designated transfer date"); 75 Fed. Reg. 57252 (Sept. 20, 2010) (establishing the designated transfer date as July 21, 2011). Additionally, Title X of the Dodd-Frank Act calls for prospective application of the amendments made thereunder. *See* Dodd-Frank Act § 1043. The claims involved in the present action arose prior to July 21, 2011; accordingly, they are analyzed under the preemption rules in effect prior to the changes imposed by the Dodd-Frank Act.

 0158 

Case No. 11-21233-CIV-ALTONAGA/Simonton

business of banking." 12 U.S.C. § 24. Congress has authorized the OCC to oversee the operations of national banks and to define these "incidental powers." *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995); *see also* 12 U.S.C. § 93a.

"To insure that national banks can carry out the business of banking without the impairment of inconsistent or intrusive state laws, courts have 'repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation.'" *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1311 (S.D. Fla. 2010) ("*In re Checking I*") (quoting *Watters v. Wachovia Bank*, 550 U.S. 1, 11 (2007)). In fact, although there is generally a presumption against preemption, "the regulation of national banks is one area where the opposite holds true." *Baptista v. JP Morgan Chase Bank N.A.*, No. 6:10-cv-139-Orl-22DAB, 2010 WL 2342436, at *3 (M.D. Fla. June 4, 2010) ("*Baptista I*").

Consequently, the Supreme Court has consistently upheld the use of the federal preemption doctrine to shield the banking activities of national banks from the application of state law. *See, e.g., Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996); *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 376–79 (1954); *Watters*, 550 U.S. at 11. For example, in *Barnett Bank*, the Court held that a federal law allowing national banks to "act as the agent for any fire, life, or other insurance company" preempted a state law outlawing banks from engaging in insurance activities. *Barnett Bank*, 517 U.S. at 28 (quoting 12 U.S.C. § 92). Similarly, the Court in *Franklin National Bank* determined federal statutes which authorize national banks to receive savings deposits preempted New York state legislation that prohibited national banks from using the word "saving" or "savings" in their advertising or business. *Franklin Nat'l Bank*, 347 U.S. at 376–79. The Court held that because advertising is

13

Case No. 11-21233-CIV-ALTONAGA/Simonton

one of the incidental powers necessary to carry on the business of banking, the government cannot allow the banks to receive savings deposits without permitting them to advertise the same. *See id.*

Likewise, in *Watters*, the Court concluded that a national bank's mortgage business, even when conducted by a subsidiary of that bank rather than the bank itself, cannot be subject to state mortgage lending requirements such as registration, inspection and enforcement regimes. *Watters*, 550 U.S. at 6–8. The Court explained that "[s]tates are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers. But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way." *Id.* at 12.

The aforementioned cases each addressed state laws that were specifically targeted at national banks. In contrast, "state laws of general applicability . . . have been found not to be preempted." *In re Checking I*, 694 F. Supp. 2d at 1311–12 (citing *Baldanzi v. WFC Holdings Corp.*, No. 07 Civ. 9551(LTS)(GWG), 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("In contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted.")); *see also Cuomo v. Clearing House Ass'n, L.L.C.*, 129 S. Ct. 2710 (2009). The general rule is that states may regulate the activities of national banks so long as they do not prevent or significantly interfere with the exercise of the banks' authority. *See Barnett Bank*, 517 U.S. at 33.

0160
0180                              14                          

Case No. 11-21233-CIV-ALTONAGA/Simonton

As the Ninth Circuit emphasized when examining the NBA's preemptive effect in the context of mortgage-related lending, "[s]tate laws of general application, which merely require all businesses (including national banks) to refrain from fraudulent, unfair, or illegal behavior, do not necessarily impair a bank's ability to exercise its real estate lending powers." *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010). This is because "[s]uch laws are not designed to regulate real estate lending, nor do they have a disproportionate or other substantial effect on lending." *Id.* The *Martinez* court noted that the OCC itself has issued an advisory letter cautioning banks that they may be subject to laws that prohibit unfair or deceptive acts or practices. *Id.* (citing OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, AL 2002-3, 2002 WL 521380, at *2, *7 n.2 (Mar. 22, 2002)).

This is consistent with the OCC's regulations concerning the applicability of state law to national banks' real estate lending activities. In particular, 12 C.F.R. § 34.4 provides:

> (b) State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers:
>
>> (1) Contracts;
>>
>> (2) Torts; . . . .

12 C.F.R. § 34.4.

In the instant case, Wells Fargo Bank contends Counts I and IV are preempted by the NBA and the regulations promulgated thereunder. Contrary to Wells Fargo's assertions, however, the claims asserted by Plaintiffs do not conflict with the NBA or the cited OCC regulations. At most, these laws only *incidentally* affect the exercise of a bank's powers.



Case No. 11-21233-CIV-ALTONAGA/Simonton

Wells Fargo Bank relies on *Schilke v. Wachovia Mortgage, FSB*, 758 F. Supp. 2d 549 (N.D. Ill. 2010), in support of its contention that Plaintiffs' claims are preempted. Nonetheless, the defendant in *Schilke* was a federal savings association, not a national bank. *Id.* That case did not address the preemptive effect of the NBA and OCC regulations; it dealt instead with preemption under the Home Owners Loan Act ("HOLA") and the regulations of the Office of Thrift Supervision ("OTS"). *See id.* at 560 (noting that the preemptive scope of the NBA was not germane to that case). Notably, in comparison to the NBA, HOLA has a much broader preemptive reach because its regulations, unlike those issued under the NBA, state that OTS "occupies the entire field of lending regulation for federal savings associations." 21 C.F.R. § 560.2(a); *see also Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d 1073, 1083 (C.D. Cal. 2009) ("OTS preemption is more sweeping because 'OTS occupies the entire field of lending regulation for federal savings associations' in connection with HOLA.") (citing 12 C.F.R. § 560.2(a)); *Agustin v. PNC Fin. Servs. Grp., Inc.*, 707 F. Supp. 2d 1080, 1097 (D. Haw. 2010) ("[M]any courts have cautioned against applying the OTS/HOLA analysis in the OCC context."). In contrast, when analyzing the preemptive effect of the NBA, courts have held that "federal regulation in this field is not so pervasive that we can reasonably infer that Congress left no room for the states to supplement it." *In re Checking I*, 694 F. Supp. 2d at 1313; *see also T.C. Jefferson v. Chase Home Fin.*, No. C 06-6510, 2008 WL 1883484, at *7 (N.D. Cal. Apr. 29, 2008) (noting that the NBA "does not 'preempt the field' of banking"). Indeed, [s]tates . . . have always enforced their general laws against national banks — and have enforced their banking-related laws against national banks for at least 85 years . . . ." *Cuomo v. Clearing House Ass'n, L.L.C.*, 129 S. Ct. 2710, 2720 (2009) (collecting cases).

16



Case No. 11-21233-CIV-ALTONAGA/Simonton

Moreover, the fact that the OCC's regulations have touched on the area of insurance does not mean that any state law affecting national banks' insurance activities is preempted. Wells Fargo Bank points out that OCC regulations have addressed the insurance activities of national banks. (*See* Reply 2–3). It notes the OCC has directed that state laws cannot "prevent or restrict" insurance activities conducted by national banks and their subsidiaries. (*See id.* 2 (citing OCC Interpretive Letter 812)). However, the OCC has emphasized that although "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its powers to conduct activities authorized under Federal law do not apply to national banks," state laws on subjects, including contracts and torts, that "are not inconsistent with the powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national bank powers" are applicable to national banks. 12 C.F.R. § 7.4009(b) and (c)(2). The laws at issue here do not seek to prevent or restrict banks' ability to engage in insurance activities. They are not directed at the activities of national banks in any way; instead, they merely incidentally affect the exercise of national banks' insurance activities.

For example, Count I alleges a breach of the implied covenant of good faith and fair dealing. The covenant of good faith and fair dealing is a contract law of general applicability that prohibits one party from taking a conscious or deliberate act that "unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000). It is not directed at national banks or their activity, nor does it mandate what national banks can or cannot do. In other words, the covenant does not force Wells Fargo Bank to "'set its contracts in a certain way, but rather merely to *adhere* to the contracts it does

0163

Case No. 11-21233-CIV-ALTONAGA/Simonton

create.'" *Trombley v. Bank of Am. Corp.*, 715 F. Supp. 2d 290, 296 (D.R.I. 2010) (quoting *Davis*, 650 F. Supp. 2d at 1086) (emphasis in original). The covenant is a law of contract that is consistent with national banks' lending powers and only incidentally affects the exercise of those powers.

Indeed, numerous courts have recognized that this type of claim is not preempted by the NBA. *See LaCuesta v. Wells Fargo Bank, N.A.*, No. 2:10-cv-0064-KJD-PAL, 2010 WL 3860731, at * 2 (D. Nev. Sept. 27, 2010) (holding that NBA does not preempt a claim for breach of the duty of good faith and fair dealing); *Trombley*, 715 F. Supp. 2d at 296 (finding that the covenant of good faith and fair dealing is a contract law of general applicability which is not preempted by the NBA); *Davis*, 650 F. Supp. 2d at 1086 (holding that contract-based claims "have at most an incidental effect on the exercise of [a bank's] lending powers"); *Poskin v. TD Banknorth, N.A.*, 687 F. Supp. 2d 530, 558–59 (W.D. Pa. 2009) (holding that common law breach of good faith and fair dealing claim is not preempted by the NBA); *Great Western Resources, L.L.C. v. Bank of Ark., N.A.*, No. 05-CV-5152, 2006 WL 626375, at *3 (W.D. Ark. Mar. 13, 2006) (holding "that plaintiffs' claims for breach of contract . . . and breach of implied covenant of good faith are not subject to complete preemption [by the NBA]").

Although Wells Fargo Bank has certain rights under the NBA and OCC regulations, it is not authorized "to ignore general contract or tort law." *In re Checking I*, 694 F. Supp. 2d at 1313; *see also Trombley*, 715 F. Supp. 2d at 296. The covenant of good faith and fair dealing is a law of general application "that do[es] not vitiate the purposes of the NBA, and banks could comply with both the NBA, OCC regulations[,] and state laws if they refrained from engaging in

18




0164

Case No. 11-21233-CIV-ALTONAGA/Simonton

the criticized . . . procedures." *In re Checking I*, 694 F. Supp. 2d at 1313. Therefore this claim is not preempted by the NBA, and it may proceed.

Similarly, the unjust-enrichment claim in Count II is a "state law[] of general application that do[es] not vitiate the purposes of the NBA." *In re Checking I*, 694 F. Supp. 2d at 1313. It is not directed at national banks or their activity, nor does it mandate what national banks can or cannot do. Moreover, Plaintiffs' unjust-enrichment claim does not challenge Wells Fargo Bank's retention of a benefit from Plaintiffs in relation to the force-placed insurance process; instead it focuses on the manner in which Wells Fargo Bank manipulated the force-placed insurance process. In other words, Plaintiffs' claim is not addressed at Wells Fargo Bank being "enriched" by Plaintiffs, but at it being "*unjustly*" enriched." The claim does not seek to impose requirements on Wells Fargo Bank's conduct; it simply seeks the return of funds unjustly paid to Wells Fargo Bank pursuant to the force-placed insurance scheme. Courts have held similar claims not to be preempted by the NBA. *See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig*, 601 F. Supp. 2d 1201, 1223 (S.D. Fla. July 13, 2011) (finding unjust enrichment claim was not preempted by the NBA); *In re Checking II*, 2011 WL 2746171, at *7–8 (same).

In conclusion, although the NBA allows banks to engage in "insurance activities," these laws of general applicability do not conflict with banks' rights to do so. The laws do not forbid or significantly impair conduct permitted by federal law. They do not undermine the supremacy of federal law. Moreover, notwithstanding Wells Fargo Bank's contentions to the contrary (*see* Reply 5), none of Plaintiffs' claims question Wells Fargo Bank's *ability* to charge fees or premiums related to force-placed insurance or to collect commissions from the force-placing of

19

0165



Case No. 11-21233-CIV-ALTONAGA/Simonton

insurance. Plaintiffs only challenge the *manner* in which Wells Fargo Bank manipulated those charges and the force-placed insurance process in general. "A desire to limit a bank's authority to charge a fee is not synonymous with a desire to hold a bank liable for the bad-faith manner in which" it exercises that authority. *In re Checking Account Overdraft Litig.*, No. 09-MD-02036, 2011 WL 2746171, at *7 (S.D. Fla. July 13, 2011) ("*In re Checking II*"). The former is not permitted in light of the NBA's preemptive reach, but the latter is. *See id.* (citing *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194 (11th Cir. 2011) ("*Baptista II*")). In the present action, Plaintiffs are not challenging the bank's right to impose force-placed insurance policies. Instead, the issue is whether Wells Fargo has been unjustly enriched by manipulating the force-placed insurance process so as to obtain kickbacks, and whether by doing so, it has violated its duty of good faith and fair dealing under the contracts.[7]

---

[7] Wells Fargo Bank contends this case is analogous to *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.2d 549 (9th Cir. 2010). (*See* Reply 5–6). In *Martinez*, the court found the plaintiff's claims under California's Unfair Competition Law ("UCL") were preempted by the NBA. *See id.* at 556–57. In that case, the plaintiff claimed that an $800 underwriting fee charged by the bank was an excessive overcharge. *See id.* at 552. The court held the plaintiff's claim was preempted by OCC regulation 12 C.F.R. § 7.4002(b)(2), which states that "[t]he establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made be each bank . . . ." The court emphasized that while some claims under the UCL would survive preemption, the claims raised in that case were directly in conflict with OCC regulations. *See id.* 555–56.

Here, unlike in *Martinez*, Plaintiffs are not merely challenging the imposition of the force-placed premiums or the amounts of those premiums. Instead, they challenge the manipulation of the force-placed insurance process in general, the payment arrangement between Wells Fargo Bank and the other Defendants, and Wells Fargo Bank's participation in the overall scheme intended to provide illegal kickbacks and commissions to the entities involved. Whereas in *Martinez* the bank simply imposed a fee directly on the plaintiff, here, Wells Fargo Bank is alleged to have colluded with other entities in bad faith in order to develop a scheme whereby the entities could manipulate the force-placed insurance process to their benefit. Both the unjust-enrichment claim and breach-of-the-implied-covenant claim are aimed at that manipulation of the force-placed insurance process. Thus, the claims raised by Plaintiffs significantly differ from those raised in *Martinez*. In fact, this case is analogous to *Gutierrez v. Wells Fargo & Co.*, No. C 07-05923 WHA, 2010 WL 1233885 (N.D. Cal. Mar. 26, 2010), which distinguished *Martinez*. In *Gutierrez*, similar to the present case, the plaintiff's UCL claims challenged Wells Fargo's "manipulation

20



0166



Case No. 11-21233-CIV-ALTONAGA/Simonton

It is clear that enforcement of these state laws would not interfere with "the NBA's purpose of creating a uniform federal regulatory system for national banks." *Mwantembe v. TD Bank, N.A.*, 669 F. Supp. 2d 545, 554 (E.D. Pa. 2009). Because enforcing these state laws will not interfere with the national banks' operation or otherwise unduly burden or impair their ability to engage in the business of lending or insurance-related activities, there is no basis for invoking federal preemption. Accordingly, the motion to dismiss on this basis must be denied.

C.      **Rule 8(a)**

Wells Fargo Bank also asserts Plaintiffs fail to meet the pleading requirements of Federal Rule of Civil Procedure 8(a) because they improperly lump Defendants together. (*See* Mot. 13–14). Specifically, Wells Fargo Bank takes issue with Plaintiffs' grouping together of Wells Fargo Bank and WFI, and referring to the two collectively as "Wells Fargo." (*Id.*).

Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). "Under this rule, when a complaint alleges that multiple defendants are liable for multiple claims, courts must determine whether the complaint gives adequate notice to each defendant." *Pro Image Installers, Inc. v. Dillon*, No. 3:08cv273/MCR/MD, 2009 WL 112953, at *1 (N.D. Fla. Jan. 15, 2009) (citing *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)). Although a complaint against multiple defendants is usually read as making the same allegation against each defendant individually, *see Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997), "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Accordingly, at times, a plaintiff's "grouping" of defendants in a complaint may require a more definite

---

of customer transactions" in order to maximize fees, and therefore the court held they were not preempted by the NBA. *Id.* at *2.

21

    0167    

Case No. 11-21233-CIV-ALTONAGA/Simonton

statement. *See Veltmann v. Walpole Pharmacy, Inc.*, 928 F. Supp. 1161, 1164 (M.D. Fla. 1996).

For example, the court in *Veltmann* found a complaint insufficient where it grouped its allegations against *all* named defendants, making it very difficult to determine which defendant committed which act:

> Plaintiffs' Complaint makes general allegations against all of the named defendants. The complaint fails to separate each alleged act by each defendant into individually numbered paragraphs. It is virtually impossible to ascertain from the Complaint which defendant committed which alleged act.
>
> This particular defect in pleading would be enough to grant a motion to dismiss with leave to amend, or, more properly perhaps, grant a motion for more definite statement pursuant to [Rule] 12(e) . . . .

*Id.* Normally, however, "'when multiple defendants are named in a complaint, the allegations can and usually are to be read in such a way that each defendant is having the allegation made about him individually.'" *Duran v. City of Satellite Beach*, No. 6:05-CV-906-PCF-KRS, 2005 WL 2129300, at *6 (M.D. Fla. Sept. 2, 2005) (quoting *Crowe*, 113 F.3d at 1539); *see also Sams v. Prison Health Servs., Inc.*, No. 8:06-cv-862-T-24 MAP, 2007 WL 788365, at *3 (M.D. Fla. Mar. 14, 2007) ("[D]espite Defendants' arguments, the Plaintiffs lumping together categories of Defendants in her allegations is permissible under Rules 8(a) and 12(b)(6)."); *Freshwater v. Shiver*, No. 6:05-CV-756-ORL19DAB, 2005 WL 2077306, at *2 (M.D. Fla. Aug. 29, 2005).

In the Amended Complaint, Plaintiffs group Defendants into two separate groups, the Wells Fargo Defendants (Wells Fargo Bank and WFI) and the QBE Defendants (QBE First and QBE Specialty Insurance). (*See generally* Am. Compl.). The Amended Complaint identifies which claims are against which group of Defendants. From these allegations it can be reasonably inferred that both WFI and Wells Fargo Bank were involved in the conduct attributed to "Wells Fargo." In other words, where claims are asserted against the collective Wells Fargo

22




0168

Case No. 11-21233-CIV-ALTONAGA/Simonton

Defendants, the claims should be read as alleging all acts against both WFI and Wells Fargo Bank individually. When read in this manner, the allegations provide notice to both WFI and Wells Fargo Bank of the claims against them.

Plaintiffs' grouping together categories of Defendants in their allegations is permissible under Rules 8(a) and 12(b)(6). *See Sams*, 2007 WL 788365, at *3; *see also Crowe*, 113 F.3d at 1539 (stating that where the complaint alleges claims against multiple defendants in a single count, the allegations can and should be read in such a way that each defendant is having the allegation made about him personally); *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) ("Rule 8 does not require Plaintiffs to identify each of the [] Defendants by name each time the Complaint makes an allegation that applies equally to all."). Moreover, the Complaint pleads specific facts regarding the relationship between WFI and Wells Fargo Bank, providing an additional factual basis to aid these Defendants in understanding the allegations asserted against them. *See In re Polaroid*, 362 F. Supp. 2d at 471 ("The Complaint is sufficient because it pleads specific facts about the relationship between Morgans Management and the other Defendants.").

In sum, this is not a case where *no* distinctions are made between the Defendants; Plaintiffs break the Defendants into two groups. *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001). Nor is this a "shotgun pleading" where every claim incorporates by reference all previous allegations and paragraphs. *See, e.g., id.* Reading the Complaint as alleging all claims against "Wells Fargo" to be claims against both WFI and Wells Fargo Bank allows Wells Fargo Bank to meaningfully respond.

0169

Case No. 11-21233-CIV-ALTONAGA/Simonton

### D.    Jury Demand

Lastly, Wells Fargo Bank suggests that pursuant to section 24 of their mortgage contract, Luis and Migdaliah Juarez waived their right to a trial by jury in any action arising out of their mortgage. (*See* Mot. 20). Consequently, Wells Fargo Bank requests that the Juarezes' demand for a jury trial be stricken. (*See id.*). Plaintiffs contend the demand should not be stricken. Specifically, Plaintiffs assert that in a case such as this, where some claims are triable by a jury and others are not, the "most judicious approach" is to use an advisory jury as provided for under Federal Rule of Civil Procedure 39.

Neither party disputes that a party may waive its right to a jury trial by contract. Here, however, even if the waiver in the Juarezes' mortgage contract is valid — and Plaintiffs do not seem to present any argument suggesting it is not — it is of no avail to Wells Fargo Bank at this point. The jury waiver is contained in the mortgage contract, and thus was part of a contractual relationship. As noted earlier, Wells Fargo Bank indicates it may not be a party to the mortgage contract. In particular, Wells Fargo Bank suggests it may be the *servicer* of the mortgage and thus would be subject to the contract only under a *possible* agency theory. (*See* Mot. 14–15). Thus, Wells Fargo Bank cannot invoke the jury waiver. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1166 (9th Cir. 1996) (noting that "a jury waiver is a contractual right and generally may not be invoked by one who is not a party to the contract"); *Hulsey v. West*, 966 F.2d 579, 581 (10th Cir. 1992) ("a jury waiver provision in a contract affects only the rights of the parties to that contract").

    0170    

Case No. 11-21233-CIV-ALTONAGA/Simonton

## IV. CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** as follows:

1. The Motion **[ECF No. 60]** is **GRANTED in part** and **DENIED in part**.

2. The Motion is **GRANTED** with respect to Counts II and III.

3. The Motion is **DENIED** with respect to Counts I and IV.

4. The Motion to Strike the jury demand is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 14th day of October, 2011.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record



0171

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BANCA POPOLARE DI NOVARA
*Plaintiff,*

v.

MANUFACTURERS AND
TRADERS TRUST COMPANY
*Defendant.*

Civil Action No.: ELH-11-736

*EX# 2*

## MEMORANDUM OPINION

Banca Popolare di Novara ("Banca"), plaintiff, is a bank organized under the laws of the Italian Republic ("Italy"), with its principal place of business in Novara, Italy.[1]  Complaint ("Compl.," ECF 1) ¶ 2.  Banca financed the purchase of an Italian "assembly line of stone cutting machinery" (the "Equipment") by a Pennsylvania quarrier and fabricator, BS Quarries, Inc. ("Quarries"), from the manufacturer of the Equipment, Effe Meccanica Srl ("Effe"), an Italian company.  *Id.* ¶¶ 7, 16.  Quarries made a downpayment to Effe, with the balance to be paid in five biannual installments, evidenced by five promissory notes (each a "Note" and collectively, the "Notes").[2]  *Id.* ¶¶ 7-10.  Effe then assigned the Notes to Banca, as it had financed the transaction.  *Id.* ¶ 16.  Because each Note was "payable at "M&T Bank" in New York, "the procedure by which Plaintiff would collect on each [N]ote was to use the services" of Manufacturers and Traders Trust Company ("M&T"), defendant, a bank organized under the laws of the State of New York, as the "collecting bank."  *Id.* ¶¶ 2, 17.  It is the collection process,

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

[2] Effe is no longer in business.  Compl. ¶ 7.




I. *Id.* at 13. In any event, asserts M&T, Banca has failed to allege actual malice with respect to M&T's conduct, and therefore, its claim for punitive damages must fail. *Id.* at 13-14.

Banca concedes that the parties agreed that URC 522 would govern the collection process. Nevertheless, it maintains that several provisions of Maryland's UCC, particularly those giving rise to statutory and fiduciary duties, cannot be waived, continue to apply, and give rise to the counts in the suit. Opp'n 13, 19. Banca argues that the facts, as pled, along with the applicable law, give rise to its claims for breach of fiduciary duty, negligence, and entitlement to punitive damages.

According to Banca, under the UCC, M&T, as the collecting bank, was Banca's agent, and, as Banca's agent M&T owed Banca a fiduciary duty. *Id.* at 13-14. Further, Banca maintains that Maryland law permits a cause of action for breach of fiduciary duty. *Id.* at 10. Banca also asserts that C.L. § 4-202 is binding in its entirety upon the parties and, by statute, sets forth the applicable standard of care, which M&T breached. *Id.* at 13-14.

In Banca's view, M&T's failure to perform the collection process in a timely manner prejudiced Banca's ability to recover payment from Quarries. *Id.* at 14. Moreover, Banca posits that M&T's relationship with Quarries, as a secured lender, constituted a conflict of interest, and the Complaint "contains sufficient factual allegations to show that Defendant acted with the requisite wrongful motive to injure the Plaintiff." *Id.* at 21.

### A. Negligence

Title 4 of Maryland's UCC, C.L. § 4-101 *et seq.*, governs "Bank Deposits and Collections." Notably, C.L. § 4-103(a) states:

> The effect of the provisions of this title may be varied by agreement, but the
> parties to the agreement cannot disclaim a bank's responsibility for its lack of

- 12 -




good faith or failure to exercise ordinary care or limit the measure of damages for lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

*See also Lema v. Bank of Am., N.A.*, 375 Md. 625, 636, 826 A.2d 504, 510 (2003) ("We have recognized the ability of parties by contract to alter the effect of provisions of the UCC . . . .").

Under C.L. § 4-202, titled "Responsibility for collection or return; when action timely," a collecting bank is required to exercise ordinary care. It states, in part:

(a) A collecting bank must exercise ordinary care in:

(1) Presenting an item or sending it for presentment;

(2) Sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be;

(3) Settling for an item when the bank receives final settlement; and

(4) Notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.

(b) A collecting bank exercises ordinary care under subsection (a) by taking proper action before its midnight deadline following receipt of an item, notice, or settlement. Taking proper action within a reasonably longer time may constitute the exercise of ordinary care, but the bank has the burden of establishing timeliness.

(c) Subject to subsection (a)(1), a bank is not liable for the insolvency, neglect, misconduct, mistake, or default of another bank or person or for loss or destruction of an item in the possession of others or in transit.

It is undisputed that the parties contractually agreed that URC 522 would apply to the collection process. The URCs are a set of principles created by a nongovernmental organization, the International Chamber of Commerce.

Collecting banks handling international collection items "operate solely as conduits," and do not "guarantee payment or assume credit risks." *Monarch Gems, J.B. v. Malca-Amit USA,*

*LLC*, No. 04-C-7664, 2007 WL 2892636, at *9 (N.D. Ill. Sept. 27, 2007). URC 522 sets forth standards for collection, *Gathercrest, Ltd. v. First Am. Bank & Trust*, 649 F. Supp. 106, 114 (M.D. Fla. 1985), *aff'd*, 805 F.2d 995 (11th Cir. 1986), and has no binding effect unless expressly incorporated into the text of a "collection instruction." Motion Exh. A ("URC 522"), art 1.a. When incorporated into the text of a "collection instruction," however, URC 522 becomes "binding on all parties . . . unless otherwise expressly agreed or contrary to the provisions of a national, state or local law and/or regulation which cannot be departed from." *Id.*

Pursuant to URC 522, "[a]ll documents sent for collection must be accompanied by a collection instruction indicating that the collection is subject to URC 522 and giving complete and precise instructions." *Id.*, art. 4.a.i. Where, as here, the collecting bank is also the bank that is presenting an instrument to the drawee or obligor for payment, URC 522 provides: "Expressions such as «first», «prompt», «immediate», and the like should not be used in connection with presentation or with reference to any period of time within which documents have to be taken up or for any other action that is to be taken by the drawee." *Id.*, art. 5.b. Further, "[d]ocuments are to be presented to the drawee in the form in which they are received." *Id.*, art. 5.c. And, "the presenting bank must, where acceptance is called for, make presentation for acceptance without delay, and where payment is called for, make presentation for payment not later than the appropriate maturity late." *Id.*, art. 6. "Amounts collected (less charges and/or disbursements and/or expenses where applicable) must be made without delay to the party from whom the collection instruction was received . . . ." *Id.*, art. 16. In addition, collecting banks "are to advise fate" of payment, non-payment, acceptance, or non-acceptance, "without delay." *Id.*, art. 26.

0175

- 14 -




As indicated, application of URC 522 does not preclude application of the UCC altogether; certain UCC provisions cannot be disclaimed. *See, e.g.*, C.L. § 4-103(a). Indeed, Article 1 of URC 522 makes clear that non-variable and non-disclaimable portions of the UCC remain applicable in the context of an international collection. It provides that the provisions of URC 522 shall be binding "unless otherwise expressly agreed or contrary to the provisions of a national, state or local law and/or regulation which cannot be departed from." However, where a provision of the UCC can be disclaimed or varied by agreement, the effect of the parties' adoption of URC 522 is to supersede those provisions, where applicable. *See SCADIF, S.A. v. First Union Nat'l Bank*, 208 F. Supp. 2d 1352, 1373 (S.D. Fla. 2002) (holding that the UCC's "midnight deadline rule," the Maryland equivalent of which is contained in C.L. § 4-302, was inapplicable because it could be varied by the parties' agreement, and the parties had adopted URC 522), *aff'd*, 344 F.3d 1123 (11th Cir. 2003). *See, e.g., Bank One Dearborn, N.A. v. Wachovia Bank, N.A., et al.*, No. 03-6575, 2005 U.S. Dist. LEXIS 413, at *11-20 (E.D. Pa. 2005) (holding that UCC warranty of presentment, which, by its language, could not be disclaimed, was still in effect, despite the parties' contractual adoption of URC 522); *Integrated Measurement Sys., Inc. v. Int'l Commercial Bank of China*, 757 F. Supp. 938, 949 (N.D. Ill. 1991) (holding that the parties' contractual adoption of the "Uniform Customs and Practice for Documentary Credits" could not override certain provisions of the UCC because, by their terms, they could not be disclaimed or varied). *Cf. Trans Meridian Trading Inc. v. Empresa Nacional de Comercializacion de Insumos*, 829 F.2d 949 (9th Cir. 1987) (holding that the parties' contractual adoption of an ICC banking practice rule, known as the "Uniform Customs and Practice for Documentary Credits," did not preclude application of California's UCC).

- 15 -





Of import here, Article 9 of URC 522 states: "Banks will act in good faith and exercise reasonable care." As one court has observed (and as the parties seem to recognize), the standard of care under URC 522 is "essentially identical" to the standard set forth in what is title 4 of Maryland's UCC. *Thiagarajar Mills, Ltd. v. Thornton*, 47 F. Supp. 2d 918, 925 (W.D. Tenn. 1999) ("[T]he standard of care is the same under both the URC and the [equivalent New York UCC provision]."), *aff'd*, 242 F.3d 710 (6th Cir. 2001).

With this background, I turn to the motion to dismiss the claim for negligence.

In order to maintain a suit for negligence, a defendant must be under a duty to protect a plaintiff from injury. *Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010). Maryland courts have characterized a "duty" as "'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" *Id.* at 120, 991 A.2d at 94 (quoting *Gourdine v. Crews*, 405 Md. 722, 745, 955 A.2d 769, 783 (2008)). An imposition of a "duty" reflects a policy determination that the specific plaintiff was "entitled to protection from the acts of the defendant." *Blondell*, 413 Md. at 120, 991 A.2d at 94.

It is well established that "'[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'" *Id.* at 120-21, 991 A.2d at 94 (quoting *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986)); *see also Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 252, 725 A.2d 1053, 1058 (1999) ("A contractual obligation, by itself, does not create a tort duty. Instead, the duty giving rise to a tort action must have some independent basis."). Notably, "when the dispute is over the existence of any valid contractual obligation covering a particular matter, or where the defendant has failed to recognize or undertake any

- 16 -

 0177

contractual obligation whatsoever, the plaintiff is ordinarily limited to a breach of contract remedy." *Mesmer*, 353 Md. at 254, 725 A.2d at 1059. In contrast, "when the defendant has proceeded on the basis that a contractual obligation exists, has undertaken that obligation, and has undertaken it in violation of the *appropriate standard of care*, . . . the plaintiff may, in some circumstances, maintain a tort action." *Id.*

Maryland courts have allowed negligence suits for violation of the UCC's duty of care. *Schultz v. Bank of Am.*, 413 Md. 15, 28, 990 A.2d 1078, 1086 (2010); *Taylor v. Equitable Trust Co.*, 269 Md. 149, 155-56, 304 A.2d 838, 841-42 (1973) ("'Nowhere in the [UCC] does it say in so many words that a bank, whether a collecting bank or payor bank, is liable for negligently paying an item. Hints, however, abound.'" (citation omitted)); *cf. Sun Trust Bank/Miami N.A. v. First Nat'l*, 698 F. Supp. 1298, 1304 (D. Md. 1988) (applying contributory negligence to suit based on alleged negligence in breach of the UCC's standard of care). Moreover, "[t]here is no contradiction in allowing a party to enforce the duty of ordinary care through a contract claim, a tort claim, or both." *Schultz*, 413 Md. at 38 n.21, 990 A.2d at 1092 n.21. The Maryland Court of Appeals has said: "[A]lthough the proof required and the measure of compensatory damages allowable may be essentially the same under either cause of action, there are other considerations, including requirements of venue and limitations on the bringing of actions, that make it desirable to provide a choice of actions." *Jacques*, 307 Md. at 545, 515 A.2d at 765); *accord Schultz*, 413 Md. at 38 n.21, 990 A.2d at 1092 n.21. For instance, "where actual malice is shown, punitive damages may be awarded in a tort action but not in an action for breach of contract." *Jacques*, 307 Md. at 545, 515 A.2d at 765.

0178

- 17 -





M&T argues that the standard of care applicable here was established entirely by contract (URC 522), and cannot form the basis of a tort suit. However, as indicated, the UCC's standard of care cannot be varied by agreement. *See* C.L. § 4-103(a). In my view, M&T's position would circumvent the express, non-disclaimable terms of the UCC's duty of good faith and ordinary care, set forth in C.L. § 4-103(a). Although URC 522 may have altered the procedures for collection, and sets forth obligations as to due care, it does not relieve a party of its duty of good faith and ordinary care under the UCC. Therefore, it does not necessarily bar a negligence claim.

For these reasons, I shall deny M&T's motion to dismiss the negligence claim (Count III).

*B. Breach of Fiduciary Duty*

M&T also contends that Banca cannot maintain a cause of action for breach of fiduciary duty under Maryland law.

"A fiduciary relationship exists when one party is under a duty to act or give advice for the benefit of another." PAUL MARK SANDLER & JAMES K. ARCHIBALD, PLEADING CAUSES OF ACTION IN MARYLAND § 3.209.A, at 436 (4th ed. 2008) (citing RESTATEMENT (SECOND) OF TORTS § 874 cmt. a (1979); RESTATEMENT (SECOND) OF TRUSTS § 2 cmt. b (1959)). Moreover, "[o]ne who breaches his or her duty as a fiduciary may be liable under various causes of action to those harmed by the breach of that duty." *Id.* However, the cases and commentary indicate that a claim for breach of fiduciary duty exists "where the breach is alleged as an element of the cause of action – not as a separate cause of action itself." *Id.*[10]

---

[10] Paul Sandler and James Archibald, the authors of *Pleading Causes of Action in Maryland,* have said: "The circuit courts follow this interpretation, yet plaintiffs continue to

- 18 -



```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MARYLAND
                      SOUTHERN DIVISION
 3

 4   ANDREA J. CANNON,        :  Civil Action No.

 5            Plaintiff,      :  RWT 12-377

 6       v.                   :

 7   WELLS FARGO BANK, NA,    :  Greenbelt, Maryland

 8            Defendant.      :  Friday, June 8, 2012

 9   _____/  10:00 A.M.

10

11              TRANSCRIPT OF MOTION PROCEEDINGS
12         BEFORE THE HONORABLE ROGER W. TITUS
                UNITED STATES DISTRICT JUDGE
13   APPEARANCES:

14   FOR THE PLAINTIFF:     HARRY T. SPIKES, SR., Esquire
15                          Law Office of Harry T. Spikes
                            1703 New Jersey Avenue, NW
16                          Washington, D.C.  20001
                            202-288-4175
17

18   FOR THE DEFENDANT:     RUSSELL J. POPE, Esquire
19                          Treanor, Pope & Hughes, PA
                            29 W. Susquehanna Avenue, Suite 110
20                          Towson, Maryland 21204
                            410-494-7777
21

22

23   OFFICIAL COURT REPORTER:  LINDA C. MARSHALL,(301) 344-3229

24       COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

25
```



```
 1                      P-R-O-C-E-E-D-I-N-G-S
 2              THE DEPUTY CLERK:  The matter now pending before this
 3    Court is Civil Docket Number RWT 12-377, Andrea Cannon versus
 4    Wells Fargo Bank National Association.  We are here for a
 5    motions hearing.
 6              Counsel, would you please identify yourselves for the
 7    record?
 8              MR. SPIKES:  Harry Spikes for the Plaintiff,
 9    Andrea Cannon.
10              THE COURT:  Morning.
11              MR. POPE:  Good morning, Your Honor.  Russ Pope on
12    behalf of Wells Fargo.
13              THE COURT:  All right.  Before we begin, I wanted to
14    express to you, Mr. Pope, the Court's condolences on the tragic
15    death of your partner.  I've met him once at his brother's
16    investiture and I'm sure that's a significant loss to your firm.
17              MR. POPE:  More than you know, Your Honor.  I
18    appreciate the Court's sentiment.  Thank you.
19              THE COURT:  All right.  You may proceed with your
20    motion.
21              MR. POPE:  Your Honor, the events that spawn this
22    litigation began with a letter the bank received from the
23    plaintiff's insurance carrier back in March of -- excuse me,
24    March of 2010, a little over two years ago.
25              The plaintiff is the owner of several daycare centers
```

1    in the Mid-Atlantic area, including one here in Maryland on Fort

2    Washington Road, and that was the subject of the letter the bank

3    received.

4    The bank owns the commercial mortgage on the property

5    and is servicing the loan as well.  And when they got the Notice

6    of Cancellation from The Travelers, which was effective

7    May 5th, 2010, they were of course concerned about the on-going

8    protection of the property from risk of loss inasmuch as the

9    property stands as collateral for the mortgage loan.

10    That began a series of letters to the plaintiff,

11    Ms. Cannon, notifying her that the bank was concerned that there

12    was no coverage on the policy -- rather on the property, and

13    asking her to send in proof of coverage.  And that was through a

14    series of letters that began on May 20th, 2010, and followed up,

15    culminating in the actual purchase of what the industry calls,

16    Lender Placed Insurance or LPI.  And that's when the property

17    owner does not keep their, their contractual obligation keeping

18    the property insured.

19    The lender's entitled under the Deed of Trust to go

20    out and procure subsequent policy coverage that in fact protects

21    the lender's interest, the collateral interest in the property

22    that the lender has.

23    In this particular case, after having received the

24    Notice of Cancellation from The Travelers and after having sent

25    these notice letters to the plaintiff in August of 2010, the

1    bank did purchase an LPI policy, a complete copy of which was

2    sent to the plaintiff and, basically, paid the premium to the

3    insurance company, which is QBE Insurance.

4         There are two different QBE defendants that have been

5    joined in this case through the Amended Complaint.  According to

6    the PACER docket, I don't know that they've been served yet, but

7    they have also been named in the Amended Complaint as additional

8    defendants.

9         In any event, Wells Fargo advanced the first year

10   premium under that LPI policy and that particular premium was

11   just a little over $7800.  That was not directly collected from

12   the plaintiff, but was rather posted to the mortgage account as

13   an expense.

14        Nine months later, when it was time for renewal, the

15   bank sent another notice to Ms. Cannon advising her of the fact

16   that the LPI would renew for another year.  Again, asking her to

17   send in proof of individual private insurance, if she had it.

18   Having heard nothing, the bank renewed the policy for a second

19   year annual premium.  This time, the policy went up a couple

20   hundred dollars.  It was $8000 and change when the policy

21   renewed.

22        It wasn't until this past January of 2012 when the

23   bank was finally given evidence from Ms. Cannon that, in fact,

24   there had not been a lapse in insurance, that there had been a,

25   simply a transfer of insurance from Travelers to a new insurance

1  company that took over in May of 2010.  And once she did produce

2  satisfactory evidence to the bank that, in fact, there had been

3  no lapse in coverage, the bank promptly by letter to her and by

4  notices to her dated January the 10th, 2012, notified her that

5  both years of LPI were being cancelled and that the posting of

6  the premium amounts to her account were being reversed and in

7  effect, wiped out so that there would be no on-going carrying of

8  that expense as part of her mortgage obligation.

9      About a month after that letter was delivered to the

10 plaintiff, this lawsuit was filed.  And through the Amended

11 Complaint, which is what we're here to address today, that's

12 what our motion is focusing on, there are 12 counts set forth

13 against both Wells Fargo and the QBE defendants.  Only nine of

14 those accounts are directed expressly to Wells Fargo and I'll

15 address those here this morning.

16     The first argument that I'd like to make to the Court

17 is basically that six of those nine counts are all common law

18 torts; negligence, breach of fiduciary duty, conversion and so

19 on, fraud.  And our first argument is basically that there is no

20 remedy for a tort claim in a situation like this, because these

21 are all torts that arise out of an underlying contractual

22 relationship.

23     I know the Court is familiar with the longstanding

24 Maryland precedent there, primarily *the Jacques versus First*

25 *National Bank* case.

6

```
1          THE COURT:  You pronounced the name correctly.

2          MR. POPE:  I did, Your Honor.

3          THE COURT:  Even though it's a French name.  I knew

4    Bob Jacques very well.

5          MR. POPE:  And I think it was you who taught me how to

6    pronounce the name correctly.  But in any event, Jacques and

7    progeny, there have been subsequent cases that recite that

8    longstanding doctrine in Maryland.

9          And in order to avoid the bar of that doctrine, the

10   plaintiff has the burden of proving special circumstances that

11   would take this situation out of a normal contract case and

12   impose additional duties on the bank outside of those that were

13   undertaken voluntarily by contract.

14         Those special circumstances simply are not present

15   and neither in the complaint nor in the Opposition to the Motion

16   to Dismiss has the Court's been presented with the types of

17   facts that have caused other Maryland Courts to say, this

18   creates a tort duty, even though there is an underlying

19   contract.  We just don't have those special circumstances here.

20         On the individual -- that argument was directed to all

21   six tort claims, Your Honor.  There are, sort of, a blunderbuss

22   shot at all of those.  There are individual sniper shots that

23   I've taken in the, in the brief.  I won't elaborate them at

24   length, but I will highlight them.

25         On the fraud and concealment counts, first of all,
```

```
 1   there is no claim damages that the plaintiff can offer this
 2   Court here.  The reality was, there were the two annual premiums
 3   that were, for a temporary period of time, posted as expenses to
 4   her mortgage account, but as of January of this year, those
 5   postings had been reversed before the plaintiff paid any amount
 6   of them and before, in fact, they had even been sought to be
 7   collected by the bank.  They were simply there and as the
 8   correspondence to the plaintiff reflected, they were there and
 9   would be provided only in the event that a payoff statement was
10   requested.
11          During the 18 months that the LPI was in effect, the
12   plaintiff did not refinance her property, she did not sell it
13   and there was no payoff statement requested.  And so, there was
14   no need to raise the issue of, by the way, you owe us the money
15   for these two premiums.  And by the time the insurance, proof of
16   insurance was provided this past January, of course nothing had
17   been paid and the amounts were simply reversed.  Instead of
18   showing as expense items open, they are now gone from the
19   account.
20          So, there are no damages, nor is there any real
21   delineation under the elements of fraud under Maryland Common
22   Law or the heightened pleading requirements of Federal Rule 9 to
23   indicate that there was an overt misrepresentation here, that
24   she relied upon it to her detriment.
25          On the fiduciary duty question, we've cited the
```

1  seminal case of *Parker versus Columbia Bank*.  In a loan

2  situation like this, the relationship between the bank and the

3  borrower was normally an ordinary debtor-creditor relationship,

4  unless as in the tort arising out of contract scenario there are

5  special circumstances that would take this situation outside of

6  that normal scenario.  There is no special circumstance here.

7          The bank did not undertake any services to Ms. Cannon

8  outside of being a lender.  When it did obtain the LPI, it

9  didn't do so gratuitously to assist Ms. Cannon.  It did so very

10  selfishly to protect its own collateral interest.  And the more

11  limited scope of the LPI coverage was well-communicated to

12  Ms. Cannon, in terms of the coverage not applying to her equity

13  in the property, to her personal contents or to any third-party

14  liability for any accidents that would take place on the

15  property.  So, we don't believe there are special circumstances

16  present that would create a fiduciary duty here.

17          On the issue of unjust enrichment, again because no

18  money was actually paid by Ms. Cannon, there is nothing in the

19  hands today of Wells Fargo, or the QBE defendants for that

20  matter, for this Court to say there is unjust enrichment because

21  of the retention of that benefit.  There is no benefit currently

22  today in the hands of the bank to make that claim against.

23          Equally important, though, under Maryland Law, if the

24  subject of the unjust enrichment claim is expressly delineated

25  in a contract, then you can't have an unjust enrichment claim,

1  an equitable relief claim like that when you have a contractual

2  remedy.

3           Because the issue of Lender Placed Insurance is very

4  well laid out in Section 5 of the Deed of Trust, which was

5  Exhibit 6 to the original complaint, there can be no unjust

6  enrichment claim here.

7           Conversion, a similar argument there, Your Honor.

8  There is nothing for the bank to give up, to give back to

9  Ms. Cannon.  It didn't take anything from Ms. Cannon.  It didn't

10  take any money from her, not a penny, for the premiums for these

11  two LPI policies.  So there's nothing for the Court to order the

12  bank to give back to her.

13           The negligence claims; negligent, negligent

14  misrepresentation claim, again we argue under the authority of

15  *Jacques* that there is no tort duty that arises here.  But even

16  if there did, the bank was not discharging any duty to her by

17  obtaining the LPI.  It was only for its own self-protection and

18  the protection of its collateral that it undertake the efforts

19  that it did.

20           And at the end of the day, with the cancellation of

21  the LPI and the reversal of the charge to her account, it's just

22  as though this never happened.  It's just as though we're taking

23  the clock back two years and it never happened.  That takes us

24  outside the tort arena, Your Honor.

25           Now, to the first of the three remaining claims.  And

1  the first of those is the Maryland Consumer Protection Act

2  Claim.  This is not a consumer transaction.  Under the statute,

3  the types of transactions that are governed there are for

4  personal, household, family or agricultural purposes.  This does

5  not fall within any of those definitions because this is a day

6  case -- a daycare center that is owned and operated by

7  Ms. Cannon.  She does not live there.

8          And in fact, if you look at her own exhibits to the

9  original complaint in this case, Exhibit's 1 and Exhibit 1-A,

10  where we had Great American Insurance Company step in to take

11  the place of The Travelers in May of 2010, to start providing

12  that coverage, in Exhibit 1 it identifies the policy for the

13  Fort Washington Child Development Center.

14          And the block is checked in the middle of the page, on

15  the left margins indicating that this is a commercial,

16  Commercial General Liability policy or a CGL policy.

17          That is confirmed in the second, which is the Dec

18  Sheet.  Exhibit 1-A to the original complaint is the declaration

19  page for this policy issued by the carrier.  The named insured

20  is Fort Washington Child Development Center.  And in about a

21  third of the way down the page on the right-hand side it says,

22  occupancy, as a block that needs to get filled in.  And under

23  occupancy it says, child-care center.

24          So, we don't believe that the plaintiff has made her

25  burden of proof in demonstrating to this Court that she is a

1  consumer, that this is a consumer transaction or that anything

2  related to this Lender Placed Insurance has anything to do with

3  the goals that the legislature had in mind when it passed the

4  Consumer Protection Act.

5        Finally, there are two different breach of contract

6  claims; a vanilla breach of contract claim in Count One and a

7  malicious breach of contract claim in Count Two. My argument

8  there is simply this: That the bank didn't do anything that

9  wasn't expressly delineated in Section 5 of the Deed of Trust.

10       And that is when it had a fair reason to believe that

11  insurance was being terminated on the, on the property by virtue

12  of The Travelers letter it received, it began a series of

13  notifications to Ms. Cannon asking that she provide proof of the

14  subsequent insurance. When it didn't get that information from

15  her, it went through the hoops of obtaining the LPI for the 18

16  months subsequent.

17       And as said, indicated earlier, once we did finally

18  receive from Ms. Cannon some 18 months later proof of insurance,

19  we cancelled the policy and reversed the charge to the mortgage

20  account.

21       We don't believe that there is a breach of contract

22  simply because that Ms. Cannon can't point to a term in the

23  contract that was breached. Everything that the bank did was,

24  in fact, set forth and justified, and authorized by the

25  contract.

1    The malicious breach of contract claim is not really a

2    stand-alone cause of action in Maryland, and we've cited case

3    authority to that effect in our reply memorandum, rather in our

4    primary memorandum.  But what we do interpret that to be is a

5    plea for punitive damages and an allegation that the bank acted

6    maliciously.

7    And again, under the Zenobia standard here in

8    Maryland, we don't believe that there is any allegation in the

9    complaint that would indicate ill-will or actual malice on the

10   part of the bank here to justify the imposition of punitive

11   damages or a finding of any malice.

12   I know that -- I'll conclude with this comment,

13   Your Honor.  I know that there is some confusion expressed by

14   Ms. Cannon in her opposition by affidavit saying that the series

15   of letters that the bank sent to her were not received by her.

16   And I know that this is a preliminary motion, this is attacking

17   the four corners of the pleading and we're not here to get into

18   disputed fact issues.

19   I will simply highlight for the Court that the same

20   series of letters was sent to Ms. Cannon in regard to another of

21   her daycare centers in Washington, down in the District on Queen

22   Street.  And when she sued the bank in the D.C. litigation, and

23   I've provided that cite to the Court in our brief.  She attached

24   as exhibits to her complaint copies of these very same letters

25   that she got.

1          So, I think what the Court can divine from that is

2   while in her affidavit she claims not to have received the

3   series of letters pertaining to the Fort Washington property in

4   Maryland, she clearly has acknowledged that she got the same

5   sequence of communications from the bank with regard to her

6   related property in the District.

7          Thank you.

8          THE COURT:  All right, Mr. Spikes.

9          MR. SPIKES:  Yes, sir.  There are several statements

10  that opposing counsel made that I need to address before we,

11  before I get into the substance.

12         The documents A, B, C and D exhibits from the

13  defendant were received by Ms. Cannon after she had explained in

14  writing that the insurance was improperly placed.  The same

15  thing occurred with the Queen Street property.

16         THE COURT:  So, you're saying that she did receive the

17  statements then, correct?

18         MR. SPIKES:  After, after she had -- she never

19  received them from the defendant.  She only received them

20  through the Court.  She observed them from the exhibits

21  submitted to the Court.  That was the first time she saw those

22  documents.

23         THE COURT:  She's sworn to that under oath?

24         MR. SPIKES:  She has and she has submitted an

25  affidavit to that effect.

1    THE COURT:  All right.

2    MR. SPIKES:  And also too with the Queen Street

3  property, it was only after she complained about the force

4  placed insurance that she received these documents.  And she has

5  an affidavit in the D.C. Court to that effect as well.

6    The defendant would have the Court to believe that

7  plaintiff's coverage by Well Fargo [sic] was for Well Fargo's

8  interest.  There's an 8,100 -- $8,011 coverage that was issued

9  by Well Fargo in 2011 and 2012 for personal property and real

10  property that was not for Well Fargo's interest.

11    THE COURT:  Counsel, I just don't understand what

12  you're saying.  Say it to me one more time.

13    I thought that the whole issue here was that the

14  lender went out and bought insurance to protect its interest in

15  the security that was given for the loan.

16    MR. SPIKES:  That's correct.  And I'm saying to this

17  Court that there are two policies that was issued by Well Fargo.

18  One for $7,844; one for $8011 that were not for Well Fargo's

19  collateral interest.

20    THE COURT:  Well, how can that be?

21    MR. SPIKES:  I'm sorry?

22    THE COURT:  How can that be?  I don't understand that.

23    MR. SPIKES:  I don't either, Judge.  I can show you

24  the policies.  I can show you the documents that the defendant

25  has provided this Court to explain, but I don't understand it

1    either.  It goes --

2            THE COURT:  Wells Fargo had the right under the Deed

3    of Trust to procure insurance to protect its interest, did it

4    not?

5            MR. SPIKES:  Well, it had a right to secure its

6    interest through the insurance if plaintiff had not provided

7    coverage.  Now, the plaintiff had coverage.  There's no question

8    about that.  The next issue --

9            THE COURT:  Well, as soon as she provided evidence of

10   that to Wells Fargo, they reversed the charge to her account.

11           MR. SPIKES:  We are contending, Your Honor, that that

12   notice was presented to the defendant long before the insurance

13   was taken out by Well Fargo.  In effect --

14           THE COURT:  I understand.  But they have represented

15   to the Court that once she gave them satisfactory proof that

16   insurance had been placed through a different carrier than the

17   one that gave the Notice of Cancellation, that they reversed the

18   charge to her account.  So, she's never paid anything.

19           MR. SPIKES:  But we have to look at the time

20   sequences.

21           THE COURT:  It is, how -- what financial loss has she

22   sustained?  I mean, are you disputing that her account was not

23   credited back with the premiums?

24           MR. SPIKES:  Yes, I am, Your Honor, I am.  I am

25   disputing that, and I am also disputing --

16

```
 1            THE COURT:  Well, you're an officer of the Court.  Do
 2    you understand you're making a representation to me that I'm
 3    assuming you're prepared to back up with an affidavit showing
 4    that, in fact, she paid these premiums?  Is that what you're
 5    telling me?
 6            MR. SPIKES:  Well, she paid the premium and I can show
 7    that she paid the premium based on the Financial Statement that
 8    she received from Well Fargo, and the money that she paid to
 9    Well Fargo on her --
10            THE COURT:  Well, the monies that she paid to
11    Wells Fargo were paid for the principal and interest on the
12    loan, weren't they?
13            MR. SPIKES:  No, sir, Your Honor, it really wasn't.
14            I'll tell you what I will do.  Let me explain this,
15    and I guess we can explain what has --
16            THE COURT:  Well, to make it simple, has Well Fargo or
17    has it not credited back to her account the amount of the
18    premiums that were charged to it?
19            MR. SPIKES:  From what I gather, no.  And my position
20    is even if they had credited the premium, a debt is a
21    obligation.  A debt is collateral.  A debt is as -- even though
22    it may be liquidity, it may be fungible, it's sold or the stock
23    market, it's traded every day, it's an obligation of which a
24    debtor has to pay.  And once that debt is posted, there's
25    damages.
```

```
 1          THE COURT:  There are what?

 2          MR. SPIKES:  There are damages.  Once the debt is

 3   posted on one's credit, on one's mortgage, that person is

 4   obligated to pay that mortgage and pay that debt to whatever

 5   extent it has been increased.

 6          THE COURT:  Well, let's assume for the moment that

 7   there was a posting error that they should not have charged her

 8   account for the premium at all, and then they reversed the

 9   charge and she's not charged any interest on the transaction.

10   How is she harmed?

11          MR. SPIKES:  I can't assume that it was a mistake.  We

12   have Williams versus --

13          THE COURT:  Well, they don't contend it was mistake.

14   They contend that your client was given notification that they'd

15   received a Cancellation Notice from Travelers, and that in order

16   to protect their interest, receiving no response to

17   communications, they procured, as was their right under the Deed

18   of Trust, insurance to protect their interest.

19          MR. SPIKES:  No, sir, Your Honor, that's, that's not

20   true.  When they received from Travelers, to the best of my

21   recollection, a Cancellation Notice, they also received notice

22   from Travelers that that insurance was also being cancelled

23   because she was getting new insurance and there would be no

24   lapse in coverage based on --

25          THE COURT:  You're representing to me as an officer of
```

0196

1  the Court that you've got a document you can present to me that

2  shows that Travelers did not tell Well Fargo that the policy was

3  being cancelled, but rather that it was being -- new insurance

4  was being procured by another insurance company whose identity

5  was disclosed to Wells Fargo?  Is that what you're telling me?

6          MR. SPIKES:  Well, Judge, I don't want to have you to

7  testify for me, with all due respect.  What I am saying to the

8  Court is simply this:  Travelers sent to Well Fargo a

9  Cancellation Notice.  Well Fargo, to the best of my

10 understanding, had the understanding that this cancellation was

11 for the placement of new insurance.

12         THE COURT:  But the notice from Travelers didn't say

13 that, did it?

14         MR. SPIKES:  Well, the notice from Travelers did not

15 say that, but the notice from Travelers did state that the

16 insurance had been cancelled.  And we have a document from

17 Travelers, from Great American showing why the insurance was

18 cancelled and that there was new coverage that was being taken

19 on the property for the collateral interest of Well Fargo.

20         And I'm saying to this Court that the only way that I

21 can say to this Court emphatically that Well Fargo did, in fact,

22 know that this insurance was not cancelled for a non-payment and

23 that this, that the coverage never ceased, that there was new

24 coverage on the property is through discovery.  And that is the

25 issue --

```
1              THE COURT:  Well, what you're telling me, though -- it
2    sounds like you're changing what you're telling me.  I need to
3    understand this.  It doesn't sound like you're disputing that
4    Travelers sent a notice to Wells Fargo stating that its coverage
5    had been terminated, correct?
6              MR. SPIKES:  Correct.
7              THE COURT:  But you're saying is that, is that even
8    though they got this notice, somehow they knew about another
9    policy being placed, right?
10             MR. SPIKES:  Correct.  And I would say that there's a
11   inference to that effect.  It was only --
12             If I may approach the easel?
13             It was only -- the first time the defendant ever said
14   that the policy was cancelled was on 5/7/12, on Document 17.1.
15             THE COURT:  This is the first time the defendant ever
16   said what?
17             MR. SPIKES:  Ever said that the policy was cancelled.
18   As far as they thought that this policy was cancelled, they
19   never said that the policy was cancelled in any documentation
20   from QBE or Well Fargo that they thought the policy was ever
21   cancelled.  They never said that, Your Honor.  This is the first
22   time that they said the policy was cancelled.
23             And when he stated that the policy was cancelled, if
24   you look at 17.1, it states that, QBE sent a letter to plaintiff
25   stating the policy was cancelled, but QBE never sent a letter
```

20

```
1    stating the policy was cancelled and Well Fargo never sent a

2    letter to plaintiff stating that the policy was cancelled.

3              And further --

4              THE COURT:  So, you're saying that the, that citation

5    is to the Memorandum in Support of the Motion to Dismiss?

6              MR. SPIKES:  Correct, Your Honor, but I'm saying that

7    the defendant would have this Court to believe that the

8    insurance was issued from QBE and Well Fargo because of the

9    cancellation, but there's no documentation from QBE or Well

10   Fargo at any time stating that the policy was cancelled.  And,

11   Your Honor, this is voluntary insurance that was cancelled.

12             It's counsel who said that it was cancelled and it's

13   counsel who moved the Cancellation Notice stating that it was

14   cancelled.  But I'm saying to this Court, at all times QBE and

15   Well Fargo secured the force placed insurance not on the issue

16   of cancellation.  They never stated that is was cancelled.  They

17   knew, and I can prove through discovery, I'm almost certain I

18   can, that they knew plaintiff had insurance at all times.

19             THE COURT:  Well, under the Deed of Trust, the lender

20   had the right to decide whether it was going to approve whatever

21   insurance she put on the property, didn't it?

22             MR. SPIKES:  Yes, sir.  And if the Court will allow

23   me, I will address that.

24             Now, the Deed of Trust stated that the plaintiff, the

25   plaintiff should have, should always maintain homeowners
```

1  insurance.  There's no question about that, she did.  Absolutely

2  no question, she always maintained homeowners insurance.

3          The Deed of Trust also stated that if the homeowner

4  did not maintain insurance, that the Well Fargo or whoever the,

5  whoever held the collateral interest would be allowed to obtain

6  fore placed insurance.

7          And the terms of the contract stated that, which shall

8  not be exercised unreasonably.  That is the reasonable clause in

9  the contract and that is the fair dealing clause in the

10 contract.

11         Now, the word "shall" which was used in the contract,

12 which state that it shall not be exercised unreasonably made it

13 mandatory that Well Fargo exercise reasonable care in obtaining

14 the insurance.  It also stated that --

15         THE COURT:  Now, wait, wait a minute.  Are you trying

16 to create a tort duty from that language?  All it's saying is

17 that our right to reject or accept insurance will not be

18 exercised unreasonably.

19         MR. SPIKES:  I understand, Your Honor, and if I may --

20         THE COURT:  That's essentially implied by case law in

21 any contract that has somebody observing the right to approve or

22 disapprove something, and the right must be exercised

23 reasonably, but that's not a negligence duty.

24         MR. SPIKES:  Well, Your Honor, if I may continue

25 please?  I understand what the Court is saying and I think I can

```
 1   get to a point where I bring more clarity to this.
 2            Your Honor, the contract states that in order for the
 3   defendant to obtain collateral coverage, plaintiff must not have
 4   voluntary coverage.  I am saying to this Court that only through
 5   discovery that I can determine with certainty that Well Fargo
 6   knew at all times that plaintiff maintained coverage.
 7            But even if she did not maintain coverage, the
 8   reasonableness clause in the contract states to Well Fargo that
 9   the coverage that Well Fargo is entitled to obtain may be
10   slightly more than, in the form of premium, than the coverage
11   that the plaintiff already had.
12            Now, the additional coverage of $8,120 from 2011 to
13   2012 was for plaintiff personal property.  There is nothing in
14   that contract that give Well Fargo authority to secure
15   collateral insurance for plaintiff personal property.  That goes
16   contrary to the word, collateral.  Well Fargo had absolutely no
17   collateral interest in Ms. Cannon's personal property and her
18   real estate.
19            Also, too, from 2010 to 2011, there was $7,844.30 Well
20   Fargo took out for, in a policy for Ms. Cannon personal
21   property.  That has nothing to do with collateral property and
22   collateral interest of Well Fargo.  That was far beyond the
23   terms of the contract.
24            Also, too, if we go back to the, to the 8,100 --
25   $8,011 in total --
```

```
 1          THE COURT:  Are you or are you not disputing that
 2    whatever premiums were charged to the account were reversed by
 3    Wells Fargo after your client produced evidence of insurance?
 4    Is that disputed or not?
 5          MR. SPIKES:  Your Honor, with all due respect to the
 6    Court, that's their defense.  This is a case here --
 7          THE COURT:  No, all I'm asking you is, do you dispute
 8    that the charges to the account for the premiums at issue were
 9    reversed?
10          MR. SPIKES:  I dispute it based on the fact that Well
11    Fargo has its books, Well Fargo has the wherewithal to change
12    its books any time it wants to.
13          THE COURT:  That's not my question.
14          MR. SPIKES:  Yes, Your Honor, I have disputed it.
15          THE COURT:  She has -- you know, you and I have
16    mortgages, I'm sure and we get monthly or quarterly statements
17    from the lender, and it shows the status of your account; what's
18    charged to it, what's credited to it and so forth.  All I want
19    to know is do you or do you not dispute, as we stand here today,
20    her mortgage account on the loan in question in this case has
21    been credited back for the premiums at issue?  Were they or were
22    they not credited back?
23          MR. SPIKES:  I would say, no, they were not credited
24    back to her.
25          THE COURT:  So, as an officer of the Court, you're
```

1  going to tell me that this account still has charged to it, plus

2  or minus $15,000 in premiums and that that charge has not been

3  reversed?  Is that what you're telling me?

4       MR. SPIKES:  I'm saying to you that that is my

5  position, that is my argument.

6       THE COURT:  No, I'm asking you to make -- tell me what

7  you know factually.

8       MR. SPIKES:  Your Honor, you are asking me to give you

9  a factual determination that only Well Fargo had.  That's one of

10  the reasons that individuals can get away with fraud.  If

11  clarity and specificity was explained to anyone who would -- the

12  defendant were trying to defraud, then fraud would not have a

13  definition.

14       I'm saying to you that Well Fargo did not just wake up

15  one morning and said to themselves, we are going to defraud

16  someone without coming up with a very elaborate plan.  And also,

17  coming up with a scheme so that if they are detected, they have

18  a way to back out.

19       And I'm saying to this Court that the issue relative

20  to the contract is a tangential issue, even though we're arguing

21  in it, arguing that issue as a primary issue.

22       The primary issue in this case is the same issue with

23  *Williams versus Well Fargo* in Florida.  Those individuals did

24  not have insurance.  And the question was, as I stated in the

25  complaint, whether Well Fargo secured that insurance for the

1  mere purpose of creating profit for QBE.  My position to you is

2  simply this:  Why would it charge the plaintiff $8,011 for

3  additional insurance; 7,400 and -- $7,844 for additional

4  insurance, for what reason?

5        THE COURT:  Well, my simple question is this.  Counsel

6  for the defense as an officer of the Court has represented to me

7  that whatever charges were assessed against her mortgage account

8  with respect to lender placed insurance have been reversed.  And

9  all I want to know is, do you dispute that the lender, the

10  lender has reversed those charges and they no longer appear on

11  her account?  That's all I want to know.

12        MR. SPIKES:  I don't know what appears on her account.

13        Yes, I do dispute that, Judge.  I'm saying to the

14  Court that I need discovery in order to say to the Court with

15  some specificity --

16        THE COURT:  Well, you need to have something more than

17  speculation to bring a lawsuit.  I mean, you're in possession of

18  your own client's mortgage account.  You can tell whether it's

19  been credited back or not.

20        MR. SPIKES:  No, I can't, Your Honor.

21        THE COURT:  I mean, I didn't know whether we're here

22  with serious business or not.  I mean, if your client has

23  suffered no loss, then that's a fact that I need to take into

24  account in deciding what to do with this case.

25        MR. SPIKES:  Well, she has suffered a loss.

```
 1                THE COURT:  What loss has she suffered?

 2                MR. SPIKES:  And she just may have --

 3                Well, Judge, let's assume that they charged her

 4      account, and let's assume she made payments on that money, on

 5      the money that they charged her.  And then let's assume that

 6      they reversed it.  That's damages.  She paid.

 7                THE COURT:  How is that damages if they reversed it?

 8                MR. SPIKES:  If she actually paid -- if someone take

 9      your credit card and charge something on your card, and when you

10      come to understand that this has been unlawfully charged, they

11      re-credit, they credit you, you have suffered a damage.  You

12      have suffered damages.

13                THE COURT:  How have I suffered damages if my account

14      has had a charge made to it that was reversed?

15                MR. SPIKES:  Your Honor, I'm saying to the Court that

16      there is three, $300, there's $60 that Ms. Cannon is certain to

17      have paid on the premium.  The premium was never disclosed to

18      Ms. Cannon on her home mortgage equity statement, but the cost

19      of the insurance, what she had to pay on the insurance was

20      disclosed.

21                There is a, there is a charge of 7,000, $7000 for

22      insurance -- $7,412 that was credited to her account that there

23      is no mention anywhere from any of the defendant's documents

24      that that particular amount of money was for anything.

25                We have $7,412 that was revealed on her account as
```

1    being reversed.  Now, there is nothing in any of the documents

2    that Well Fargo has provided me to explain why she was charged

3    the $7,412.

4          And also, too, in reference to whether the defendant

5    understood that Ms. Cannon had insurance or did not have

6    insurance, the defendant charged Ms. Cannon 8,100 -- $8,011.20

7    for 12 -- 2/11 to 2/12.  That was supplemental insurance,

8    additional insurance.

9          In order to give someone additional insurance, you

10   must have primary insurance.  So, we are going to say that Well

11   Fargo, a company that is as shrewd as Well Fargo is in finance

12   will issue a supplemental policy that is not even for

13   Ms. Cannon's interest and not recognize a primary policy.

14         The question to the Court is simply this:  Why would,

15   under the contract, Well Fargo issue a supplemental policy from

16   2011 to 2012, and not a primary policy for their collateral

17   interest?  There is nowhere in Well Fargo documentation that

18   will show this Court that Well Fargo secured its interest from

19   2011 to 2012, but yet it secured plaintiff's personal interest.

20   That just doesn't sound right, Your Honor.

21         THE COURT:  Well, let me ask you this, Mr. Spikes.

22   What is the basis for this Court to have jurisdiction over this

23   case?

24         MR. SPIKES:  The diversity of citizenship.

25         THE COURT:  Well, where is $75,000?

0206

28

1              MR. SPIKES:  We are speaking of --

2              THE COURT:  I mean, you're talking about a couple of

3     payments that you're claiming were charged to your account that

4     they've reversed.

5              MR. SPIKES:  I don't know that we agree with that.

6              THE COURT:  And you're saying that you were damaged

7     even if they have been reversed, but how do I get to $75,000?

8              MR. SPIKES:  The property that is collateralized,

9     collateralized is -- Well Fargo has an interest in that property

10    to extent of $176,000.

11             THE COURT:  That's not the amount in controversy in

12    this case.

13             MR. SPIKES:  I know.

14             THE COURT:  The damages have to be the amount in

15    controversy.  The damages aren't measured by the amount of your

16    loan.

17             MR. SPIKES:  Well, the issue of damages, Your Honor,

18    can very well be an issue as far as the matter of jurisdiction.

19    But I will say to this Court that QBE is not a citizen of the

20    state of Maryland.  And again, we're speaking of the amount in

21    controversy.

22             THE COURT:  Well, I'm not talking about diversity in

23    terms of whether the persons are citizens of different states.

24    I'm asking the question of whether there's $75,000 in

25    controversy in this case?

1    MR. SPIKES:  Well, if you're asking me, Judge, whether

2    there is a ascertainable amount of damages that Ms. Cannon can

3    come up with and for the expenditure to the extent of $75,000,

4    I'll say to you that that may not be there.  But I will say to

5    you that under the Truth and Lending Act, there is a federal

6    question.

7          THE COURT:  Well, where is there a federal -- where is

8    there a Truth and Lending Act claim in this case?

9          MR. SPIKES:  Well, disclosure.

10         THE COURT:  Well, where -- I mean, your complaint is

11   very, very difficult to read and I've read it, but I don't see a

12   federal claim in this case.  Now, maybe I've missed something.

13   I mean, I'm looking at the counts in your complaint and the

14   first count is for breach of contract.  The second count is for

15   malicious breach of contract; third count is for fraud; fourth

16   count is for fraud; fifth count is for Maryland Unfair and

17   Deceptive Trade Practices; sixth count is fraudulent

18   concealment; seventh count is common law fraud.

19         There's two count sevens.  The second one is breach of

20   fiduciary duty; eighth is unjust enrichment; the ninth is

21   conversion, and the tenth is negligence and negligent

22   misrepresentation.  So, where is there a federal claim in this

23   complaint?

24         MR. SPIKES:  In the caption of the complaint,

25   Your Honor --

1          THE COURT:  I can't hear you, sir.

2          MR. SPIKES:  In the caption of the complaint under the

3  Unfair and Deceptive Trade Practice, we have the

4  Truth-in-Lending Act.  And we invoke the federal subject matter

5  jurisdiction based on the federal question.  And that is also in

6  the body of the complaint.

7          THE COURT:  Well, Count five is a count for violation

8  of Maryland Unfair Deceptive Trade Practices Act.

9          MR. SPIKES:  The count doesn't necessarily specify the

10  jurisdiction, but the claim for jurisdiction does, Your Honor.

11  And the, under the Truth-in-Lending Act, the defendant has a

12  responsibility to disclose.  And I'm saying to this, to the

13  Court that we have invoked the Truth-in-Lending Act.  That's a

14  federal question.

15          THE COURT:  All right.  Anything further?

16          MR. SPIKES:  Yes, sir, Your Honor.

17          The contract under *Jacque* [sic] and also under the

18  Uniform Commercial Code, and also what this Court has ruled in

19  the *Stewart* case, the *Marjorie Stewart* case, it looks to the

20  Uniform Commercial Code as to a bank obligation to be fair.  And

21  Judge Hollander, Holland also ruled in the same, consistently.

22  And that is that the terms of the contract must be dealt with

23  fairly by the defendant.

24          The insurance that was obtained for plaintiff was

25  $15,855.01 a year.  That's how much she would be required to

1  pay. Her premium is $1,763 per year. That's unreasonable. The

2  contract states that it be slightly different. This is not

3  slightly different.

4        Here we have the collateral interest for Well Fargo

5  being 704,000. Now, for 704,000 plaintiff purchased coverage

6  for $1,763, and defendant has coverage for $15,855. Now,

7  defendant has in the Exhibit A, B and C, it explains what is

8  called a 90-day binder, which is for 90 days. And that 90-day

9  binder is for $7,844.

10       But that being the case, if you add that to the

11  coverage, the premium multiply times four, because there's four

12  quarters in one year, we would come out with $31,377 for one

13  year of coverage for collateral interest that is $164,250.

14       Now, we speak of breach of contract. The Columbia

15  Bank, those cases explain to the Court the unique position a

16  bank is in with its customers, and that unique position creates

17  a duty of care. This Court and Judge Holland, Hollander stated

18  in *U.S. Bank versus Manufactures and Traders Trust*, and this

19  case was cited in this Court and also in the *Stewart* case, that

20  the duty of care that is owed to a plaintiff can be determined

21  from the contract terms or from the Uniform Commercial Code.

22  Therefore, there is a duty of care.

23       This Court has also ruled that when there is a duty of

24  care, and Judge Hollander ruled, relative to the bank, the

25  action in negligence can be sustained. And in the recent case

1   on the easel there, she did sustain a negligent cause of action

2   based on breach of contract.

3        THE COURT:  What if anything was especially vulnerable

4   about your client in its contractual relationship with

5   Wells Fargo?

6        MR. SPIKES:  Okay.  The vulnerability, Your Honor, is

7   simply this:  There are many lawyers who do not understand bank

8   transactions.  My client is not in the banking business.  My

9   client depends on the bank, as the bank knows she does, to deal

10   fairly and equitably with her mortgage statements and her

11   premiums, and the cost of insurance or whatever the bank may do.

12        THE COURT:  What I'm asking you is, how is she

13   especially vulnerable, subject to unique damages if they were to

14   make a mess out of her account?  Tell me how she was especially

15   vulnerable unlike other regular customers.

16        MR. SPIKES:  She were vulnerable -- if the defendant

17   wants to say that she's a business, her livelihood depends on

18   the insurance.

19        THE COURT:  Well, have you read *Jacques versus*

20   *Maryland National Bank*?

21        MR. SPIKES:  Yes, sir, I have.

22        THE COURT:  All right.  Well, tell me what made your

23   client especially vulnerable sufficient to justify imposition of

24   a tort duty.

25        MR. SPIKES:  In *Jacques*, Your Honor, it appears

33

1   that -- and I know I had pronounced it Jay-Qui.  Jacque went to

2   the bank for a loan because it wanted to finance a new house or

3   accept the house.  The bank approved -- the bank pronised Jacque

4   a certain amount of money.  Then the bank sent Jacque a letter

5   stating to Jacque that that amount of money would not be

6   available to Jacque.  So, Jacque filed suit.

7         But -- and Jacque went to another bank to obtain a

8   loan, but the interest rate at that time had increased to the

9   extent that it would have been approximately $5,000 more on the,

10  on the end of the loan.  So, Jacque filed suit.

11        The Court stated that a bank that violate its own

12  regulations is liable.  Even though Jacque went to the Court of

13  Special Appeals and the Court of Special Appeals sent Jacque

14  back down to the, to the lower court, the Court recognized that

15  Jacque had a cause of action that went beyond breach of

16  contract.

17        And also, too, in *Jacque* it was understood that Jacque

18  filed a cause of action for malicious interference with

19  contractual rights.  Now, this Court may not recognize malicious

20  breach of contract, but my claim for malicious breach of

21  contract were based on the fact that the complaint is sufficient

22  to show, based on the facts, that the defendant maliciously,

23  willfully and intentionally breached a contract.

24        So, the, the position that Jacque was in is the same

25  position that my client is in as far as reliance is concerned.

```
 1    And I will say to this Court that every position that is taken
 2    between a bank and a customer create a difference in the -- as
 3    to vulnerability of the client.  Every client is vulnerable to
 4    the bank.
 5              THE COURT:  So, you're saying that every bank owes a
 6    negligence duty to all of its customers generally?
 7              MR. SPIKES:  No, sir.  I'm saying that the Uniform
 8    Commercial Code 31034 imposed upon the bank good-faith and fair
 9    dealing.  Good-faith and fair dealing means that you honor the
10    terms of the contract.  When you go beyond those terms of the
11    contract and you know you've gone beyond those terms of the
12    contract, then you also understand that you are not dealing
13    fair.
14              And I would ask this Court, can anyone say that
15    $15,000 a year cost in premium is fair when plaintiff's premium
16    coverage cost for the same coverage, identical coverage, is
17    $1,763.  That's not fair, Your Honor.
18              THE COURT:  Okay.  All right.  Mr. Spikes, you need to
19    wrap up.  This hearing was set for an hour and we've already
20    exceeded an hour, so we need to wrap up quickly.
21              MR. SPIKES:  Well, I would like to just say a few
22    other things, Your Honor.
23              Number one, Ms. Cannon was charged with $8,120.  She
24    was charged with $7,844 for personal property, not for a
25    plaintiff collateral -- not for the defendant collateral
```

1   interest.  Also, too, she was charged on her equity mortgage

2   statement.  It appeared that she was reimbursed $7,412, with

3   there being no representation anywhere where that particular

4   cost and that particular item come from, came from.

5       I would say to this Court that in *Schwartz versus the*

6   *bank, Bank of America*, the Court came to the conclusion that

7   even if a person was not a customer to the bank, a customer of

8   the bank, the bank still owed that person a duty of care and a

9   tort action could arise from that duty of care.

10      Schwartz was a person who had, apparently, an

11  alcoholic problem.  He didn't take good care of himself, he

12  died.  The person who was taking care of him allegedly changed

13  the terms of the account and entered into the account, and took

14  some of his money.

15      The person who brought suit was not a customer of the

16  bank, and in that case the Court found that there were, there

17  were relationships that was special and sufficient to maintain a

18  cause of action and tort.

19      I would also say to the Court that if the Court would

20  understand this ruling in the *Marjorie Stewart* case, Your Honor

21  issued that ruling.  This was a case where you were dealing with

22  employment discrimination.

23      THE COURT:  I can't hear you, Mr. Spikes, when you're

24  walking in the room.

25      MR. SPIKES:  I'm sorry.  In the *Marjorie Stewart* case,

1    Your Honor issued the opinion in that case.   And this was a case

2    dealing with employment discrimination.   And this Court,

3    Your Honor stated clearly that the cause of action as far as a

4    tort liability is concerned, could derive from a contract action

5    under the Uniform Commercial Code.

6          The reason this Court did not rule in Ms. Marjorie

7    favor is that she was still in her home, there was no

8    foreclosure and that particular section of the code had not been

9    violated.  But the Court explained in all terms that if that

10   particular code section had been violated, she would have had a

11   cause of action in tort beyond the breach of contract claim.

12         Now, I was closing saying to the Court that in Florida

13   we have the *William* case.  The *William* case is a case where the

14   plaintiffs had allowed their insurance to either lapse or they

15   did not have insurance.  Defendant Well Fargo manipulated the

16   terms of the contract for profit.  And I will say to this Court,

17   where is there justification for $8,011 insurance charged to

18   plaintiff and $7,844 charged to plaintiff for insurance that was

19   not of collateral interest for Well Fargo?

20         And I will say to the Court -- and if the Court just

21   give me two more minutes, please.

22      (Pause.)

23      MR. SPIKES:  I would ask the Court to take a look at

24   Defendant Exhibit Document 9-4, page 5.  This policy, this is an

25   additional name insurance certificate for $7,844.30.  At the

1    bottom it said, Personal property and personal liability

2    coverage.  That has nothing to do with Well Fargo's collateral

3    interest, and the contract did not permit such coverage.

4         Then we go up -- we come to Document 9.5, additional

5    named insurance certificate.

6         THE COURT:  Mr. Spikes, I have read these exhibits,

7    okay.  And I told you, we're already ten minutes over and I got

8    people waiting for me that's --

9         MR. SPIKES:  Thank you, Your Honor.

10        THE COURT:  I really need to proceed, okay.

11        You may proceed.

12        MR. POPE:  Your Honor, just one statement in response

13   to the Court's question on subject matter jurisdiction.  We did

14   not move to dismiss on that basis, because this is a putative

15   class action.  I won't say any more on that point, but I will

16   conclude by asking the Court to consider dismissing this Amended

17   Complaint with prejudice.

18        Thank you.

19        THE COURT:  All right.  Well, this has been brought --

20   it would be subject to the recent Class Action Reform Act.  I

21   suppose, we could possibly consider it.

22        All right.  Let me address the issues raised by the

23   Motion to Dismiss.  The plaintiff in this case filed a complaint

24   against Wells Fargo Bank, which is a successor to Wachovia Bank

25   in relation to a loan that had been made by Wachovia which was

1  secured by a Deed of Trust on a daycare center operated by the

2  plaintiff at 12400 Fort Washington Road in Fort Washington,

3  Maryland.

4        The plaintiff, as I said, executed a Deed of Trust in

5  favor of Wachovia that's attached to the complaint and is,

6  therefore, a document that the Court can refer to.  The Deed of

7  Trust contained provisions which are typical under such

8  circumstances authorizing --

9        Well, first of all, requiring the borrower to maintain

10  insurance for its protection as well as that of the lender.  And

11  then having continuing provisions that provided for the right of

12  the lender to provide insurance in the absence of satisfactory

13  proof of the required insurance.

14        The plaintiff contends that the defendant improperly

15  charged her loan account for premiums that were expended by it,

16  to procure insurance that, at least in the view of the bank, had

17  not been provided by the plaintiff.

18        The plaintiff has filed this suit and a purported

19  class action raising a number of complaints about the actions

20  taken by the defendant.  I have granted leave to the plaintiff

21  to file an Amended Complaint.  The Amended Complaint is

22  extremely difficult to read.  It didn't comply with our red line

23  rules, but I've basically given up on the plaintiff being able

24  to comply with the red line rules so we can see what the changes

25  are.

1    But reading the entire document from scratch, there

2    are profound questions as to the drafting of the complaint, but

3    more importantly, as to the adequacy of the allegations in the

4    complaint.

5        First of all, the Deed of Trust in this case

6    authorized the lender to obtain coverage and, but it was not

7    obligated to do so.  And the defendant in this case contends

8    that it received and it has attached a copy of a notification

9    from Travelers, which does not say what counsel for the

10    plaintiff said or suggested, but it simply says, it's been

11    cancelled.  And that's a, it's a flat-out Notice of Cancellation

12    of Coverage; and that is attached to the Motion to Dismiss the

13    Amended Complaint or -- excuse me, it's a reply.  And it's a

14    straight-forward notification of cancellation.

15        It's attached as Exhibit B to the reply filed by

16    Wells Fargo.  It doesn't say somebody else is providing

17    coverage.  It simply says, please take notice that the policy

18    designated above has been cancelled.  Your interest under the

19    policy is cancelled as of the date of cancellation above.  And

20    in this case, the lender exercised its right to procure

21    insurance.

22        It's been represented to me that at a later time, the

23    plaintiff provided evidence to Wells Fargo that, while it is

24    true that Travelers had cancelled the policy, that another

25    lender, another -- excuse me, another insurer had been procured.

And once that information was brought to the attention of
Wells Fargo, it reversed charges that had been made to the
lending, lenders of the borrower's account.  And so, we have a
situation where it is quite difficult for the Court to
understand how there's been any damages in this case at all.

But let me address the allegations of the complaint in
greater detail.  The complaint has also added another defendant
which apparently is the insurance company that issued the policy
of insurance procured by Wells Fargo. I do not yet have a Motion
to Dismiss filed by that defendant, but I have grave
reservations as to whether there's any cause of action,
whatsoever, against that defendant in this case.

As far as I can tell, there's been no evidence of
service of the, of the Amended Complaint on the new defendant.
All I see is an Affidavit of Service on Wells Fargo.  So, I'm
not quite sure what the intentions of the plaintiff are with
respect to this other defendant.

MR. SPIKES:  If I may, Your Honor, please?

THE COURT:  No, no.  Just let me continue please.

The first major problem with the plaintiff's
complaint, and this applies to almost all of the counts and
would have been, it would also include claims against the not
yet served defendant.  The plaintiff attempts to assert a large
variety of tort claims in this case.  Other than Count One,
which is a breach of contract count, the remaining counts are

1    tort counts.

2         There is a malicious breach of contract which really

3    isn't really recognized in Maryland, but if it's anything, it's

4    a tort claim. There's a fraud claim in Count Three. There's a

5    second fraud count against the new defendant, QBE. There's a

6    violation of the Maryland Unfair Deceptive Trade Practices Act

7    in Count Five.

8         There's multiple counts in here that are mis-numbered;

9    fraudulent concealment in Count Six, common law fraud in Count

10    Seven, a second breach of fiduciary count in Count Seven. I

11    guess, it's two Count Sevens, I guess. An unjust enrichment

12    count in Count Eight, a conversion count in Count Nine, and an

13    apparent -- yeah, a negligence count or negligent

14    misrepresentation in Count Ten.

15         As I said, the complaint is rather dis-jumbled and

16    sloppy, and it's very hard to discern exactly what's being

17    asserted, but let's, first of all, talk about the tort claims.

18         This Court is well aware of the ruling of the Maryland

19    Court of Appeals in *Jacques versus Maryland National Bank*. In

20    fact, I've had to argue before another judge of this Court when

21    I was practicing in significant issues relating to that case and

22    how to interpret it in a case called, *HSA/Wexford versus*

23    *Silver Hill Partnership*, if I recall it correctly, in which I

24    prevailed in front of Judge Messitte in how to interpret that

25    case.

1           But it is very simple that when there is a contractual

2    relationship, as there is here, the Economic Loss Doctrine is

3    going to preclude you from pursuing damages other than those

4    which are awardable under the contract itself, unless we can

5    come up with some notion that would create a tort duty.

6           On the general subject of creating tort duties where

7    tort duties don't exist, the most famous quote on this subject,

8    which I think is mentioned in the *Jacques* case is the famous

9    quote of Justice Blackmun in *East River Steamship Corporation*

10   *versus Transamerica Delaval*, which is 476 U.S. 858, where he

11   cautioned what would happen if we did not restrain ourselves

12   with the obvious restrictions of the Economic Loss Doctrine.

13          In that case, there was an attempt to create a

14   products liability claim that was rejected by the Supreme Court,

15   and he cautioned that, quote, "It is clear, however, that if

16   this development were allowed to progress too far, contract law

17   would drown in a sea of tort" unquote.  That's his famous quote.

18          And that's exactly the caution that Judge McAuliffe in

19   his opinion of *Jacques* mentioned.  In *Jacques*, a very, very

20   narrow exception was created when there is a contractual

21   relationship between the parties.  And that was when under the

22   unique circumstances that were only present in *Jacques*, but

23   woefully lacking here, there was a case of a special

24   vulnerability of the plaintiff to harm, above and beyond the

25   terms of the contractual instrument itself.

1          That is utterly lacking in this case.  This is a case

2    in which the relationship between the parties is defined by the

3    Deed of Trust and note, and the notion of allowing a broad

4    assortment of tort claims to arise out of a matter that is fully

5    and comprehensively covered by a contractual relationship is one

6    that this Court simply will not accept.

7          So, because of that, the Court concludes that Count

8    Two, malicious breach of contract, is deficient as a matter of

9    law and will be dismissed.  Count Three, fraud against the

10   defendant, first of all, comes nowhere close to meeting the

11   particularized requirements for allegations of fraud, but it

12   really -- all it does is regurgitate the same complaints that

13   the account of the plaintiff was charged for a premium for

14   lender placed insurance, which is hardly enough to constitute a

15   fraud claim.

16         Count Four, which is misspelled Count Fount, is a

17   second fraud claim in this case against QBE, which is also

18   deficient as a matter of law, because it's -- there's simply no

19   basis for a fraud claim against QBE which provided insurance to

20   the lender, which was the lender's right to procure under the

21   terms of the Deed of Trust.

22         There's also no basis for the Count Six, the

23   fraudulent concealment, which is also misspelled.  This is,

24   again, a -- it relates solely to the question of a contractual

25   relationship and whether Wells Fargo complied with its

obligations under the contract.

Count Seven is a common law fraud.  Again, it utterly fails to meet the requirements of pleading a fraud claim, but it is, quite simply, a regurgitation of complaints that the account was wrongfully charged for lender placed insurance.

Count Seven is a breach of fiduciary duty, and that likewise falls because I'm not going to permit a tort claim to be derived from an existing contractual relationship for which there's a complete remedy.

Count Eight is unjust enrichment and that cannot apply in this case, because there's an existing undisputed contractual relationship between the parties, and that would be fully complete in terms of a remedy.

Count Nine is conversion, which once again is attempting to make a tort claim under circumstances in which there is a contractual remedy, and I will not do what Judge -- Justice Blackmun cautioned against doing.

And then, finally, Count Ten, for negligence, again, is barred by *East River Steamship, Jacques* and other cases applying the Economic Loss Doctrine to a circumstance like this.

Now, the count that is for breach of contract, again, is deficient as a matter of law, because the -- Wells Fargo had the right to place insurance in the absence of insurance information being satisfactorily provided to it.  They did. They had the right to do that.  That is not a breach of

1    contract.  When the borrower finally gave evidence of the

2    existence of insurance, whatever charges that had been imposed

3    on the account were reversed.  I see no basis for a breach of

4    contract claim whatsoever.

5          One must remember that it was the right of Wells Fargo

6    under the Deed of Trust to except or reject proposed insurance

7    by the borrower, even if one were to assume that this borrower

8    showed them insurance, but that's not what happened.  And they

9    had no obligation to inform the plaintiff of their intent to

10   obtain coverage.  That's an allegation in here.

11         What was reserved to the lender was the right to

12   procure insurance to protect its interest.  And no lender is

13   obligated to sit idly by when they are not satisfied that their

14   interest has been protected and allow it to be harmed by

15   allowing a property to go uninsured and, therefore, impair the

16   security interest.

17         Now, I've already addressed the unjust enrichment

18   claim, but I'll do it again.  I mean, it's a tort claim that I

19   don't think applies in this circumstance at all.  And the, all

20   the plaintiff has told me in response to the suggestion by the

21   defense that, whether the charges were ever reversed was that

22   she was harmed because the charges had been on her account at

23   one time.  And that simply does not constitute unjust enrichment

24   and it doesn't constitute damages.

25         There's also a claim for the violation of the Maryland

1    Consumer Protection Act.  That does not apply because this, this

2    transaction on its face is not a consumer transaction, but it's

3    on its face styled as a business transaction for a daycare

4    center, and I conclude that there's simply no basis for it.

5              Accordingly, I'm going to grant the Defendant's Motion

6    to Dismiss.  I will deny the motion of the plaintiff to file an

7    Amended Complaint, because I believe that any amendments under

8    the circumstances factually before the Court would be feudal.

9              I will -- the Motion to Dismiss that I'm granting is

10   16.  That's the Motion to Dismiss the Amended Complaint.  The

11   Motion to Dismiss in number nine is denied as moot.

12             And I will deny the Plaintiff's Motion for Leave to

13   File Supplemental Written Supplement or Argument.  I'm not even

14   sure what it means.  It's essentially nonsensical.  I can't even

15   understand what it's saying.  But I think I have more than

16   sufficient information in front of me to conclude that this is a

17   complaint that cannot possibly survive a Motion to Dismiss.

18             I will therefore dismiss the entire complaint with

19   prejudice as to Wells Fargo Bank.  I will dismiss it also

20   without prejudice as to QBE.  If the plaintiff wishes to pursue

21   a claim against QBE, and I am extremely skeptical that there

22   could possibly be a basis for a claim against it, it will have

23   to file an Amended Complaint limited to QBE.

24             And I, again, would caution the plaintiff that that

25   may not be an intelligent thing to do, unless there are far more

47

```
1    facts available to the plaintiff to allege than are before the
2    Court today.
3             Thank you very much.
4             MR. POPE:  Thank you, Your Honor.
5        (Recess at 11:15 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1             CERTIFICATE OF COURT REPORTER

2      I, Linda C. Marshall, certify that the foregoing is a

3 correct transcript from the record of proceedings in the

4 above-entitled matter.

5

6

7

8           _____
          Linda C. Marshall, RPR

9           Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

$1,763 [3]   31/1 31/6 34/17
$15,000 [2]   24/2 34/15
$15,855 [1]   31/6
$15,855.01 [1]   30/25
$164,250 [1]   31/13
$176,000 [1]   28/10
$300 [1]   26/16
$31,377 [1]   31/12
$5,000 [1]   33/9
$60 [1]   26/16
$7,412 [4]   26/22 26/25 27/3 35/2
$7,844 [5]   14/18 25/3 31/9 34/24 36/18
$7,844.30 [2]   22/19 36/25
$7000 [1]   26/21
$75,000 [4]   27/25 28/7 28/24 29/3
$7800 [1]   4/11
$8,011 [4]   14/8 22/25 25/2 36/17
$8,011.20 [1]   27/6
$8,120 [2]   22/12 34/23
$8000 [1]   4/20
$8011 [1]   14/18

1
1-A [2]   10/9 10/18
10:00 [1]   1/9
10th [1]   5/4
11 [1]   27/7
110 [1]   1/19
11:15 [1]   47/5
12 [4]   5/12 19/14 27/7 27/7
12-377 [2]   1/5 2/3
12400 [1]   38/2
16 [1]   46/10
17.1 [2]   19/14 19/24
1703 [1]   1/15
18 [3]   7/11 11/15 11/18

2
2/11 [1]   27/7
2/12 [1]   27/7
20001 [1]   1/15
2010 [7]   2/24 3/7 3/14 3/25 5/1 10/11 22/19
2011 [5]   14/9 22/12 22/19 27/16 27/19
2012 [7]   1/8 4/22 5/4 14/9 22/13 27/16 27/19
202-288-4175 [1]   1/16
20th [1]   3/14
21204 [1]   1/19
29 [1]   1/19

3
301 [1]   1/23
31034 [1]   34/8
3229 [1]   1/23
344-3229 [1]   1/23
377 [2]   1/5 2/3

4
410-494-7777 [1]   1/20
4175 [1]   1/16
476 [1]   42/10

5
5/7/12 [1]   19/14

7
7,000 [1]   26/21
7,400 [1]   25/3
704,000 [2]   31/5 31/5
7777 [1]   1/20

8
8,100 [3]   14/8 22/24 27/6
858 [1]   42/10

9
9-4 [1]   36/24
9.5 [1]   37/4
90 [1]   31/8
90-day [2]   31/8 31/8

A
a.m [2]   1/9 47/5
able [1]   38/23
about [12]   3/7 5/9 10/20 14/3 15/8 19/8 21/1 28/2 28/22 32/4 38/19 41/17
above [3]   39/18 39/19 42/24 48/4
above-entitled [1]   48/4
absence [2]   38/12 44/23
absolutely [1]   21/1 22/16
accept [3]   21/17 33/3 43/6
accidents [1]   8/14
According [1]   4/5
Accordingly [1]   46/5
account [35]   4/12 5/6 7/4 7/19 9/21 11/20 15/10 15/18 15/22 16/17 17/8 23/2 23/8 23/17 23/20 24/1 25/7 25/11 25/12 25/18 25/24 26/4 26/13 26/22 26/25 28/3 32/14 35/13 35/13 38/15 40/3 43/13 44/4 45/3 45/22
accounts [1]   5/14
acknowledged [1]   13/4
Act [11]   10/1 11/4 29/5 29/8 30/4 30/8 30/11 30/13 37/20 41/6 46/1
acted [1]   12/5
action [15]   1/4 12/2 31/25 32/1 33/15 33/18 35/9 35/18 36/3 36/4 36/11 37/15 37/20 38/19 40/11
actions [1]   38/19
actual [2]   3/15 12/9
actually [2]   8/18 26/8
add [1]   31/10
added [1]   40/7
additional [9]   4/7 6/12 22/12 25/3 25/3 27/8 27/9 36/25 37/4
address [6]   5/11 5/15 13/10 20/23 37/22 40/6
addressed [1]   45/17
adequacy [1]   39/3
advanced [1]   4/9
advising [1]   4/15
affidavit [6]   12/14 13/2 13/25 14/5 16/3 40/15
after [8]   3/23 3/24 5/9 13/13 13/18 13/18 14/3 23/3
again [12]   1/16 8/17 9/14 12/7 28/20 43/24 44/2 44/14 44/18 44/21 45/18 46/24
against [13]   5/13 8/22 25/7 37/24 40/12 40/22 41/5 43/9 43/17 43/19 44/17 46/21 46/22
ago [1]   2/24

agree [1]   28/5
agricultural [1]   10/4
AIDED [1]   1/24
alcoholic [1]   35/11
all [37]   2/13 2/19 5/17 5/21 6/20 6/22 6/25 13/8 14/1 17/8 18/7 20/14 20/18 21/16 22/6 23/5 23/7 23/18 25/9 25/11 30/15 32/22 34/6 34/18 36/9 37/19 37/22 38/9 39/5 40/5 40/15 40/21 41/17 43/10 43/12 45/19 45/19
allegation [3]   12/5 12/8 45/10
allegations [3]   39/3 40/6 43/11
allege [1]   47/1
allegedly [1]   35/12
allow [2]   20/22 45/14
allowed [3]   21/5 36/14 42/16
allowing [2]   43/3 45/15
almost [2]   20/17 40/21
alone [1]   12/2
already [4]   22/11 34/19 37/7 45/17
also [28]   4/7 14/2 15/25 17/21 17/22 21/3 21/14 22/19 22/24 24/16 27/4 30/5 30/17 30/18 30/21 31/19 31/23 33/17 34/12 35/1 35/19 40/7 40/22 43/17 43/22 43/23 45/25 46/19
always [2]   20/25 21/2
am [7]   15/24 15/24 15/24 15/25 18/7 22/4 46/21
Amended [11]   4/5 4/7 5/10 37/16 38/21 38/21 39/13 40/14 46/7 46/10 46/23
amendments [1]   46/7
America [1]   35/6
American [2]   10/10 18/17
amount [10]   7/5 16/7 26/24 28/11 28/14 28/15 28/20 29/2 33/4 33/5
amounts [2]   5/6 7/17
and neither [1]   6/15
ANDREA [3]   1/4 2/3 2/9
Andrea Cannon [2]   2/3 2/9
annual [2]   4/19 7/2
another [11]   4/15 4/16 12/20 18/4 19/8 33/7 39/24 39/25 39/25 40/7 41/20
any [23]   4/9 6/6 7/5 7/20 8/7 8/13 8/14 9/10 9/16 10/5 12/8 12/11 17/9 19/19 20/10 21/21 23/12 26/23 27/1 37/15 40/5 40/11 46/7
anyone [2]   24/11 34/14
anything [9]   9/9 11/1 11/2 11/8 15/18 26/24 30/15 32/3 41/3
anywhere [2]   26/23 35/3
apparent [1]   41/13
apparently [2]   35/10 40/8
Appeals [3]   33/13 33/13 41/19
appear [1]   25/10
APPEARANCES [1]   1/13
appeared [1]   35/2
appears [2]   25/12 32/25
applies [2]   40/21 45/19
apply [2]   44/10 46/1
applying [2]   8/12 44/20
appreciate [1]   2/18
approach [1]   19/12
approve [2]   20/20 21/21

**A**

approved [1]   33/3
approximately [1]   33/9
are [43]   2/4 4/4 5/12 5/14
  5/17 5/21 6/14 6/21 6/22 7/18
  7/20 8/4 8/15 10/3 10/3 11/5
  13/9 14/17 15/11 15/22 17/1
  17/2 21/15 23/1 23/1 24/8
  24/15 24/17 27/10 28/1 28/9
  32/7 34/12 38/7 38/25 39/2
  40/16 40/25 41/8 42/4 45/13
  46/25 47/1
area [1]   3/1
aren't [1]   28/15
arena [1]   9/24
argue [2]   9/14 41/20
arguing [2]   24/20 24/21
argument [7]   5/16 5/19 6/20
  9/7 11/7 24/5 46/13
arise [3]   5/21 35/9 43/4
arises [1]   9/15
arising [1]   8/4
as [60]
ascertainable [1]   29/2
ask [3]   27/21 34/14 36/23
asking [10]   3/13 4/16 11/13
  23/7 24/6 24/8 28/24 29/1
  32/12 37/16
assert [1]   40/23
asserted [1]   41/17
assessed [1]   25/7
assist [1]   8/9
Association [1]   2/4
assortment [1]   43/4
assume [6]   17/6 17/11 26/3
  26/4 26/5 45/7
assuming [1]   16/3
at [25]   2/15 6/22 6/23 9/20
  10/8 15/19 17/8 19/24 20/10
  20/14 20/18 22/6 23/8 23/21
  29/13 33/8 36/23 36/25 38/2
  38/16 39/22 40/5 45/19 45/22
  47/5
Atlantic [1]   3/1
attached [5]   12/23 38/5 39/8
  39/12 39/15
attacking [1]   12/16
attempt [1]   42/13
attempting [1]   44/15
attempts [1]   40/23
attention [1]   40/1
August [1]   3/25
authority [3]   9/14 12/3 22/14
authorized [2]   11/24 39/6
authorizing [1]   38/8
available [2]   33/6 47/1
Avenue [1]   1/15 1/19
avoid [1]   6/9
awardable [1]   42/4
aware [1]   41/18
away [1]   24/10

**B**

back [14]   2/23 9/8 9/12 9/23
  15/23 16/3 16/17 22/24 23/21
  23/22 23/24 24/18 25/19 33/14
bank [60]
banking [1]   32/8
bar [1]   6/9
barred [1]   44/19
based [7]   16/7 17/24 23/10
  30/5 32/2 33/21 33/22

basically [1]   4/2 7/13
  38/23
basis [7]   27/22 37/14 43/19
  43/22 45/3 46/4 46/22
be [34]   5/7 7/6 7/9 9/5 12/4
  14/20 14/22 16/22 16/22 17/23
  21/5 21/8 21/12 21/17 21/22
  22/9 28/14 28/18 29/4 30/20
  30/22 30/25 31/2 31/20 31/25
  33/5 37/20 43/9 44/8 44/12
  45/14 46/8 46/22 46/25
because [19]   5/20 8/17 8/20
  9/3 10/5 11/22 17/23 20/8
  31/11 33/2 37/14 43/7 43/18
  44/7 44/11 44/22 45/22 46/1
  46/7
been [38]   4/4 4/6 4/7 4/24
  4/24 5/2 6/7 6/16 7/5 7/6 7/17
  15/16 17/5 18/16 19/5 23/21
  24/2 25/8 25/19 26/10 28/7
  33/9 36/8 36/10 37/19 37/25
  38/17 39/10 39/18 39/22 39/25
  40/2 40/5 40/13 40/22 45/2
  45/14 45/22
before [11]   1/11 2/2 2/13 7/5
  7/6 13/10 13/11 15/12 41/20
  46/8 47/1
began [4]   2/22 3/10 3/14 11/12
begin [1]   2/13
behalf [1]   2/12
being [7]   5/5 5/6 8/8 11/11
  17/22 18/3 18/3 18/4 18/18
  19/9 27/1 31/5 31/10 35/3
  38/23 41/16 44/24
believe [8]   8/15 10/24 11/10
  11/21 12/8 14/6 20/7 46/7
benefit [2]   8/21 8/21
best [2]   17/20 18/9
between [5]   8/2 34/2 42/21
  43/2 44/12
beyond [6]   22/22 33/15 34/10
  34/11 36/11 42/24
binder [2]   31/8 31/9
Blackmun [2]   42/9 44/17
block [2]   10/14 10/22
blunderbuss [1]   6/21
Bob [1]   6/4
body [1]   30/6
books [2]   23/11 23/12
borrower [5]   8/3 38/9 45/1
  45/7 45/7
borrower's [1]   40/3
both [2]   5/5 5/13
bottom [1]   37/1
bought [1]   14/14
breach [23]   5/18 11/5 11/6
  11/7 11/21 12/1 29/14 29/15
  29/19 31/14 32/2 33/15 33/20
  33/20 36/11 40/25 41/2 41/10
  43/8 44/6 44/21 44/25 45/3
breached [2]   11/23 33/23
brief [2]   6/23 12/23
bring [2]   22/1 25/17
broad [1]   43/3
brother's [1]   2/15
brought [3]   35/15 37/19 40/1
burden [2]   6/10 10/25
business [4]   25/22 32/8 32/17
  46/3
but [50]

**C**

called [2]   31/8 41/22

balls [1]   3/15
came [2]   35/4 35/6
can [26]   7/1 9/5 13/1 14/20
  14/22 14/23 14/24 16/6 16/15
  18/1 18/21 20/17 20/18 21/25
  22/5 24/10 25/18 28/18 29/2
  31/20 31/25 34/14 38/6 38/24
  40/13 42/4
can't [7]   8/25 11/22 17/11
  25/20 30/1 35/23 46/14
cancellation [14]   3/6 3/24
  9/20 15/17 17/15 17/21 18/9
  18/10 20/9 20/13 20/16 39/11
  39/14 39/19
cancelled [26]   5/5 11/19 17/22
  18/3 18/16 18/18 18/22 19/14
  19/17 19/18 19/19 19/21 19/22
  19/23 19/25 20/1 20/2 20/10
  20/11 20/12 20/14 20/16 39/11
  39/18 39/19 39/24
CANNON [26]   1/4 2/3 2/9 3/11
  4/15 4/23 8/7 8/9 8/12 8/18
  9/9 9/9 10/7 11/13 11/18 11/22
  12/14 12/20 13/13 22/20 26/16
  26/18 27/5 27/6 29/2 34/23
Cannon's [2]   22/17 27/13
cannot [2]   44/10 46/17
caption [2]   29/24 30/2
card [2]   26/9 26/9
care [10]   10/23 21/13 31/17
  31/20 31/22 31/24 35/8 35/9
  35/11 35/12
carrier [3]   2/23 10/19 15/16
carrying [1]   5/7
case [50]
cases [3]   6/7 31/15 44/19
cause [8]   12/2 32/1 33/15
  33/18 35/18 36/3 36/11 40/11
caused [1]   6/17
caution [2]   42/18 46/24
cautioned [3]   42/11 42/15
  44/17
ceased [1]   18/23
center [6]   10/6 10/13 10/20
  10/23 38/1 46/4
centers [2]   2/25 12/21
certain [3]   20/17 26/16 33/4
certainty [1]   22/5
certificate [3]   36/25 37/5
  48/1
certify [1]   48/2
CGL [1]   10/16
change [2]   4/20 23/11
changed [1]   35/12
changes [1]   38/24
changing [1]   19/2
charge [10]   9/21 11/19 15/10
  15/18 17/9 24/2 25/2 26/9
  26/14 26/21
charged [20]   16/18 17/7 17/9
  23/2 23/18 24/21 26/5 26/5
  26/10 27/2 27/6 28/3 34/23
  34/24 35/1 36/17 36/18 38/15
  43/13 44/5
charges [7]   23/8 25/7 25/10
  40/2 45/2 45/21 45/22
checked [1]   10/14
child [3]   10/13 10/20 10/23
child-care [1]   10/23
circumstance [3]   8/6 44/20
  45/19
circumstances [9]   6/10 6/14
  6/19 8/5 8/15 38/8 42/22 44/15

## C

circumstances... [1]  46/8
citation [1]  20/4
cite [1]  12/23
cited [3]  7/25 12/2 31/19
citizen [1]  28/19
citizens [1]  28/23
citizenship [1]  27/24
Civil [2]  1/4 2/3
claim [33]  5/20 7/1 8/22 8/24
 8/25 9/1 9/6 9/14 10/2 11/6
 11/7 12/1 29/8 29/12 29/22
 30/10 33/20 36/11 41/4 41/4
 42/14 43/15 43/17 43/19 44/3
 44/7 44/15 45/4 45/18 45/18
 45/25 46/21 46/22
claiming [1]  28/3
claims [9]  6/21 9/13 9/25 11/6
 13/2 40/22 40/24 41/17 43/4
clarity [1]  22/1 24/11
class [3]  37/15 37/20 38/19
clause [3]  21/8 21/9 22/8
clear [1]  42/15
clearly [1]  13/4 36/3
client [10]  17/14 23/3 25/22
 32/4 32/8 32/9 32/23 33/25
 34/3 34/3
client's [1]  25/18
clock [1]  9/23
close [1]  43/10
closing [1]  36/12
code [7]  30/18 30/20 31/21
 34/8 36/5 36/8 36/10
collateral [21]  3/9 3/21 8/10
 9/18 14/19 16/21 18/19 21/5
 22/3 22/15 22/16 22/17 22/21
 22/22 27/16 31/4 31/13 34/25
 34/25 36/19 37/2
collateralized [2]  28/8 28/9
collected [2]  4/11 7/7
Columbia [2]  8/1 31/14
come [6]  26/10 29/3 31/12 35/4
 37/4 42/5
comes [1]  43/10
coming [2]  24/16 24/17
comment [1]  12/12
commercial [8]  3/4 10/15 10/16
 30/18 30/20 31/21 34/8 36/5
common [5]  5/17 7/21 29/18
 41/9 44/2
communicated [1]  8/11
communications [2]  13/5 17/17
company [6]  4/3 5/1 10/10 18/4
 27/11 40/8
complained [1]  14/3
complaint [35]  4/5 4/7 5/11
 6/15 9/5 10/9 10/18 12/9 12/24
 24/25 29/10 29/13 29/23 29/24
 30/2 30/6 33/21 37/17 37/23
 38/5 38/21 38/21 39/2 39/4
 39/13 40/6 40/7 40/14 40/21
 41/15 46/7 46/10 46/17 46/18
 46/23
complaints [3]  38/19 43/12
 44/4
complete [3]  4/1 44/9 44/13
complied [1]  43/25
comply [2]  38/22 38/24
comprehensively [1]  43/5
COMPUTER [1]  1/24
COMPUTER-AIDED [1]  1/24
concealment [4]  6/25 29/18

concerned [4]  3/7 3/11 33/25
 36/4
conclude [4]  12/12 37/16 46/4
 46/16
concludes [1]  43/7
conclusion [1]  35/6
condolences [1]  2/14
confirmed [1]  10/17
confusion [1]  12/13
consider [2]  37/16 37/21
consistently [1]  30/21
constitute [3]  43/14 45/23
 45/24
consumer [7]  10/1 10/2 11/1
 11/1 11/4 46/1 46/2
contained [1]  38/7
contend [2]  17/13 17/14
contending [1]  15/11
contends [2]  38/14 39/7
contents [1]  8/13
continue [2]  21/24 40/19
continuing [1]  38/11
contract [51]
contractual [13]  3/17 5/21 9/1
 32/4 33/19 42/1 42/20 42/25
 43/5 43/24 44/8 44/11 44/16
contrary [1]  22/16
controversy [4]  28/11 28/15
 28/21 28/25
conversion [5]  5/18 9/7 29/21
 41/12 44/14
copies [1]  12/24
copy [2]  4/1 39/8
corners [1]  12/17
Corporation [1]  42/9
correct [7]  13/17 14/16 19/5
 19/6 19/10 20/6 48/3
correctly [3]  6/1 6/6 41/23
correspondence [1]  7/8
cost [5]  26/18 32/11 34/15
 34/16 35/4
could [4]  35/9 36/4 37/21
 46/22
counsel [7]  2/6 13/10 14/11
 20/12 20/13 25/5 39/9
count [40]  11/6 11/7 29/9
 29/14 29/15 29/16 29/16 29/17
 29/18 29/19 30/7 30/7 30/9
 40/24 40/25 41/4 41/5 41/7
 41/9 41/9 41/10 41/10 41/11
 41/12 41/12 41/12 41/12 41/13
 41/14 43/7 43/9 43/16 43/16
 43/22 44/2 44/6 44/10 44/14
 44/18 44/21
counts [8]  5/12 5/17 6/25
 29/13 40/21 40/25 41/1 41/8
couple [2]  4/19 28/2
course [2]  3/7 7/16
court [80]
Court's [4]  2/14 2/18 6/16
 37/13
Courts [1]  6/17
coverage [36]  3/12 3/13 3/20
 5/3 8/11 8/12 10/12 14/7 14/8
 15/7 15/7 17/24 18/18 18/23
 18/24 19/4 22/3 22/4 22/6 22/7
 22/9 22/10 22/12 31/5 31/6
 31/11 31/13 34/16 34/16 34/16
 37/2 37/3 39/6 39/12 39/17
 45/10
covered [1]  43/5
create [5]  8/16 21/16 34/2

42/5 42/13
created [1]  42/20
creates [2]  6/18 31/16
creating [2]  25/1 42/6
credit [4]  17/3 26/9 26/11
 26/11
credited [9]  15/23 16/17 16/20
 23/18 23/21 23/22 23/23 25/19
 26/22
creditor [1]  8/3
culminating [1]  3/15
currently [1]  8/21
customer [4]  34/2 35/7 35/7
 35/15
customers [3]  31/16 32/15 34/6

## D

D.C [3]  1/15 12/22 14/5
damage [1]  26/11
damaged [1]  28/6
damages [18]  7/1 7/20 12/5
 12/11 16/25 17/2 26/6 26/7
 26/12 26/13 28/14 28/15 28/17
 29/2 32/13 40/5 42/3 45/24
date [1]  39/19
dated [1]  5/4
day [5]  9/20 10/5 16/23 31/8
 31/8
daycare [5]  2/25 10/6 12/21
 38/1 46/3
days [1]  31/8
deal [1]  32/9
dealing [6]  21/9 34/9 34/9
 34/12 35/12 36/2
dealt [1]  30/22
death [1]  2/15
debt [6]  16/20 16/21 16/21
 16/24 17/2 17/4
debtor [2]  8/3 16/24
debtor-creditor [1]  8/3
Dec [1]  10/17
Deceptive [4]  29/17 30/3 30/8
 41/6
decide [1]  20/20
deciding [1]  25/24
declaration [1]  10/18
Deed [15]  3/19 9/4 11/9 15/2
 17/17 20/19 20/24 21/3 38/1
 38/4 38/6 39/5 43/3 43/21 45/6
defendant [34]  1/8 1/18 13/13
 13/19 14/6 14/24 15/12 19/13
 19/15 20/7 22/3 24/12 27/4
 27/6 30/11 30/23 31/6 31/7
 32/16 33/22 34/25 36/15 36/24
 38/14 38/20 39/7 40/7 40/10
 40/12 40/14 40/17 40/23 41/5
 43/10
defendant's [2]  26/23 46/5
defendants [4]  4/4 4/8 5/13
 8/19
defense [3]  23/6 25/6 45/21
deficient [3]  43/8 43/18 44/22
defined [1]  43/2
definition [1]  24/13
definitions [1]  10/5
defraud [2]  24/12 24/15
Delaval [1]  42/10
delineated [2]  8/24 11/9
delineation [1]  7/21
delivered [1]  5/9
demonstrating [1]  10/25
denied [1]  46/11
deny [2]  46/6 46/12

**D**

depends [2]  32/9 32/17
derive [1]  36/4
derived [1]  44/8
designated [1]  39/18
detail [1]  40/7
detected [1]  24/17
determination [1]  24/9
determine [1]  22/5
determined [1]  31/20
detriment [1]  7/24
development [3]  10/13 10/20
42/16
did [32]  4/1 5/1 6/2 7/12 7/12
8/7 8/8 8/9 9/16 9/19 11/17
11/23 13/16 15/3 18/2 18/13
18/14 18/15 18/21 21/1 21/4
22/7 24/14 24/23 27/5 32/1
36/6 36/15 37/3 37/13 42/11
44/24
didn't [10]  8/9 9/9 9/9 11/8
11/14 18/12 20/21 25/21 35/11
38/22
died [1]  35/12
difference [1]  34/2
different [6]  4/4 11/5 15/16
28/23 31/2 31/3
difficult [5]  29/11 38/22 40/4
directed [2]  5/14 6/20
directly [1]  4/11
dis [1]  41/15
dis-jumbled [1]  41/15
disapprove [1]  21/22
discern [1]  41/16
discharging [1]  9/16
disclose [1]  30/12
disclosed [3]  18/5 26/17 26/20
disclosure [1]  29/9
discovery [4]  18/24 20/17 22/5
25/14
discrimination [2]  35/22 36/2
dismiss [13]  6/16 20/5 37/14
37/23 39/12 40/10 46/6 46/9
46/10 46/11 46/17 46/18 46/19
dismissed [1]  43/9
dismissing [1]  37/16
dispute [5]  23/7 23/10 23/19
25/9 25/13
disputed [3]  12/18 23/4 23/14
disputing [5]  15/22 15/25
15/25 19/3 23/1
DISTRICT [5]  1/1 1/1 1/12
12/21 13/6
diversity [2]  27/24 28/22
divine [1]  13/1
DIVISION [1]  1/2
do [23]  8/9 11/2 11/8 12/4
16/1 16/14 22/21 23/7 23/19
23/19 25/9 25/13 25/24 28/7
32/7 32/11 37/2 39/7 40/9
44/16 44/25 45/18 46/25
docket [2]  2/3 4/6
doctrine [5]  6/8 6/9 42/2
42/12 44/20
document [7]  18/1 18/16 19/14
36/24 37/4 38/6 39/1
documentation [3]  19/19 20/9
27/17
documents [6]  13/12 13/22 14/4
14/24 26/23 27/1
does [9]  3/17 10/4 10/7 30/10
32/9 39/9 43/12 45/23 46/1

doesn't [5]  12/3 27/20 30/9
39/16 43/24
doing [1]  44/17
dollars [1]  4/20
don't [17]  4/6 6/19 8/15 10/24
11/21 12/8 14/11 14/22 14/23
14/25 17/13 18/6 25/12 28/5
29/11 42/7 45/19
down [3]  10/21 12/21 33/14
drafting [1]  39/2
drown [1]  42/17
due [1]  17/23 8/25
During [1]  7/11
duties [3]  6/12 42/6 42/7
duty [19]  5/18 6/18 7/25 8/16
9/15 9/16 21/16 21/23 29/20
31/17 31/20 31/22 31/23 32/24
34/6 35/8 35/9 42/5 44/6

**E**

earlier [1]  11/17
easel [2]  19/12 32/1
East [2]  42/9 44/19
Economic [3]  42/2 42/12 44/20
effect [7]  5/7 7/11 12/3 13/25
14/5 15/13 19/11
effective [1]  3/6
efforts [1]  9/18
Eight [2]  41/12 44/10
eighth [1]  29/20
either [3]  14/23 15/1 36/14
elaborate [2]  6/23 24/16
elements [1]  9/1
else [1]  39/16
emphatically [1]  18/21
employment [2]  35/22 36/2
end [2]  9/20 33/10
enough [1]  43/14
enrichment [10]  8/17 8/20 8/24
8/25 9/6 29/20 41/11 44/10
45/17 45/23
entered [1]  35/13
entire [2]  39/1 46/18
entitled [3]  3/19 22/9 48/4
Equally [1]  8/23
equitable [1]  9/1
equitably [1]  32/10
equity [3]  8/12 26/18 35/1
equity mortgage [1]  35/1
error [1]  37/7
especially [4]  32/3 32/13
32/14 32/23
Esquire [2]  1/14 1/18
essentially [2]  21/20 46/14
estate [1]  22/18
even [6]  6/3 6/18 7/6 9/15
16/20 16/21 19/7 22/7 24/20
27/12 28/7 33/12 35/7 45/7
46/13 46/14
event [3]  4/9 6/6 7/9
events [1]  2/21
ever [5]  19/13 19/15 19/17
19/20 45/21
every [4]  16/23 34/1 34/3 34/5
Everything [1]  11/23
evidence [7]  4/23 5/2 15/9
23/3 39/23 40/13 45/1
exactly [2]  41/16 42/18
exceeded [1]  34/20
except [1]  45/6
exception [1]  42/20
excuse [3]  2/23 39/13 39/25
executed [1]  38/4

exercise [1]  21/13
exercised [5]  21/8 21/12 21/18
21/22 39/20
Exhibit [7]  9/5 10/9 10/12
10/18 31/7 36/24 39/15
Exhibit's [1]  10/9
exhibits [5]  10/8 12/24 13/12
13/20 37/6
exist [1]  42/7
existence [1]  45/2
existing [2]  44/8 44/11
expended [1]  38/15
expenditure [1]  29/3
expense [3]  4/13 5/8 7/18
expenses [1]  7/3
explain [5]  14/25 16/14 16/15
27/2 31/15
explained [3]  13/13 24/11 36/9
explains [1]  31/7
express [1]  2/14
expressed [1]  12/13
expressly [3]  5/14 8/24 11/9
extent [4]  17/5 28/10 29/3
33/9
extremely [2]  38/22 46/21

**F**

face [2]  46/2 46/3
fact [14]  3/20 4/15 4/23 5/2
7/6 10/8 11/24 12/18 16/4
18/21 23/10 25/23 33/21 41/20
facts [3]  6/17 33/22 47/1
factual [1]  24/9
factually [2]  24/7 46/8
fails [1]  44/3
fair [8]  11/10 21/9 30/20 34/8
34/9 34/13 34/15 34/17
fairly [2]  30/23 32/10
faith [2]  34/8 34/9
fall [1]  10/5
falls [1]  44/7
familiar [1]  5/23
family [1]  10/4
famous [3]  42/7 42/8 42/17
far [8]  19/18 22/22 28/18
33/25 36/3 40/13 42/16 46/25
FARGO [66]
Fargo's [4]  14/7 14/10 14/18
37/2
favor [2]  36/7 38/5
federal [8]  7/22 29/5 29/7
29/12 29/22 30/4 30/5 30/14
feudal [1]  46/8
few [1]  34/21
fiduciary [6]  5/18 7/25 8/16
29/20 41/10 44/6
fifth [1]  29/16
file [4]  38/21 46/6 46/13
46/23
filed [8]  5/10 33/6 33/10
33/18 37/23 38/18 39/15 40/10
filled [1]  10/22
finally [5]  4/23 11/5 11/17
44/18 45/1
finance [2]  27/11 33/2
financial [2]  15/21 16/7
finding [1]  12/11
firm [1]  2/16
first [7]  4/9 5/16 5/19 5/24
6/25 9/25 10/1 13/21 19/13
19/15 19/21 29/14 38/9 39/5
40/20 41/17 43/10
five [2]  30/7 41/7

flat [1]   39/11
flat-out [1]   39/11
Florida [2]   24/23  36/12
focusing [1]   5/12
followed [1]   3/14
force [2]   14/3  20/15
fore [1]   21/6
foreclosure [1]   36/8
foregoing [1]   48/2
form [1]   22/10
Fort [6]   3/1  10/13  10/20  13/3
38/2  38/2
forth [3]   5/12  11/24  23/18
forward [1]   39/14
found [1]   35/16
Fount [1]   43/16
four [4]   12/17  31/11  31/11
43/16
fourth [1]   29/17
fraud [18]   5/19  6/25  7/21
24/10  24/12  29/15  29/16  29/18
41/4  41/5  41/9  43/9  43/11
43/15  43/17  43/19  44/2  44/3
fraudulent [3]   29/17  41/9
43/23
French [1]   6/3
Friday [1]   1/8
from pursuing [1]   42/3
front [2]   41/24  46/16
fully [2]   43/4  44/12
fungible [1]   16/22
further [2]   20/3  30/15

G
gather [1]   16/19
gave [3]   15/15  15/17  45/1
general [2]   10/16  42/6
generally [1]   34/6
get [8]   10/22  11/14  12/17
13/11  22/11  23/16  24/10  28/7
getting [1]   17/23
give [7]   9/8  9/8  9/12  22/14
24/8  27/9  36/21
given [4]   4/23  14/15  17/14
38/23
go [5]   3/19  22/24  34/10  37/4
45/15
go up [1]   37/4
goals [1]   11/3
goes [2]   15/1  22/15
going [9]   3/7  5/7  20/20  24/1
24/15  27/10  42/3  44/7  46/5
gone [2]   7/18  34/11
good [4]   2/11  34/8  34/9  35/11
good-faith [1]   34/8  34/9
got [6]   3/5  12/25  13/4  18/1
19/8  37/7
governed [1]   10/3
grant [1]   46/5
granted [1]   38/20
granting [1]   46/9
gratuitously [1]   8/9
grave [1]   40/10
Great [2]   10/10  18/17
greater [1]   40/7
Greenbelt [1]   1/7
guess [3]   16/15  41/11  41/11

H
had [48]   4/17  4/24  4/24  5/2
7/5  7/6  7/16  10/10  11/3  11/10

15/5  15/6
15/7  15/16  16/20  18/10  18/16
19/5  20/18  20/20  22/11  22/16
24/9  26/14  26/19  27/5  33/1
33/8  33/15  35/10  36/8  36/10
36/10  36/14  37/25  38/16  39/24
39/25  40/2  41/20  44/22  44/25
45/2  45/9  45/22
hand [1]   10/21
hands [2]   8/19  8/22
happen [1]   42/11
happened [3]   9/22  9/23  45/8
hard [1]   41/16
hardly [1]   43/14
harm [1]   42/24
harmed [3]   17/10  45/14  45/22
HARRY [1]   1/14  1/14  2/8
has [46]   3/22  6/10  6/16  10/24
11/2  13/4  13/24  13/24  14/4
14/25  15/21  16/15  16/16  16/17
16/24  17/5  21/21  22/21  23/11
23/11  23/23  23/20  24/1  24/2
25/6  25/10  25/22  25/25  26/1
26/10  26/14  27/2  28/9  30/11
30/18  31/6  31/7  31/23  37/2
37/19  38/18  39/8  39/18  40/7
45/14  45/20
have [53]
having [4]   3/23  3/24  4/18
38/11
he [5]   19/23  35/11  35/11  42/10
42/15
hear [2]   30/1  35/23
heard [1]   4/18
hearing [2]   2/5  34/19
heightened [1]   7/22
held [1]   21/5
her [54]
here [23]   2/4  3/1  5/11  5/15
6/19  7/2  7/23  8/6  8/16  9/6
9/15  12/7  12/10  12/17  14/13
23/6  23/19  25/21  31/4  41/8
42/2  42/23  45/10
highlight [2]   6/24  12/19
Hill [1]   41/23
him [2]   2/15  35/12
himself [1]   35/11
his [4]   2/15  35/14  42/17  42/19
Holland [2]   30/21  31/17
Hollander [3]   30/21  31/17
31/24
home [2]   26/18  36/7
homeowner [1]   21/3
homeowners [2]   20/25  21/2
honor [40]   2/11  2/17  2/21  6/2
6/21  9/7  9/24  12/13  15/11
15/24  16/13  17/19  19/21  20/6
20/11  21/19  21/24  22/2  23/5
23/14  24/8  25/20  26/15  27/20
28/17  29/25  30/10  30/16  32/6
32/25  34/9  34/17  34/22  35/20
36/1  36/3  37/9  37/12  40/18
47/4
HONORABLE [1]   1/11
hoops [1]   11/15
hour [2]   34/19  34/20
house [2]   33/2  33/3
household [1]   10/4
how [14]   6/5  14/20  14/22  15/21
17/10  26/7  26/13  28/7  30/25
32/12  32/14  40/5  41/22  41/24
however [1]   42/15
HSA [1]   41/22

HSA/Wexford [1]   41/22
Hughes [1]   1/18
hundred [1]   4/20

I
I'd [1]   5/16
I'll [5]   5/14  12/12  16/14  29/4
45/18
I'm [28]   2/16  14/16  14/21  16/2
18/20  20/6  20/14  20/17  23/7
23/16  24/4  24/6  24/14  24/19
25/13  26/15  28/22  28/24  29/13
30/12  32/12  34/7  35/25  40/15
44/7  46/5  46/9  46/13
I've [8]   2/15  6/23  12/23  29/11
29/12  38/23  41/20  45/17
identical [1]   34/16
identifies [1]   10/12
identify [1]   2/6
identity [1]   18/4
idly [1]   45/13
if [38]   4/17  8/23  9/16  10/8
15/6  16/20  19/12  19/23  20/22
21/3  21/19  21/24  22/7  22/24
24/10  24/17  25/22  26/7  26/8
26/8  26/13  28/7  29/1  31/10
32/3  32/13  32/16  35/7  35/19
36/9  36/20  40/18  41/3  41/23
42/11  42/15  45/7  46/20
ill [1]   12/9
ill-will [1]   12/9
impair [1]   45/15
implied [1]   21/20
important [1]   8/23
importantly [1]   39/3
impose [1]   6/12
imposed [2]   34/8  45/2
imposition [2]   12/10  32/23
improperly [2]   13/14  38/14
in [205]
inasmuch [1]   3/8
include [1]   40/22
including [1]   3/1
increased [2]   17/5  33/8
indicate [2]   7/23  12/9
indicated [1]   11/17
indicating [1]   10/15
individual [3]   4/17  6/20  6/22
individuals [2]   24/10  24/23
industry [1]   3/15
inference [1]   19/11
inform [1]   45/9
information [4]   11/14  40/1
44/24  46/16
Instead [1]   7/17
instrument [1]   42/25
insurance [84]
insured [2]   3/18  10/19
insurer [1]   39/25
intelligent [1]   46/25
intent [1]   45/9
intentionally [1]   33/23
intentions [1]   40/16
interest [32]   3/21  3/21  8/10
14/8  14/10  14/14  14/19  15/3
15/6  16/11  17/9  17/16  17/18
18/19  21/5  22/17  22/22  27/13
27/17  27/18  27/19  28/9  31/4
31/13  33/8  35/1  36/19  37/3
39/18  45/12  45/14  45/16
interference [1]   33/18
interpret [3]   12/4  41/22  41/24
into [4]   12/17  13/11  25/23

into... [1]   35/13
investiture [1]   2/16
invoke [1]   30/4
invoked [1]   30/13
is [201]
isn't [1]   41/3
issue [19]   7/14 8/17 9/3 14/13
  15/8 18/25 20/15 23/8 23/21
  24/19 24/20 24/21 24/21 24/22
  24/22 27/12 27/15 28/17 28/18
issued [7]   10/19 14/8 14/17
  20/8 35/21 36/1 40/8
issues [3]   12/18 37/22 41/21
it [112]
it's [25]   6/3 9/21 9/22 16/22
  16/23 16/23 20/12 20/12 21/16
  25/18 39/10 39/11 39/13 39/13
  39/15 39/22 41/3 41/3 41/11
  41/16 43/15 45/18 46/2 46/14
  46/15
item [1]   35/4
items [1]   7/18
its [20]   8/10 9/17 9/18 14/14
  15/3 15/5 19/4 23/11 23/12
  27/18 31/16 32/4 33/11 34/6
  38/10 39/20 43/25 45/12 46/2
  46/3
itself [2]   42/4 42/25

J

Jacque [15]   30/17 33/1 33/3
  33/4 33/5 33/6 33/6 33/7 33/10
  33/12 33/13 33/15 33/17 33/17
  33/24
Jacques [12]   5/24 6/4 6/6 9/15
  32/19 32/25 41/19 42/8 42/19
  42/19 42/22 44/19
January [4]   4/22 5/4 7/4 7/16
Jay [1]   33/1
Jay-Qui [1]   33/1
Jersey [1]   1/15
joined [1]   4/5
judge [13]   1/12 14/23 18/6
  25/13 26/3 29/1 30/21 31/17
  31/24 41/20 41/24 42/18 44/16
Judge Holland [1]   31/17
Judge Hollander [1]   30/21
jumbled [1]   41/15
June [1]   1/8
jurisdiction [6]   27/22 28/18
  30/5 30/10 30/10 37/13
just [12]   4/11 6/19 9/21 9/22
  14/11 24/14 26/2 27/20 34/21
  36/20 37/12 42/19
Justice [2]   42/9 44/17
justification [1]   36/17
justified [1]   11/24
justify [2]   12/10 32/23

K

keep [1]   3/17
keeping [1]   3/17
knew [5]   6/3 19/8 20/17 20/18
  22/6
know [18]   2/17 4/6 5/23 12/12
  12/13 12/16 18/22 23/15 23/19
  24/7 25/9 25/11 25/12 25/21
  28/5 28/13 33/1 34/11
knows [1]   32/9

L

lacking [2]   42/23 43/1

language [1]   21/16
lapse [4]   4/24 5/3 17/24 36/14
large [1]   40/23
later [3]   4/14 11/18 39/22
law [12]   1/14 5/17 7/22 8/23
  21/20 29/1 41/9 42/16 43/9
  43/18 44/2 44/22
lawsuit [2]   5/10 25/17
lawyers [1]   32/7
least [1]   38/16
left [1]   10/15
legislature [1]   11/3
lender [21]   3/16 3/22 8/8 9/3
  11/2 14/14 20/19 23/17 25/8
  25/9 25/10 38/10 38/12 39/6
  39/20 39/25 43/14 43/20 44/5
  45/11 45/12
lender's [3]   3/19 3/21 43/20
lenders [1]   40/3
lenders of [1]   40/3
lending [6]   29/5 29/8 30/4
  30/11 30/13 40/3
length [1]   6/24
let [5]   16/14 27/21 37/22 40/6
  40/19
let's [5]   17/6 26/3 26/4 26/5
  41/17
letter [9]   2/22 3/2 5/3 5/9
  11/12 19/24 19/25 20/2 33/4
letters [7]   3/10 3/14 3/25
  12/15 12/20 12/24 13/3
liability [5]   8/14 10/16 36/4
  37/1 42/14
liable [1]   33/12
like [8]   5/16 5/20 8/2 9/1
  19/2 19/3 34/21 44/20
likewise [1]   44/7
limited [2]   8/11 46/23
LINDA [3]   1/23 48/2 48/8
line [2]   38/22 38/24
liquidity [1]   16/22
litigation [2]   2/22 12/22
little [2]   2/24 4/11
live [1]   10/7
livelihood [1]   32/17
loan [12]   3/5 3/9 8/1 14/15
  16/12 23/20 28/16 33/2 33/8
  33/10 37/25 38/15
long [1]   15/12
longer [1]   25/10
longstanding [2]   5/23 6/8
look [4]   10/8 15/19 19/24
  36/23
looking [1]   29/13
looks [1]   30/19
loss [9]   2/16 3/8 15/21 25/23
  25/25 26/1 42/2 42/12 44/20
lower [1]   33/14
LPI [12]   3/16 4/1 4/10 4/16
  5/5 7/11 8/8 8/11 9/10 9/17
  9/21 11/15

M

made [8]   10/24 13/10 21/12
  26/4 26/14 32/22 37/25 40/2
maintain [5]   20/25 21/4 22/7
  35/17 38/9
maintained [2]   21/2 22/6
major [1]   40/20
make [6]   5/16 8/22 16/16 24/6
  32/14 44/15

maintaining [1]   16/2
malice [2]   12/9 12/11
malicious [8]   11/7 12/1 29/15
  33/18 33/19 33/20 41/2 43/8
maliciously [2]   12/6 33/22
mandatory [1]   21/13
manipulated [1]   36/15
Manufactures [1]   31/18
many [1]   32/7
March [2]   2/23 2/24
margins [1]   40/17
Marjorie [4]   30/19 35/20 35/25
  36/6
Marjorie Stewart [1]   35/25
market [1]   16/23
MARSHALL [3]   1/23 48/2 48/8
MARYLAND [23]   1/1 1/7 1/19 3/1
  5/24 6/8 6/17 7/21 8/23 10/1
  12/2 12/8 13/4 28/20 29/16
  30/8 32/20 38/3 41/3 41/6
  41/18 41/19 45/25
matter [10]   2/2 8/20 28/18
  30/4 37/13 43/4 43/8 43/18
  44/22 48/4
may [18]   2/19 3/7 3/14 5/1
  10/11 16/22 16/22 19/12 21/19
  21/24 22/9 34/2 42/11
  33/19 37/11 40/18 46/25
May 20th [1]   3/14
May 5th, 2010 [1]   3/7
maybe [1]   29/12
McAuliffe [1]   42/18
me [33]   2/23 6/5 14/12 16/2
  16/5 16/14 17/25 18/1 18/5
  18/7 19/1 19/2 20/23 24/1 24/3
  24/6 24/8 25/6 27/2 27/21 29/1
  32/14 32/22 36/21 37/8 37/22
  39/13 39/22 39/25 40/6 40/19
  45/20 46/16
me that's [1]   37/8
mean [8]   15/22 25/17 25/21
  25/22 28/2 29/10 29/13 45/18
means [2]   34/9 46/14
measured [1]   28/15
meet [1]   44/3
meeting [1]   43/10
memorandum [3]   12/3 12/4 20/5
mention [1]   26/23
mentioned [2]   42/8 42/19
mere [1]   25/1
mess [1]   32/14
Messitte [1]   41/24
met [2]   2/15
Mid [1]   3/1
Mid-Atlantic [1]   3/1
middle [1]   10/14
mind [1]   11/3
minus [1]   24/2
minute [1]   21/15
minutes [2]   36/21 37/7
mis [1]   41/8
mis-numbered [1]   41/8
misrepresentation [4]   7/23
  9/14 29/22 41/14
missed [1]   29/12
misspelled [2]   43/16 43/23
mistake [2]   17/11 17/13
moment [1]   17/6
money [10]   7/14 8/18 9/10 16/8
  26/4 26/5 26/24 33/4 33/5
  35/14
monies [1]   16/10
month [1]   5/9

monthly [1]  23/16
months [4]  4/14 7/11 11/16
 11/18
moot [1]  46/11
more [12]  2/17 8/10 14/12 22/1
 22/10 25/6 33/9 36/21 37/15
 39/3 46/15 46/25
morning [4]  2/10 2/11 5/15
 24/15
mortgage [14]  3/4 3/9 4/12 5/8
 7/4 11/19 17/3 17/14 23/20 25/7
 25/18 26/18 32/10 35/1
mortgages [1]  23/16
most [1]  42/7
motion [16]  1/11 2/20 5/12
 6/15 12/16 20/5 37/23 39/12
 40/9 46/5 46/6 46/9 46/10
 46/11 46/12 46/17
motions [1]  2/5
move [1]  37/14
moved [1]  20/13
Mr [2]  13/8 35/23
Mr. [4]  2/14 27/21 34/18 37/6
Mr. Pope [1]  2/14
Mr. Spikes [3]  27/21 34/18
 37/6
Ms. [26]  3/11 4/15 4/23 8/7
 8/9 8/12 8/18 9/9 9/9 10/7
 11/13 11/18 11/22 12/14 12/20
 13/13 22/17 22/20 26/16 26/18
 27/5 27/6 27/13 29/2 34/23
 36/6
Ms. Cannon [23]  3/11 4/15 4/23
 8/7 8/9 8/12 8/18 9/9 9/9 10/7
 11/13 11/18 11/22 12/14 12/20
 13/13 22/20 26/16 26/18 27/5
 27/6 29/2 34/23
Ms. Cannon's [2]  12/17 27/13
Ms. Marjorie [1]  36/6
much [2]  30/25 47/3
multiple [1]  41/8
multiply [1]  31/11
must [5]  21/22 22/3 27/10
 30/22 45/5
my [14]  11/7 16/19 17/20 18/9
 23/13 24/4 24/5 25/1 25/5
 26/13 32/8 32/8 33/20 33/25

N

NA [1]  1/7
name [4]  6/1 6/3 6/6 36/25
named [3]  4/7 10/19 37/5
narrow [1]  42/20
National [2]  2/4 5/25 32/20
 41/19
necessarily [1]  30/9
need [9]  7/14 13/10 19/2 25/14
 25/16 25/23 34/18 34/20 37/10
needs [1]  10/12
negligence [8]  5/18 9/13 21/23
 29/21 31/25 34/6 41/13 44/18
negligent [5]  9/13 9/13 29/21
 32/1 41/13
neither [1]  6/15
never [11]  9/22 9/23 13/18
 15/18 18/23 19/19 19/21 19/25
 20/1 20/16 26/17
new [10]  1/15 4/25 17/23 18/3
 18/11 18/18 18/23 33/2 40/14
 41/5
next [1]  15/8

 44/14 46/11
ninth [1]  29/20
no [43]  1/4 3/12 5/3 5/7 5/19
 7/1 7/13 7/14 7/20 8/6 8/17
 8/21 9/5 9/15 15/7 16/13 16/19
 17/16 17/19 17/23 20/9 21/21 21/21
 21/2 22/16 23/7 23/23 24/6
 25/10 25/20 25/23 26/23 34/7
 35/3 36/7 40/13 40/19 40/19
 43/18 43/22 45/3 45/9 45/12
 46/4
non [1]  18/22
non-payment [1]  18/22
nonsensical [1]  46/14
nor [2]  6/15 7/20
normal [2]  6/11 8/6
normally [1]  8/3
not [92]
note [1]  43/3
NOTES [1]  1/24
nothing [9]  4/18 7/16 8/18 9/8
 9/11 22/13 22/21 27/1 37/2
notice [18]  3/5 3/24 3/25 4/15
 15/12 15/17 17/15 17/21 17/21
 18/9 18/12 18/14 18/15 19/4
 19/8 20/13 39/11 39/17
notices [1]  5/4
notification [3]  17/14 39/8
 39/14
notifications [1]  11/13
notified [1]  5/4
notifying [1]  3/11
notion [2]  42/5 43/3
now [17]  2/2 7/18 9/25 15/7
 20/24 21/11 21/15 22/12 27/1
 29/12 31/5 31/6 31/14 33/19
 36/12 44/21 45/17
nowhere [2]  27/17 43/10
number [4]  2/3 34/23 38/19
 46/11
numbered [1]  41/8
NW [1]  1/15

O

oath [1]  13/23
obligated [3]  17/4 39/7 45/13
obligation [6]  3/17 5/8 16/21
 16/23 30/20 45/9
obligations [1]  44/1
observed [1]  13/20
observing [1]  21/21
obtain [7]  8/8 21/5 22/3 22/9
 33/7 39/6 45/10
obtained [1]  30/24
obtaining [3]  9/17 11/15 21/13
obvious [1]  42/12
occupancy [2]  10/22 10/23
occurred [1]  13/15
offer [1]  7/1
Office [1]  1/14
officer [4]  16/1 17/25 23/25
 25/6
OFFICIAL [2]  1/23 48/9
okay [4]  32/6 34/18 37/7 37/10
on.[71]
on-going [2]  3/7 5/7
once [8]  2/15 5/11 11/17 15/15
 16/24 17/2 40/1 44/14
one [18]  3/1 11/6 14/12 14/18
 14/18 15/17 24/9 24/15 29/19
 31/12 31/12 34/23 37/12 40/24
 43/5 45/5 45/7 45/23

one's [2]  17/3 17/3
only [11]  5/13 7/9 9/17 13/19
 14/3 18/20 19/11 19/13 22/4
 24/9 42/22
open [1]  7/18
operated [2]  10/6 38/1
opinion [2]  36/1 42/19
opposing [1]  13/10
opposition [2]  6/15 12/14
or [33]  3/16 7/22 8/13 8/19
 10/4 10/16 11/1 12/9 12/11
 16/16 19/20 20/9 21/4 21/17
 21/21 23/1 23/4 23/16 23/19
 23/21 24/2 25/19 25/22 27/5
 31/21 32/13 36/14 39/10
 39/13 41/13 45/6 46/13
order [6]  6/9 9/11 17/15 22/2
 25/14 27/9
ordinary [1]  8/3
original [3]  9/18 10/9 10/18
other [7]  6/17 32/15 34/22
 40/17 40/24 42/3 44/19
our [7]  5/12 5/19 12/3 12/3
 12/23 21/17 38/22
ourselves [1]  42/11
out [14]  3/20 5/7 5/21 6/11
 8/4 9/4 14/14 15/13 22/20
 24/18 31/12 32/14 39/11 43/4
outside [4]  6/12 8/5 8/8 9/24
over [5]  2/24 4/11 5/1 27/22
 37/7
overt [1]  7/23
owe [1]  7/14
owed [2]  31/20 35/8
owes [1]  34/5
own [5]  8/10 9/17 10/8 25/18
 33/11
owned [1]  10/6
owner [2]  2/25 3/17
owns [1]  3/4

P

P-R-O-C-E-E-D-I-N-G-S [1]  2/1
PA [1]  1/18
PACER [1]  4/6
page [4]  10/14 10/19 10/21
 36/24
paid [14]  4/2 7/5 7/17 8/18
 16/10 16/4 16/6 16/7 16/8
 16/10 16/11 26/6 26/8 26/17
Parker [1]  8/1
part [2]  5/8 12/10
particular [7]  3/23 4/10 26/24
 35/3 35/4 36/8 36/10
particularized [1]  43/11
parties [3]  42/21 43/2 44/12
partner [1]  2/15
Partnership [1]  41/23
party [1]  8/13
passed [1]  11/3
past [2]  4/22 7/16
Pause [1]  36/22
pay [5]  16/24 17/4 17/4 26/19
 31/1
payment [1]  18/22
payments [2]  26/4 28/3
payoff [2]  7/9 7/13
pending [1]  2/2
penny [1]  9/10
people [1]  37/8
per [1]  31/1
period [1]  7/3
permit [2]  37/3 44/7

**P**

person [6]   17/3 35/7 35/8 35/10 35/12 35/15
personal [11]   8/13 10/4 14/9 22/13 22/15 22/17 22/20 27/19 34/24 37/1 37/1
persons [1]   28/23
pertaining [1]   13/3
place [3]   8/14 10/11 44/23
placed [12]   3/16 9/3 11/2 13/14 14/4 15/16 19/9 20/15 21/6 25/8 43/14 44/5
placement [1]   18/11
plaintiff [54]
plaintiff's [6]   2/23 14/7 27/19 34/15 40/20 46/12
plaintiffs [1]   36/14
plan [1]   24/16
plea [1]   12/5
pleading [3]   7/22 12/17 44/3
please [6]   2/6 21/25 36/21 39/17 40/18 40/19
plus [1]   24/1
point [3]   11/22 22/1 37/15
policies [3]   9/11 14/17 14/24
policy [35]   3/12 3/20 4/1 4/10 4/18 4/19 4/20 10/12 10/16 10/16 10/19 11/19 18/2 19/9 19/14 19/17 19/18 19/19 19/20 19/22 19/23 19/25 20/1 20/2 20/10 22/20 27/12 27/13 27/15 27/16 36/24 39/17 39/19 39/24 40/8
POPE [4]   1/18 1/18 2/11 2/14
position [8]   16/19 24/5 25/1 31/15 31/16 33/24 33/25 34/1
possession [1]   25/17
possibly [5]   37/21 46/17 46/22
posted [4]   4/12 7/3 16/24 17/3
posting [2]   5/5 17/7
postings [1]   7/5
Practice [1]   30/3
Practices [3]   29/17 30/8 41/6
practicing [1]   41/21
precedent [1]   5/24
preclude [1]   42/3
prejudice [3]   37/17 46/19 46/20
preliminary [1]   12/16
premium [17]   4/2 4/10 4/10 4/19 5/6 16/6 16/7 16/20 17/8 22/10 26/17 26/17 31/1 31/11 34/15 34/15 43/13
premiums [12]   7/2 7/15 9/10 15/23 16/4 16/18 23/2 23/8 23/21 24/2 32/11 38/15
prepared [1]   16/3
present [4]   6/14 8/16 18/1 42/22
presented [2]   6/16 15/12
prevailed [1]   41/24
primarily [1]   5/24
primary [6]   12/4 24/21 24/22 27/10 27/13 27/16
principal [1]   16/11
private [1]   4/17
problem [2]   35/11 40/20
proceed [3]   2/19 37/10 37/11
proceedings [2]   1/11 48/3
procure [6]   12/4 20/15/3 38/16 39/20 43/20 45/12
procured [4]   17/17 18/4 39/25

produced [1]   23/3
products [1]   42/14
profit [2]   25/1 36/16
profound [1]   39/2
progeny [1]   6/7
progress [1]   42/16
promised [1]   33/3
promptly [1]   5/3
pronounce [1]   6/6
pronounced [2]   6/1 33/1
proof [8]   3/13 4/17 7/15 10/25 11/13 11/18 15/15 38/13
property [30]   3/4 3/8 3/9 3/12 3/16 3/18 3/21 7/12 8/13 8/15 11/11 13/3 13/6 13/15 14/3 14/9 14/10 18/19 18/24 20/21 22/13 22/15 22/17 22/21 22/21 28/8 28/9 34/24 37/1 45/15
proposed [1]   45/6
protect [6]   8/10 14/14 15/3 17/16 17/18 45/12
protected [1]   45/14
protection [7]   3/8 9/17 9/18 10/1 11/4 38/10 46/1
protects [1]   3/20
prove [1]   20/17
provide [2]   11/13 38/12
provided [12]   7/9 7/16 12/23 14/25 15/6 15/9 27/2 38/11 38/17 39/23 43/19 44/24
providing [2]   10/11 39/16
proving [1]   6/10
provisions [2]   38/7 38/11
punitive [2]   12/5 12/10
purchase [2]   3/15 4/1
purchased [1]   31/5
purported [1]   38/18
purpose [1]   25/1
purposes [1]   10/4
pursue [1]   46/20
pursuing [1]   42/3
put [1]   20/21
putative [1]   37/14

**Q**

QBE [18]   4/3 4/4 5/13 8/19 19/20 19/24 19/25 20/8 20/9 20/14 25/1 28/19 41/5 43/17 43/19 46/20 46/21 46/23
quarterly [1]   23/16
quarters [1]   31/12
Queen [3]   12/21 13/15 14/2
question [15]   7/25 15/7 21/1 21/2 23/13 23/20 24/24 25/5 27/14 28/24 29/6 30/5 30/14 37/13 43/24
questions [1]   39/2
Qui [1]   33/1
quickly [1]   34/20
quite [3]   40/4 40/16 44/4
quote [4]   42/7 42/9 42/15 42/17

**R**

raise [1]   7/14
raised [1]   37/22
raising [1]   38/19
rate [1]   33/8
rather [5]   3/12 4/12 12/3 18/3 41/15
re [1]   26/11

no-credit [1]   26/11
lead [5]   29/11 29/11 32/19 37/6 38/22
reading [1]   39/1
real [3]   7/20 14/9 22/18
reality [1]   7/2
really [6]   12/1 16/13 37/10 41/2 41/3 43/12
reason [3]   11/10 25/4 36/6
reasonable [2]   21/8 21/13
reasonableness [1]   22/8
reasonably [1]   21/23
reasons [1]   24/10
recall [1]   41/23
receive [2]   11/18 13/16
received [15]   2/22 3/3 3/23 11/12 12/15 13/12 13/13 13/19 13/19 14/4 16/8 17/15 17/20 17/21 39/8
receiving [1]   17/16
recent [2]   31/25 37/20
Recess [1]   47/5
recite [1]   6/7
recognize [2]   27/13 33/19
recognized [2]   33/14 41/3
recollection [1]   17/21
record [2]   2/7 48/3
red [2]   38/22 38/24
refer [1]   38/6
reference [1]   27/4
refinance [1]   7/12
reflected [1]   7/8
Reform [1]   37/20
regard [2]   12/20 13/5
regular [1]   32/15
regulations [1]   33/12
regurgitate [1]   43/12
regurgitation [1]   44/4
reimbursed [1]   35/2
reject [2]   21/17 45/6
rejected [1]   42/14
related [2]   11/2 13/6
relates [1]   43/24
relating [1]   41/21
relation [1]   37/25
relationship [11]   5/22 8/2 8/3 32/4 42/2 42/21 43/2 43/5 43/25 44/8 44/12
relationships [1]   35/17
relative [2]   24/19 31/24
reliance [1]   33/25
relied [1]   7/24
relief [1]   9/1
remaining [2]   9/25 40/25
remedy [5]   5/20 9/2 44/9 44/13 44/16
remember [1]   45/5
renew [1]   4/16
renewal [1]   4/14
renewed [2]   4/18 4/21
reply [1]   12/3 39/13 39/15
REPORTER [3]   1/23 48/1 48/9
representation [2]   16/2 35/3
represented [3]   15/14 25/6 39/22
representing [1]   17/25
requested [2]   7/10 7/13
required [2]   30/25 38/13
requirements [3]   7/22 43/11 44/3
requiring [1]   38/9
reservations [1]   40/11
reserved [1]   45/11

respect [4]   18/7 23/5 25/8 40/17
response [3]   17/16 37/12 45/20
responsibility [1]   30/12
restrain [1]   42/11
restrictions [1]   42/12
retention [1]   8/21
revealed [1]   26/25
reversal [1]   9/21
reversed [21]   5/6 7/5 7/17 11/19 15/10 15/17 17/8 23/2 23/9 24/3 25/8 25/10 26/6 26/7 26/14 27/1 28/4 28/7 40/2 45/3 45/21
right [26]   2/13 2/19 10/21 13/8 14/1 15/2 15/5 17/17 19/9 20/20 21/17 21/21 26/22 27/20 30/15 32/22 34/18 37/19 37/22 38/11 39/20 43/20 44/23 44/25 45/5 45/11
right-hand [1]   10/21
rights [1]   33/19
risk [1]   3/8
River [2]   42/9 44/19
Road [2]   3/2 38/2
ROGER [1]   1/11
room [1]   35/24
RPR [1]   48/8
rule [2]   7/22 36/6
ruled [6]   30/18 30/21 31/23 31/24
rules [2]   38/23 38/24
ruling [3]   35/20 35/21 41/18
Russ [1]   2/11
RUSSELL [1]   1/18
RWT [2]   1/5 2/3

S

said [13]   11/17 19/13 19/16 19/17 19/19 19/21 19/22 20/12 24/15 37/1 38/4 39/10 41/15
same [9]   12/19 12/24 13/4 13/14 24/22 30/21 33/24 34/16 43/12
satisfactorily [1]   44/24
satisfactory [3]   5/2 15/15 38/12
satisfied [1]   45/13
saw [1]   13/21
say [24]   6/17 8/20 14/12 18/12 18/15 18/21 19/10 23/23 25/14 27/10 28/19 29/4 29/4 32/17 34/1 34/14 34/21 35/5 35/19 36/16 36/20 37/15 39/9 39/16
saying [24]   12/14 13/16 14/12 14/16 18/7 18/20 19/7 20/4 20/6 20/14 21/16 21/25 22/4 24/4 24/14 24/19 25/13 26/15 28/6 30/12 34/5 34/7 36/12 46/15
says [4]   10/21 10/23 39/10 39/17
scenario [2]   8/4 8/6
scheme [1]   24/17
Schwartz [2]   35/5 35/10
scope [1]   8/11
scratch [1]   39/1
sea [1]   42/17
second [7]   4/18 10/17 29/14 29/19 41/5 41/10 43/17
section [4]   9/4 11/9 36/8

secure [2]   15/5 22/14
secured [5]   20/15 24/25 27/18 27/19 38/1
security [2]   14/15 45/16
see [4]   29/11 38/24 40/15 45/3
self [1]   9/17
self-protection [1]   9/17
selfishly [1]   8/10
sell [1]   7/12
seminal [1]   8/1
send [2]   3/13 4/17
sent [3]   3/24 4/2 4/15 12/15 12/20 18/8 19/4 19/24 19/25 20/1 33/4 33/13
sentiment [1]   2/18
sequence [1]   13/5
sequences [1]   15/20
series [6]   3/10 3/14 11/12 12/14 12/20 13/3
serious [1]   25/22
served [2]   4/6 40/23
service [2]   40/14 40/15
services [1]   8/7
servicing [1]   3/5
set [3]   5/12 11/24 34/19
Seven [4]   41/10 41/10 44/2 44/6
sevens [2]   29/19 41/11
seventh [1]   29/18
several [2]   2/25 13/9
shall [3]   21/7 21/11 21/12
she [61]
she's [4]   13/23 15/18 17/9 32/17
Sheet [1]   10/18
shot [1]   6/22
shots [1]   6/22
should [3]   17/7 20/25 20/25
show [5]   14/23 14/24 16/6 27/18 33/22
showed [1]   45/8
showing [3]   7/18 16/3 18/17
shows [2]   18/2 23/17
shrewd [1]   27/11
sic [2]   14/7 30/17
side [1]   10/21
significant [2]   2/16 41/21
Silver [1]   41/23
Silver Hill Partnership [1]   41/23
similar [1]   9/7
simple [3]   16/16 25/5 42/1
simply [18]   4/25 6/14 7/7 7/17 11/8 11/22 12/19 18/8 25/2 27/14 32/7 32/19 37/17 43/6 43/18 44/4 45/23 46/4
sir [8]   13/9 16/13 17/19 20/22 30/1 30/16 32/21 34/7
sit [1]   45/13
situation [5]   5/20 6/11 8/2 8/5 40/4
six [4]   5/17 6/21 41/9 43/22
sixth [1]   29/17
skeptical [1]   46/21
slightly [3]   22/10 31/2 31/3
sloppy [1]   41/16
sniper [1]   6/22
so [28]   5/7 5/18 7/13 7/20 8/9 8/9 8/15 9/11 10/24 13/1 13/16 15/18 20/4 23/18 23/23 24/1 27/10 29/22 33/6 33/10 33/24 34/5 34/20 38/24 39/7 40/3

40/15 43/7
sold [1]   16/22
solely [1]   43/24
some [5]   11/18 12/13 25/15 35/14 42/5
somebody [2]   21/21 39/16
somehow [1]   19/8
someone [3]   24/16 26/8 27/9
something [4]   21/22 25/16 26/9 29/12
soon [1]   15/9
sorry [2]   14/21 35/25
sort [1]   6/21
sought [1]   7/6
sound [2]   19/3 27/20
sounds [1]   19/2
SOUTHERN [1]   1/2
spawn [1]   2/21
speak [1]   31/14
speaking [2]   28/1 28/20
special [10]   6/10 6/14 6/19 8/5 8/6 8/15 33/13 33/13 35/17 42/23
specificity [2]   24/11 25/15
specify [1]   30/9
speculation [1]   25/17
SPIKES [8]   1/14 1/14 2/8 13/8 27/21 34/18 35/23 37/6
SR [1]   1/14
stand [2]   12/2 23/19
stand-alone [1]   12/2
standard [1]   12/7
stands [1]   3/9
start [1]   10/11
state [3]   18/15 21/12 28/20
stated [10]   19/23 20/16 20/24 21/3 21/7 21/14 24/24 31/17 33/11 36/3
statement [6]   7/9 7/13 16/7 26/18 35/2 37/12
statements [4]   13/9 13/17 23/16 32/10
states [3]   1/1 1/12 19/24 22/2 22/8 28/23 31/2
stating [7]   19/4 19/25 20/1 20/2 20/10 20/13 33/5
status [1]   23/17
statute [1]   10/2
Steamship [2]   42/9 44/19
STENOTYPE [1]   1/24
step [1]   10/10
Stewart [3]   30/19 30/19 31/19 35/20 35/25
still [3]   24/1 35/8 36/7
stock [1]   16/22
straight [1]   39/14
straight-forward [1]   39/14
Street [3]   12/22 13/15 14/2
styled [1]   46/3
subject [8]   3/2 8/24 30/4 32/13 37/13 37/20 42/6 42/7
submitted [2]   13/21 13/24
subsequent [4]   3/20 6/7 11/14 11/16
substance [1]   13/11
successor [1]   37/24
such [2]   37/3 38/7
sued [1]   12/22
suffered [6]   25/23 25/25 26/1 26/11 26/12 26/13
sufficient [4]   32/23 33/21 35/17 46/16
suggested [1]   39/10

## S

suggestion [1]  45/20
suit [4]  33/6 33/10 35/15
  38/18
Suite [1]  1/19
Supplement [1]  46/13
supplemental [4]  27/7 27/12
  27/15 46/13
Support [1]  20/5
suppose [1]  37/21
Supreme [1]  42/14
sure [4]  2/16 23/16 40/16
  46/14
survive [1]  46/17
Susquehanna [1]  1/19
sustain [1]  32/1
sustained [2]  15/22 31/25
sworn [1]  13/23

## T

take [11]  6/11 8/5 8/14 9/9
  9/10 10/10 25/23 26/8 35/11
  36/23 39/17
taken [6]  6/23 15/13 18/18
  34/1 38/20
takes [1]  9/23
taking [2]  9/22 35/12
talk [1]  41/17
talking [2]  28/2 28/22
tangential [1]  24/20
taught [1]  6/5
tell [8]  16/14 18/2 24/1 24/6
  25/18 32/14 32/22 40/13
telling [5]  16/5 18/5 19/1
  19/2 24/3
temporary [1]  7/3
ten [3]  37/7 41/14 44/18
tenth [1]  29/21
term [1]  11/22
terminated [2]  11/11 19/5
terms [15]  8/12 21/7 22/23
  28/23 30/22 31/21 34/10 34/10
  34/11 35/13 36/9 36/16 42/25
  43/21 44/13
testify [1]  18/7
than [9]  2/17 15/16 22/10
  22/10 25/16 40/24 42/3 46/15
  47/1
Thank [6]  2/18 13/7 37/9 37/18
  47/3 47/4
that [395]
that in [1]  17/15
that's [27]  2/16 3/16 5/11
  14/16 17/19 17/19 21/20 21/23
  23/6 23/13 24/19 25/11 25/23
  26/6 28/11 30/13 30/25 31/1
  34/17 37/8 38/5 39/11 42/17
  42/18 45/8 45/10 46/10
their [10]  3/17 3/17 17/16
  17/17 17/18 23/6 27/16 36/14
  45/9 45/13
them [8]  6/23 6/24 7/6 13/19
  13/19 13/20 15/15 45/8
themselves [1]  24/15
then [11]  8/25 13/17 17/8
  24/12 25/23 26/5 33/4 34/12
  37/4 38/11 44/18
there [81]
there's [24]  9/11 14/8 15/7
  16/24 19/10 20/9 21/1 26/16
  28/24 29/19 31/11 40/5 40/11
  40/13 41/4 41/4 41/5 41/8

therefore [4]  31/22 38/6 45/15
  46/18
these [8]  3/25 5/20 7/15 9/10
  12/24 14/4 16/4 37/6
they [48]  3/5 3/7 4/7 7/6 7/7
  7/18 7/18 15/10 15/14 15/17
  16/12 16/20 17/7 17/8 17/13
  17/14 17/17 17/20 17/21 19/8
  19/8 19/18 19/18 19/20 19/21
  19/22 20/16 20/16 20/18 23/21
  23/22 23/23 24/17 24/17 25/10
  26/3 26/5 26/6 26/7 26/10
  26/11 28/7 32/13 36/14 44/24
  44/25 45/8 45/13
they'd [1]  17/14
they've [2]  4/6 28/4
thing [2]  13/15 46/25
things [1]  34/22
think [6]  6/5 13/1 21/25 42/8
  45/19 46/15
third [3]  8/13 10/21 29/15
third-party [1]  8/13
this [120]
those [17]  5/14 5/15 5/17 6/12
  6/14 6/19 6/22 7/4 10/1 10/5
  13/21 24/23 25/10 31/15 34/10
  34/11 42/3
though [10]  6/3 6/18 8/23 9/22
  9/22 16/21 19/1 19/8 24/20
  33/12
thought [3]  14/13 19/18 19/20
three [4]  9/25 26/16 41/4 43/9
through [10]  3/13 4/5 5/10
  11/15 13/20 15/6 15/16 18/24
  20/17 22/4
time [5]  4/14 4/19 7/3 7/15
  13/21 14/12 15/19 19/13 19/15
  19/22 20/10 23/12 33/8 39/22
  45/23
times [4]  20/14 20/18 22/6
  31/11
TITUS [1]  1/11
today [5]  5/11 8/19 8/22 23/19
  47/2
told [2]  37/7 45/20
too [7]  14/2 22/19 22/24 27/4
  33/17 35/1 42/16
took [3]  5/1 22/20 35/13
tort [24]  5/20 6/18 6/21 8/4
  9/15 9/24 21/16 32/24 35/9
  35/18 36/4 36/11 40/24 41/1
  41/4 41/17 42/5 42/6 42/7
  42/17 43/4 44/17 44/15 45/18
torts [2]  5/18 5/21
total [1]  22/25
Towson [1]  1/19
Trade [4]  29/17 30/3 30/8 41/6
traded [1]  16/23
Traders [1]  31/18
tragic [1]  2/14
transaction [6]  10/2 11/1 17/9
  46/2 46/2 46/3
transactions [2]  10/3 32/8
Transamerica [1]  42/10
transcript [2]  1/11 48/3
TRANSCRIPTION [1]  1/24
transfer [1]  4/25
Travelers [17]  3/6 3/24 4/25
  10/11 11/12 17/15 17/20 17/22
  18/2 18/8 18/12 18/14 18/15
  18/17 19/4 39/9 39/24

minor [1]  1/18
true [2]  17/20 39/24
Trust [16]  3/19 9/4 11/9 15/3
  20/19 20/19 20/24 21/3 31/18
  38/1 38/4 38/7 39/5 43/3 43/21
  45/6
Truth [5]  29/5 29/8 30/4 30/11
  30/13
Truth-in-Lending [3]  30/4
  30/11 30/13
trying [2]  21/15 24/12
two [13]  2/24 4/4 7/2 7/15
  9/11 9/23 11/5 11/7 14/17
  29/19 36/21 41/11 43/8
types [2]  6/16 10/3
typical [1]  38/7

## U

U.S [2]  31/18 42/10
under [29]  3/19 4/10 7/21 7/21
  8/23 9/14 10/2 10/22 12/7
  13/23 15/2 17/17 20/19 27/15
  29/5 30/2 30/11 30/17 30/17
  36/5 38/7 39/18 42/4 42/21
  43/20 44/1 44/15 45/6 46/7
underlying [2]  5/21 6/18
understand [14]  14/11 14/22
  14/25 14/16 16/2 19/3 21/19
  21/25 26/12 32/7 34/12 35/20
  40/5 46/15
understanding [2]  18/10 18/10
understood [2]  27/5 33/17
undertake [2]  8/7 9/18
undertaken [1]  6/13
undisputed [1]  44/11
Unfair [4]  29/16 30/3 30/8
  41/6
Uniform [5]  30/18 30/20 31/21
  34/7 36/5
uninsured [1]  45/15
unique [4]  31/15 31/16 32/13
  42/22
UNITED [2]  1/1 1/12
unjust [10]  8/17 8/20 8/24
  8/25 9/5 29/20 41/11 44/10
  45/17 45/23
unlawfully [1]  26/10
unless [3]  8/4 42/4 46/25
unlike [1]  32/15
unquote [1]  42/17
unreasonable [1]  31/1
unreasonably [3]  21/8 21/12
  21/18
until [1]  4/22
up [13]  3/14 4/19 9/8 16/3
  24/14 24/16 24/17 29/3 34/19
  34/20 37/4 38/23 42/5
upon [2]  7/24 34/8
us [2]  7/14 9/23
used [1]  21/11
utterly [2]  43/1 44/2

## V

vanilla [1]  11/6
variety [1]  40/24
versus [11]  2/3 5/24 8/1 17/12
  24/23 31/18 32/19 35/5 41/19
  41/22 42/10
very [13]  6/4 8/9 9/3 12/24
  24/16 28/18 29/11 41/16
  42/1 42/19 42/19 47/3
view [1]  38/16
violate [1]  33/11

## V

violated [2]   36/9 36/10
violation [3]   30/7 41/6 45/25
virtue [1]   11/11
voluntarily [1]   6/13
voluntary [2]   20/11 22/4
vulnerability [1]   32/6 34/3
  42/24
vulnerable [6]   32/3 32/13
  32/15 32/16 32/23 34/3

## W

Wachovia [3]   37/24 37/25 38/5
wait [2]   21/15 21/15
waiting [1]   37/8
wake [1]   24/14
walking [1]   35/24
want [4]   18/6 23/18 25/9 25/11
wanted [2]   2/13 33/2
wants [2]   23/12 32/17
was [136]
Washington [8]   1/15 3/2 10/13
  10/20 12/21 13/3 38/2 38/2
wasn't [3]   4/22 11/9 16/13
way [4]   7/14 10/21 18/20 24/18
we [42]   2/4 2/13 6/19 8/15
  9/14 10/10 10/24 11/17 11/19
  11/21 12/4 12/8 13/10 15/11
  15/19 16/15 17/11 18/16 22/24
  23/16 23/19 24/25 26/25 27/10
  28/1 28/5 30/3 30/4 30/13 31/4
  31/12 31/14 34/20 36/13 37/4
  37/4 37/13 37/21 38/24 40/3
  42/4 42/11
we're [7]   5/11 9/22 12/17
  24/20 25/21 28/20 37/7
we've [3]   7/25 12/2 34/19
well [86]
Well Fargo [1]   14/17
well-communicated [1]   8/11
WELLS [24]   1/7 2/4 2/12 4/9
  5/13 5/14 8/19 15/2 15/10
  16/11 18/5 19/4 23/3 32/5
  37/24 39/16 39/23 40/2 40/9
  40/15 43/25 44/22 45/5 46/19
Wells Fargo [18]   5/13 5/14
  8/19 15/2 15/10 16/11 18/5
  19/4 32/5 37/24 39/16 39/23
  40/2 40/9 40/15 43/25 44/22
  45/5
went [7]   4/19 11/15 14/14 33/1
  33/7 33/12 33/15
were [36]   3/7 5/5 5/6 6/12 7/2
  7/3 7/7 7/8 7/17 12/15 13/13
  14/18 16/11 16/18 23/2 23/2
  23/8 23/21 23/21 23/23 24/12
  25/7 28/3 28/6 32/13 32/16
  33/21 35/16 35/17 35/21 38/15
  42/16 42/22 45/3 45/7 45/21
weren't [1]   16/12
Wexford [1]   41/22
what [40]   3/15 5/11 5/12 12/4
  13/1 14/11 15/21 16/4 16/14
  16/15 16/19 17/1 18/5 18/7
  19/1 19/2 19/16 21/25 24/3
  24/6 25/4 25/12 25/24 26/1
  26/19 27/22 30/18 31/7 32/3
  32/12 32/22 38/24 39/9 40/16
  42/11 44/16 45/8 45/11 46/14
  46/15
what's [3]   23/17 23/18 41/16
whatever [6]   17/4 20/20 23/2

  25/7 32/11 45/2
whatsoever [2]   40/12 45/4
when [24]   3/5 3/16 4/14 4/20
  4/22 8/8 9/1 11/3 11/10 11/14
  12/22 17/20 19/23 26/9 31/23
  34/10 34/15 35/23 41/20 42/1
  42/20 42/21 45/1 45/13
where [14]   10/10 22/1 27/25
  29/7 29/7 29/10 29/22 35/3
  35/21 36/13 36/17 40/4 42/6
  42/10
wherewithal [1]   23/11
whether [11]   20/20 24/25 25/18
  25/21 27/4 28/23 28/24 29/1
  40/11 43/25 45/21
which [32]   3/6 4/1 4/3 5/11
  9/4 10/17 16/23 21/7 21/11
  21/12 31/8 37/24 37/25 38/7
  39/9 40/8 40/25 41/2 41/23
  42/4 42/8 42/10 43/2 43/14
  43/16 43/17 43/19 43/20 43/23
  44/8 44/14 44/15
while [1]   13/2 39/23
who [8]   6/5 20/12 20/13 24/11
  32/7 35/10 35/12 35/15
whoever [2]   21/4 21/5
whole [1]   14/13
whose [1]   18/4
why [4]   18/17 25/2 27/2 27/14
will [24]   6/24 12/9 12/19
  16/14 20/22 20/23 21/17 27/12
  27/18 28/19 29/4 34/1 36/16
  36/20 37/15 43/6 43/9 44/16
  46/6 46/9 46/12 46/18 46/19
  46/22
willfully [1]   33/23
William [2]   36/13 36/13
Williams [2]   17/12 24/23
wiped [1]   5/7
wishes [1]   46/20
within [1]   10/5
without [2]   24/16 46/20
woefully [1]   42/23
won't [2]   6/23 37/15
word [2]   21/11 22/16
would [39]   2/6 4/16 5/7 6/11
  7/9 8/5 8/14 8/16 12/9 14/6
  17/23 19/10 20/7 21/5 23/23
  24/11 24/12 25/2 27/14 30/25
  31/12 33/5 33/9 34/14 34/21
  35/5 35/19 35/19 36/10 36/23
  37/20 40/22 40/22 42/5 42/11
  42/17 44/12 46/8 46/24
wrap [2]   34/19 34/20
writing [1]   13/14
Written [1]   46/13
wrongfully [1]   44/5

## Y

yeah [1]   41/13
year [9]   4/9 4/16 4/19 7/4
  30/25 31/1 31/12 31/13 34/15
years [3]   2/24 5/5 9/23
Yes [7]   13/9 15/24 20/22 23/14
  25/13 30/16 32/21
yet [4]   4/6 27/19 40/9 40/23
you [67]
you're [23]   13/16 14/12 16/1
  16/2 16/3 16/4 17/25 18/5 19/1
  19/2 19/2 19/3 19/7 20/4 23/25
  24/3 25/17 28/2 28/3 28/6 29/1
  34/5 35/23
you've [2]   18/1 34/11

your [56]
Your Honor [29]   2/11 2/17 2/21
  6/21 12/13 15/11 15/24 16/13
  17/19 19/21 21/24 23/5 24/8
  26/15 27/20 28/17 29/25 30/10
  30/16 32/6 32/25 34/17 34/22
  35/20 36/1 36/3 37/12 40/18
  47/4
yourselves [1]   2/6

## Z

Zenobia [1]   12/7

0238

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ANDREA JACKOSON CANNON | * | |
| Plaintiff, | * | |
| | * | Case No.: RWT 12cv377 |
| v. | * | |
| WELLS FARGO BANK NA., *et al.* | * | |
| Defendants. | * | |

### ORDER

Upon consideration of Defendant Wells Fargo's Motion to Dismiss [ECF No. 9], Plaintiff's Motion for Leave to File Amended Complaint [ECF No. 16], Defendant Wells Fargo's Motion to Dismiss Amended Complaint [ECF No. 17], and Plaintiff's Motion for Leave to File Written Supplement to Oral Argument [ECF No. 19] and the arguments of counsel presented at the hearing conducted before the undersigned on June 8, 2012, it is, for the reasons stated in the record, this 12th day of June, 2012, by the United States District Court for the District of Maryland,

ORDERED, that Defendant Wells Fargo's Motion to Dismiss [ECF No. 9] is **DENIED AS MOOT**; and it is further

ORDERED, that Plaintiff's Motion for Leave to File Amended Complaint [ECF No. 16] is **GRANTED**; and it is further

ORDERED, that Defendant Wells Fargo's Motion to Dismiss Amended Complaint [ECF No. 17] is **GRANTED**; and it is further

0239

**ORDERED**, that Plaintiff's Motion for Leave to File Written Supplement to Oral Argument [ECF No. 19] is **DENIED**; and it is further

**ORDERED**, that the Complaint is **DISMISSED with prejudice** as to Defendant Wells Fargo; and it is further

**ORDERED**, that the Complaint is **DISMISSED without prejudice** as to Defendant QBE Specialty Insurance, Co.; and it is further

**ORDERED**, that judgment for costs be entered in favor of the Defendant Wells Fargo; and it is further

**ORDERED**, that that the Clerk is directed to close the case.

                              /s/
                        ROGER W. TITUS
                UNITED STATES DISTRICT JUDGE

0240



2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

ANDREA JACKSON CANNON          *
                               *
     Plaintiff,                *
                               *
          v.                   *          Case No.: RWT 12cv377
                               *
WELLS FARGO BANK NA., et al.   *
                               *
     Defendants                *          Notice of Appeal
                               *
_____*

Notice is hereby given that Andrea Jackson Cannon, Plaintiff in the above

named case, hereby appeal to the United States Court of Appeal for the

Fourth Circuit from the final order, Document number 22, of the United

States District Court, entered in this action on the 12th day of June 2012 and

docketed on June 13, 2012.


                    Signature of:      *Harry T. Spikes*
                                       Harry T. Spikes
                                       Federal Bar#02493
                                       Attorney for Plaintiff
                                       Andrea Jackson Cannon
                                       P.O. Box 23828
                                       L'Enfant Plaza S.W.
                                       Washington, DC 20026
                                       (202) 288-4175

0241

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the Joint Appendix was served upon Counsel for Appellee, Wells Fargo on this 1st day of October 2012 by regular mail to Mr. Russell J. Pope, 29 W. Susquehanna Avenue, Suite 110, Towson, Maryland 21204; and to non-Party, QBE First, 210 Interstate North Parkway, Atlanta, Georgia 30339.

Signature of Harry T. Spikes

Harry T. Spikes, #02493

0242